## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CLOVIS ONCOLOGY, INC., *et al.*[1] | Case No. 22-11292 (JKS) |
| Debtors. | (Jointly Administered) |
|  | **Re: D.I. 28, 29, 36, 93, 107, 108** |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors-in-possession

(the "<u>Debtors</u>"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1),

364(c)(2), 364(c)(3), 364(e), 503, 506(c), 507, and 552 of title 11 of the United States Code, 11

U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6003, 6004, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and the Local Rules of

Bankruptcy Procedure for the District of Delaware (the "<u>Local Bankruptcy Rules</u>"), seeking entry

of an interim order (together with all annexes and exhibits hereto, this "<u>Interim Order</u>") and a final

order (the "<u>Final Order</u>," and together with the Interim Order, the "<u>DIP Orders</u>"):

    (a)    authorizing the Debtors to obtain postpetition financing pursuant to a secured super-priority debtor-in-possession credit facility (the "<u>DIP Facility</u>") in an aggregate principal amount not to exceed $75 million, including an initial draw of up to $50

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their U.S. federal tax identification number, to the extent applicable, are Clovis Oncology, Inc. (5355), Clovis Oncology UK Limited, and Clovis Oncology Ireland Limited. The Debtors' headquarters is located at 5500 Flatiron Parkway, Suite 100, Boulder, CO 80301.

[2] Capitalized terms used but not defined herein are given the meanings ascribed to such terms in the Motion and the DIP Term Sheet (as defined below), as applicable.

million to be funded upon entry of this Interim Order (the "Initial Draw"), on the terms and conditions set forth in the term sheet attached hereto as **Exhibit A** (as amended, restated, supplemented, or otherwise modified from time to time, the "DIP Term Sheet"), together with the other DIP Documents (as defined below), including a secured super-priority loan agreement (as amended and in effect from time to time, the "DIP Credit Agreement") to be executed following the Initial Draw by and among Clovis Oncology, Inc. as borrower (the "Borrower"), the obligors party thereto (together with the Borrower, the "Loan Parties"), TOP IV TALENTS, LLC as the administrative and collateral agent (the "DIP Agent"), and the lenders from time to time party thereto (the "DIP Lenders");

(b) authorizing the Debtors to execute, deliver, and perform under, as applicable, the DIP Term Sheet, the DIP Credit Agreement, and all other loan documentation related thereto, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively with the applicable DIP Order, the DIP Credit Agreement, the DIP Term Sheet, the "DIP Documents"),[3] and to perform such other acts as may be necessary or desirable in connection with the DIP Documents; provided, that once the form of DIP Credit Agreement is finalized, the Debtors shall file the DIP Credit Agreement with the Court and serve on all parties requesting notice under Bankruptcy 2002, if no party objects, to the form of such agreement within 7 business days of service thereof, the DIP Credit Agreement shall be included as a DIP Document pursuant to this Interim Order;

(c) authorizing the Debtors to incur obligations under the DIP Documents, including to borrow loans under, and pay fees in respect of, the DIP Facility (collectively, the "DIP Obligations"), and to use the proceeds thereof as provided in the DIP Documents, the applicable DIP Orders, the DIP Budget (as defined below), and the DIP Cash Flow Forecast (as defined below);

(d) granting to the DIP Lenders allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations and authorizing and approving the Carve-Out (as defined below);

(e) subject to Permitted Prior Liens and the Carve-Out (each as defined below), granting to the DIP Lenders valid, enforceable, non-avoidable, and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3), as applicable, of the Bankruptcy Code on the DIP Collateral (as defined below) in accordance with the priorities set forth herein;

---

[3] It is understood and agreed by the parties that the DIP Documents shall include (i) an New York law governed intercreditor agreement further effectuating the Lien priorities (including under New York, English and Irish law) set forth herein on the Prepetition Collateral as between the DIP Obligations and the Prepetition Financing Obligations and (ii) Irish and English law governed security documents (and related filings) in respect of the relevant Guarantors and DIP Collateral to be completed within a reasonable period of time to be agreed following the Closing Date.

(f)     authorizing the Debtors to pay principal, interest, fees, expenses, and other DIP Obligations payable under the DIP Documents as they become due, including DIP Consideration and DIP Expenses (each as defined below);

(g)     vacating and modifying the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay") on the terms set forth herein, including to the extent necessary to permit the Debtors to implement and effectuate the terms and provisions of the applicable DIP Order and the other DIP Documents, and for the DIP Lenders and DIP Agent to deliver any notices of termination described below and as further set forth herein;

(h)     authorizing the Debtors, the DIP Agent, and the DIP Lenders to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order;

(i)     authorizing the Debtors to use Cash Collateral (as defined below) pursuant to section 363 of the Bankruptcy Code, subject to the terms of this Interim Order, and provide adequate protection to the Prepetition Secured Parties (as defined below);

(j)     authorizing the waiver by the Debtors, subject to entry of the Final Order granting such relief, of (a) any right to seek to surcharge against the DIP Collateral (as defined below) and the Prepetition Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code and (b) the equities of the case exception of section 552(b) of the Bankruptcy Code with respect to the Prepetition Collateral (as defined below);

(k)     waiving any applicable stay and providing for immediate effectiveness of this Interim Order; and

(l)     scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order authorizing and approving, on a final basis, among other things, Borrower's borrowing from the DIP Lenders under the DIP Documents up to an aggregate principal amount of $75 million as described in the Motion and set forth in the DIP Documents.

The hearing to approve the Motion on an interim basis (the "Interim Hearing") having been held by this Court on December 16, 2022, and this Court having considered the relief requested in the Motion on an interim basis, the exhibits attached hereto and thereto, the declarations of John Cesarz and Randall S. Eisenberg in support of the Motion (the "DIP and Cash Collateral Declarations"), the DIP Documents, and the evidence submitted and arguments made at the Interim Hearing; and the Interim Hearing having been held and concluded; and all objections, if

any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the administration of these Chapter 11 Cases, the continued operation of the Debtors in the ordinary course, and the preservation of the value of the Debtors' assets; and it appearing, based on the record before the Court, that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

A.   *Petition Date*.   On December 11, 2022 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court.

B.   *Debtors in Possession*.   The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.   No trustee or examiner has been appointed in the Chapter 11 Cases.

C.   *Jurisdiction and Venue*.   This Court has core jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334 and the *Amended Standing Order of Reference*, dated February 29, 2012, from the

---

[4]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

United States District Court for the District of Delaware.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 362, 363(c), 363(e), 363(m), 364(c), 364(e), and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014.

D.    *Creditors' Committee*.  As of the date of the Interim Hearing, the United States Trustee for Region 3 (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors (a "Committee") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

E.    *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(c)(2). Under the exigent circumstances described in the Declarations (as defined below), proper, timely, adequate, and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and no other or further notice of the Motion or the entry of this Interim Order shall be required.

F.    *Findings Regarding the DIP Facility*.

(i)    Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing contemplated by the Initial Draw pursuant to and on the terms set forth in the DIP Documents.

(ii)    The Debtors have a critical need to obtain the DIP Facility and to use the proceeds of the Initial Draw to maintain the orderly operation of their businesses, to meet payroll obligations, to make capital expenditures, to satisfy other working capital and operational needs, and to fund expenses of these Chapter 11 Cases.  Access to sufficient working capital and liquidity

through the incurrence of new indebtedness under the DIP Documents is necessary and vital to, among other things, the preservation and maintenance of the Debtors' operations and to enable the Debtors to implement a sale process and to formulate and implement a chapter 11 plan.

(iii)    The Debtors are unable to obtain financing on terms more favorable than those offered by the DIP Lenders under the DIP Documents, including on a timetable sufficient to meet the Debtors' liquidity needs, and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code solely as an administrative expense.  The Debtors are also unable to obtain credit without granting the DIP Liens and the DIP Superpriority Claims (each as defined herein) under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code, as applicable, in each case, subject to the Permitted Prior Liens and the Carve-Out (each as defined below), and otherwise on the terms and conditions set forth in this Interim Order and in the other DIP Documents.

(iv)    Based on the Motion, the First Day Declaration, the DIP and Cash Collateral Declarations, the DIP Documents, and the record presented to the Court at the Interim Hearing, the terms of the DIP Facility and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

(v)    The DIP Facility has been negotiated in good faith and at arm's length among the Debtors, the DIP Agent, and the DIP Lenders, and the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Documents shall be deemed to have been for credit extended by the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and

DIP Lenders (and any successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

       (vi)     The Debtors have prepared and delivered to the DIP Agent and DIP Lenders (i) an initial monthly line item budget covering the period from the Petition Date through the anticipated Maturity Date (as defined in the DIP Documents) of the DIP Facility (the "Initial DIP Budget" and each subsequently approved budget for the then applicable period, the "DIP Budget") and (ii) a 13-week cash flow forecast (the "Initial DIP Cash Flow Forecast" and each subsequently approved 13-week cash flow forecast for the then applicable period, the "DIP Cash Flow Forecast").  The Initial DIP Cash Flow Forecast reflects, among other things, the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week covered thereby, including the funding of the Professional Fees Account (as defined below).  In addition, the Debtors shall establish a segregated account, opened pursuant to and in accordance with this Court's cash management order [Docket No. 83] under the control of the DIP Agent (the "Lockbox Account") and shall deposit into such account all net cash proceeds (net of certain cure costs[5] and investment banking fees in an amount acceptable to the Debtors and the Required DIP Lenders) realized by the Debtors in connection with the Sale Transaction[6] and on further terms and conditions as provided in the DIP Documents.  The DIP Budget and the DIP Cash Flow Forecast may each be modified, extended, amended, and updated from time to time in accordance with the

---

[5]    Notwithstanding anything herein to the contrary, without the prior written consent of the Required DIP Lenders, the Debtors shall not be permitted to, directly or indirectly, use or otherwise expend more than $6 million to pay or otherwise satisfy cure costs in connection with the assumption and/or assignment of executory contracts or unexpired leases in connection with the Sale Transaction.

[6]    As used herein, "Sale Transaction" means the sale of the FAP Assets pursuant to (i) that certain *Purchase and Assignment Agreement*, by and among Clovis and Novartis Innovative Therapies AG, with respect to the sale of the FAP Assets or (ii) another purchase agreement with respect to the FAP Assets that is in form and substance acceptable to the Debtors, DIP Agent and the Required DIP Lenders.

DIP Documents and this Interim Order. The Debtors believe that the Initial DIP Budget and Initial DIP Cash Flow Forecast are reasonable under the facts and circumstances of the Debtors and these Chapter 11 Cases.

G.    *Stipulations Regarding Certain Prepetition Agreements.* Subject to the Challenge (as defined below) provisions in paragraph 19 of this Interim Order, each Debtor (on its own behalf and on behalf of its estate) admits, stipulates, acknowledges, and agrees as follows:

(i)    The Debtors are party to that certain *Financing Agreement*, dated as of May 1, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Financing Agreement" and, together with all security, pledge, and guaranty agreements, intercreditors, and all other documentation executed in connection with any of the foregoing, each as amended, supplemented or otherwise modified prior to the Petition Date, the "Prepetition Financing Documents"), by and among Clovis Oncology, Inc. ("Clovis"), certain subsidiaries of Clovis, as guarantors, the lenders from time-to-time party thereto (the "Prepetition Lenders"), and Top IV SPV GP, LLC, as administrative agent for the Prepetition Lenders and collateral agent for the Prepetition Secured Parties (as defined below) (in such capacities, the "Prepetition Agent" and, together with the Prepetition Lenders and such other Secured Parties (as defined in the Prepetition Financing Agreement), the "Prepetition Secured Parties"). Under the Prepetition Financing Agreement, the Prepetition Lenders provided to Clovis a secured debt financing facility for clinical trial debt funding in an initial aggregate principal amount of $175 million. As of the Petition Date, the Debtors were indebted and jointly and severally liable to the Prepetition Secured Parties under the Prepetition Financing Agreement in the aggregate principal amount of $347,000,000 (representing the "Discharge Amount" as defined in the Prepetition Financing Agreement) (together with accrued and unpaid fees, expenses

and disbursements (including any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations and other Obligations (as defined in the Prepetition Financing Agreement) and other Secured Obligations (as defined in the Prepetition Financing Agreement), and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of the Debtors' obligations pursuant to the Prepetition Financing Documents (the "Prepetition Financing Obligations").  The Prepetition Financing Agreement is secured by a perfected security interest and continuing perfected liens (the "Prepetition Financing Liens") in all of the Debtors' assets related to Rubraca[7] and other Collateral (as defined in the Prepetition Financing Agreement) to the extent set forth therein (the "Prepetition Collateral").[8]

(ii)    All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties, including the approximately $31,738,039 set forth in the DIP Budget as the Debtors' Beginning Book Cash Balance as of the Petition Date.

(iii)    The Debtors are also party to: (A) that certain Indenture, dated as of August 13, 2019, between Clovis, as issuer, and The Bank of New York Mellon Trust Company, N.A., as trustee, for the issuance of 4.50% Convertible Senior Notes due 2024; (B) that certain Indenture, dated as of November 17, 2020, between Clovis, as issuer, and The Bank of New York Mellon Trust Company, N.A., as trustee, for the issuance of 4.50% Convertible Senior Notes due 2024;

---

[7]    As used herein, "Rubraca" shall have the meaning assigned to the term "Product" in the Prepetition Financing Agreement.

[8]    For the avoidance of doubt, as used in this Interim Order, the term "Prepetition Collateral" shall include the "Collateral" as defined in the Prepetition Financing Agreement.

and (C) that certain First Supplemental Indenture, dated as of April 19, 2018, between Clovis, as issuer, and The Bank of New York Mellon Trust Company, N.A., as trustee, for the issuance of 1.25% Convertible Senior Notes due 2025.

H.    *Validity, Perfection, and Priority of Prepetition Financing Liens and Prepetition Financing Obligations.*  Subject to the Challenge (as defined below) provisions in paragraph 19 of this Interim Order, the Debtors acknowledge and agree that, as of the Petition Date, (a) the Prepetition Financing Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value, (b) the Prepetition Financing Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to liens senior by operation of law (solely to the extent any such liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Financing Liens as of the Petition Date), (c) the Prepetition Financing Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Financing Documents, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition Financing Liens or Prepetition Financing Obligations exist, and no portion of the Prepetition Financing Liens or Prepetition Financing Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (e) the Debtors and their estates have no claims, objections, challenges, or causes of action against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees arising out of, based upon or related to the

Prepetition Financing Obligations, (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Financing Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Financing Obligations, and (g) the Prepetition Financing Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

I.      *Relief Essential; Best Interest.*   The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (d). Absent granting the relief sought by this Interim Order, the Debtors' estates and their ability to successfully reorganize or otherwise preserve the enterprise value of the Debtors' estates could be immediately and irreparably harmed. Consummation of the DIP Facility in accordance with this Interim Order and the other DIP Documents is therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.  Further, the Debtors have an immediate need to use Cash Collateral to, among other things, fund the clinical trials and expenditures related to Rubraca, facilitate patient access to and, if necessary, an orderly transition from, Rubraca, and pay obligations that are necessary to preserve and enhance the value of the Debtors' Rubraca-related business and the Prepetition Collateral, in each case consistent with paragraph 20 of this Interim Order, the DIP Budget, and the DIP Term Sheet. In the absence of the availability of such liquidity in accordance with the terms hereof, all aspects of Debtors' Rubraca related businesses will need to be wound down in an abrupt fashion, and serious and irreparable harm to the Debtors, their estates and their creditors would occur. The terms for the Debtors' use of Cash Collateral pursuant to this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

J.      *Use of Cash Collateral.* All Cash Collateral shall only be used and/or applied in accordance with the terms and conditions of this Interim Order, including the DIP Budget.

K.      *Lender Consent to Use Of Cash Collateral.* Notwithstanding anything herein to the contrary, to the extent the Debtors require funds (in excess of what was authorized by the Bankruptcy Court on December 15, 2022) after the Interim Order is entered but before the Initial Draw can be made, the DIP Lenders hereby consent to the use of Cash Collateral in accordance with the DIP Budget for such period beginning on the date the Interim Order is entered and ending on the earlier of the Initial Draw and the termination of the Commitment Letter in accordance with its terms.

L.      *Adequate Protection for Prepetition Secured Parties.* The Prepetition Secured Parties are entitled to adequate protection as and to the extent set forth herein pursuant to sections 361, 362 and 363 of the Bankruptcy Code. Based on the Motion, the First Day Declaration, DIP and Cash Collateral Declarations, and the *Supplemental Declaration of John Cesarz in Support of the Entry of an Interim Order (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to Prepetition Lenders, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief;* (the "Supplemental DIP Declaration" and, together with the First Day Declaration, DIP and Cash Collateral Declarations, the "Declarations") and the evidence presented at the Interim Hearing, the proposed adequate protection and the use of the Cash Collateral are fair and reasonable and reflect a prudent exercise of the Debtors' business judgment.

M.      *Permitted Prior Liens*.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien (as defined below) is valid, senior, enforceable, prior,

perfected, or non-avoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest, including the Debtors, the DIP Agent, the Prepetition Secured Parties, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien or security interest.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly subject and subordinate to the Permitted Prior Liens and DIP Liens.

N.     *Sections 506(c) and 552(b).*  In light of (i) the DIP Lenders' agreement that their liens on the DIP Collateral owned by the Debtors and superpriority claims shall be subject to the Carve-Out and (ii) the Prepetition Secured Parties' agreement that their liens on the Prepetition Collateral owned by the Debtors shall be subject to the Carve-Out, (a) subject to entry of a Final Order granting such relief, the DIP Lenders are entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code and (b) subject to entry of a Final Order granting such relief, the DIP Lenders and Prepetition Secured Parties are entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

Based upon the foregoing findings and conclusions, the Motion, the DIP and Cash Collateral Declarations, the First Day Declaration, and the Supplemental DIP Declaration, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.     *Motion Granted.*  The relief sought in the Motion is granted on an interim basis and the DIP Facility and the Debtors' entry into the DIP Documents is authorized and approved, subject to the terms and conditions set forth in this Interim Order and the other DIP Documents.  All

objections to this Interim Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled on the merits.

2.     *Authorization to Use Cash Collateral.* The Debtors are authorized to use Cash Collateral as set forth in this Interim Order commencing from the Petition Date through and including (but not beyond) any termination of the DIP Lenders' obligations to extend credit under the DIP Facility, subject to the terms and conditions of this Interim Order and in accordance with the DIP Budget and DIP Term Sheet.

3.     *Authorization of the DIP Facility and the DIP Documents.*

(a)     The Debtors are hereby authorized to execute, deliver, enter into, and, as applicable, perform all of their obligations under the DIP Documents and such other and further acts as may be necessary, appropriate, or desirable in connection therewith.  The Debtors are hereby authorized to borrow the Initial Draw in an amount not to exceed $50 million pursuant to the DIP Documents and used for the purposes and in the amounts set forth in the DIP Cash Flow Forecast (subject to permitted variances) and otherwise in accordance with the terms hereof or permitted under the DIP Documents, which Initial Draw shall consist of (1) $30 million of new money debtor-in-possession term loans (the "Initial Tranche A DIP Term Loans"), which shall be available to be borrowed (in a single draw) on the Closing Date (as defined in the DIP Credit Agreement, the "Closing Date"), and (ii) $20 million of Prepetition Financing Obligations outstanding under the Prepetition Financing Documents to be rolled into borrowings under the DIP Credit Agreement (the "Initial Tranche B Term Loans" and, together with the Initial Tranche A DIP Term Loans, the "Initial DIP Loans"), which Initial Tranche B DIP Term Loans shall automatically be deemed funded on the Closing Date to permanently convert such Prepetition Financing Obligations, on a dollar for dollar basis, into DIP Obligations.

(b)     Upon the entry of the Final Order granting such relief and, solely in the case of the second borrowing of Tranche A DIP Term Loans (as defined below), satisfaction of all applicable conditions precedent under the DIP Credit Agreement in accordance therewith to borrow up to $25 million of original principal amount of Additional DIP Loans (as defined below) on a final basis consisting of (x) $15 million of new money debtor-in-possession term loans (the "Additional Tranche A DIP Term Loans" and, together with the Initial Tranche A DIP Term Loans, the "Tranche A DIP Term Loans") available to be borrowed (in a single draw) as set forth in the DIP Documents and (y) an additional $10 million of Prepetition Financing Obligations outstanding under the Prepetition Financing Documents to be rolled into borrowings under the DIP Credit Agreement (the "Additional Tranche B DIP Term Loans" and, together with the Initial Tranche B Term Loans, the "Tranche B DIP Term Loans"; the Additional Tranche B DIP Term Loans together with the Additional Tranche A DIP Term Loans, the "Additional DIP Loans"; and the Initial DIP Loans together with the Additional DIP Loans, the "DIP Loans"), which Additional Tranche B DIP Term Loans shall automatically be deemed funded on the date the Final Order is entered to permanently convert such Prepetition Financing Obligations, on a dollar for dollar basis, into DIP Obligations;

(c)     In furtherance of the foregoing and without further approval of this Court, the Debtors hereby are authorized to perform all acts, to make, execute, and deliver all related instruments, certificates, agreements, charges, deeds, intellectual property filings, and other documents (including, without limitation, the execution or recordation financing statements and other similar documents in each relevant jurisdiction) as contemplated by the DIP Documents or otherwise with respect to the DIP Collateral, and to pay all fees, premiums, and expenses and distribute all rights in connection with, or that may be reasonably required, necessary, or desirable

for the Debtors' performance of their obligations under or related to the DIP Facility, including, without limitation:

(i)    the execution and delivery of, and performance under, each of the DIP Documents, including to the extent that recordation is necessary or advisable to effectuate the lien priorities set forth herein;

(ii)   the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, including any extensions of the maturity thereof, in each case, in such form as the Debtors, the DIP Agent, and the DIP Lenders may agree, it being understood that no further approval of this Court shall be required for (A) any authorizations, amendments, waivers, consents, or other modifications to and under the DIP Documents that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest or fees payable thereunder or (B) any updates, modifications, extensions, and supplements to the DIP Budget or DIP Cash Flow Forecast; provided, that, any change under (A) or (B) requires 5 days' advance written notice to any statutory committee appointed in these cases and the U.S. Trustee;

(iii)  the payment or distribution to the DIP Agent and DIP Lenders, as the case may be, of (A) all fees payable under the DIP Documents (which when paid shall be fully earned, nonrefundable, and nonavoidable), including, to the extent applicable: (i) the Commitment Fee; and (ii) the Upfront Fee; (B) all premiums (which when paid shall be fully earned, nonrefundable, and nonavoidable), including, to the extent applicable: the Sale Proceeds Prepayment Premium and the Non-Sale Proceeds Prepayment Premium; (C) the Contingent Value Rights (which when distributed shall be fully earned, nonrefundable, and nonavoidable); (D) any amounts due (or that may become due) in respect of the indemnification and other reimbursement obligations, in each case referred to in the DIP Credit Agreement or the other DIP Documents (the foregoing (A), (B), (C), and (D), the "DIP Consideration"); and (E) reimbursement of all reasonable and documented out-of-pocket expenses of the DIP Agent (including the fees, costs, disbursements, and expenses of (a) Weil, Gotshal, & Manges LLP, (b) Richards, Layton & Finger, PA, (c) Arthur Cox, LLP, and (d) Ducera Partners, LLC, as provided for in the DIP Documents (this subsection (E), the "DIP Expense Reimbursement" and, together with the DIP Consideration,

the "DIP Fees and Expenses"); provided, that, the DIP Fees and Expenses shall be subject to the review procedures set forth herein; and

(iv)     the performance of all other acts required under or in connection with the DIP Documents, or reasonably requested by the DIP Agent and DIP Lenders and the granting of the DIP Liens and the DIP Superpriority Claims and perfection of the DIP Liens as provided herein and therein.

4.     *DIP Budget and DIP Cash Flow Forecast.*

(a)     Except as otherwise provided herein or in the DIP Documents, the Debtors may only use cash collateral and the proceeds of the DIP Facility in accordance with the DIP Budget, Initial DIP Cash Flow Forecast, and any subsequent DIP Cash Flow Forecast, all on a consolidated basis, including without limitation, for: (i) working capital requirements; (ii) general corporate purposes; and (iii) the costs and expenses of administering the Chapter 11 Cases (including, but not limited to, the payment of the allowed fees, costs, and expenses of Professional Persons (as defined below), the DIP Agent, and the DIP Lenders).

(b)     Following the Petition Date, the Debtors shall deliver to the DIP Agent and DIP Lenders an updated DIP Budget in accordance with the DIP Documents, which is to be delivered on a monthly basis subject to the Debtors' month-end closing process, but no later than thirty (30) calendar days after month-end.  On the first Thursday of the second full calendar week following the Petition Date, and every other Thursday thereafter, the Debtors shall deliver to the DIP Agent and the DIP Lenders an updated DIP Cash Flow Forecast in accordance with the DIP Documents, which shall reflect the most recently updated and approved DIP Budget.  Each of the DIP Budget and the DIP Cash Flow Forecast shall be deemed accepted unless the Required DIP Lenders object via email to the Debtors and their advisors within five (5) business days of receipt; provided that if the Required DIP Lenders object to any future DIP Budget or DIP Cash Flow Forecast, the prior approved DIP Budget or DIP Cash Flow Forecast, as applicable, shall remain

in place and in full effect until a new DIP Budget or DIP Cash Flow Forecast, as applicable, is not objected to by the Required DIP Lenders.

(c)     On each Thursday that the Debtors are required to deliver a DIP Cash Flow Forecast (each such two-week period, a "Reporting Period"), the Debtors shall also deliver to the DIP Agent and DIP Lenders a variance report (each, a "Variance Report"), which shall have been certified by an authorized officer of the Borrower, in accordance with the DIP Documents.  Each Variance Report shall set forth:

(i)     the variance (as compared to the applicable DIP Cash Flow Forecast) of the total operating expense disbursements (on a line item by line item basis and an aggregate basis for all line items), excluding capital expenditures set forth in clause (ii) below and restructuring costs set forth in clause (iii) below, for the applicable Reporting Period;

(ii)     the variance (as compared to the applicable DIP Cash Flow Forecast) of the total capital expenditures (on a line item by line item basis and an aggregate basis for all line items) for the applicable Reporting Period;

(iii)     the variance (as compared to the applicable DIP Cash Flow Forecast) of total restructuring costs (on a line item by line item basis and an aggregate basis for all line items) for the applicable Reporting Period; and

(iv)     an explanation, in reasonable detail, for any material variances.

(d)     In no event shall there be, over each rolling Reporting Period:

(i)     a positive variance (as compared to the applicable DIP Cash Flow Forecast) of the aggregate operating expense disbursements (excluding capital expenditures in clause (ii) below and restructuring costs set forth in clause (iii) below) incurred that exceeds fifteen percent (15%); and

(ii)     a positive variance (as compared to the applicable DIP Cash Flow Forecast) of the aggregate capital expenditures incurred that exceeds the greater of ten percent (10%) and $500,000.00.

(e)     Additionally, in no event over each four-week period shall the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate restructuring costs exceed twenty-five percent (25%).

(f)     Except as expressly set forth herein, the consent of the DIP Lenders to the DIP Budget or DIP Cash Flow Forecast shall not be construed as consent to the use of any DIP Loans after the occurrence of an Event of Default (as defined below), regardless of whether the aggregate funds shown on the DIP Budget or DIP Cash Flow Forecast have been expended.

5.     *DIP Obligations*. Upon execution and delivery of the DIP Documents, and subject the opportunity of any party to object to the form of the DIP Credit Agreement within 7 business days of service thereof, the DIP Documents shall constitute (and shall continue to constitute) legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable against the Debtors and their estates, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing ("Successor Cases"), in accordance with the terms of this Interim Order and the other DIP Documents.  Upon execution and delivery of the DIP Documents, the DIP Obligations shall include (and shall continue to include) all loans and any other indebtedness which may now or from time to time be owing by the Debtors to the DIP Agent and DIP Lenders under the DIP Documents, including all principal, interest, costs, fees, expenses, indemnities, and other amounts payable to the DIP Agent and DIP Lenders under the DIP Documents, including the DIP Fees and Expenses.  No obligation incurred or transfer or grant of security hereunder or under the other DIP Documents to the DIP Agent and DIP Lenders shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under chapter 5 of

the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

6.      *Adequate Protection for Prepetition Secured Parties.* The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2) and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, solely to the extent of the aggregate postpetition diminution in value, if any, of such interests resulting from, as provided in the Bankruptcy Code, the use, sale or lease by the Debtors of the Prepetition Collateral, including the Cash Collateral, or the imposition or enforcement of the automatic stay pursuant to section 362(a) of the Bankruptcy Code ("Diminution in Value"), and, accordingly, shall receive the following (collectively, the "Adequate Protection Obligations"):

(a)      *Additional and Replacement Liens.* The Prepetition Secured Parties are hereby granted, pursuant to sections 361 and 363(e) of the Bankruptcy Code, solely to the extent of the aggregate Diminution in Value, if any, (i) a valid, enforceable, unavoidable, and duly perfected replacement lien on all of the Debtors' assets related to Rubraca (as well as all other assets that constitute Prepetition Collateral) that are encumbered by the liens securing the Prepetition Financing Agreement (the "Rubraca Assets") (whether now existing or hereafter acquired or arising), senior to the DIP Liens, and (ii) a valid, enforceable, unavoidable, and duly perfected lien on all other DIP Collateral (other than the Rubraca Assets), subject and subordinate only to (a) the Carve-Out, (b) the DIP Liens (as defined in the Interim DIP Order), and (c) any

valid, binding, enforceable, unavoidable, and duly perfected liens that are senior to the DIP Liens, including the Permitted Prior Liens (as defined in the Interim DIP Order).

(b)     *Adequate Protection Superpriority Claims.*  The Prepetition Secured Parties are hereby granted, to the extent of any insufficiency and, for the avoidance of doubt, in no event greater than the aggregate Diminution in Value, if any, claims with priority in payment to the extent provided by section 507(b) of the Bankruptcy Code (the "Adequate Protection Claims"), subject and subordinate to (x) the Carve-Out and (y) the DIP Superpriority Claims.

(c)     *Adequate Protection Payments and Protections for Prepetition Secured Parties.*  As further adequate protection, the Debtors are authorized and directed to provide the following to the Prepetition Secured Parties: (i) immediately upon entry of this Interim Order, payment of documented fees and expenses incurred by the Prepetition Agent arising prior to the Petition Date and (ii) the documented postpetition fees and expenses incurred by the Prepetition Agent up to an amount not to exceed $20,000.

7.     *Adequate Protection Lien Perfection.* This Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Adequate Protection Liens or to entitle the Adequate Protection Liens to the priority set forth herein. Notwithstanding the foregoing, the Prepetition Secured Parties may, in their sole discretion, file such financing statements, mortgages, security agreements, notices of liens and other similar documents, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents

shall be deemed to have been filed or recorded at the time and on the date of the commencement of these Chapter 11 Cases. The Prepetition Secured Parties may, in their sole discretion, to the extent permitted by applicable non-bankruptcy law, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.   For the avoidance of doubt, the grant of adequate protection under this Interim Order does not in any way impact the Challenge rights of parties, including the quantum of such claims, under paragraph 19 of this Interim Order.

8.    *Carve-Out.*

(a)    *Generally.*  As used in this Interim Order, the term "Carve-Out" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest, if any, pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses, in an aggregate amount not to exceed $50,000, incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) accrued but unpaid fees, costs, and expenses ("Allowed Professional Fees") of the professionals of the Debtors and any Committee (such professional persons of the Debtors and the Committee, the "Professional Persons") incurred at any time prior to the DIP Agent's (acting at the written direction of the Required DIP Lenders) delivery of a Carve-Out Trigger Notice (as defined below), to the extent allowed by the Court (whether allowed before or after delivery of the Carve-Out Trigger Notice); and (iv) Allowed Professional Fees of Professional Persons incurred on or after delivery of a Carve-Out Trigger Notice not to exceed $1,000,000 in the aggregate, to the extent allowed by the Court (whether allowed before or after delivery of the Carve-Out Trigger Notice).  For purposes of the foregoing,

the "Carve-Out Trigger Notice" shall mean a written notice by the DIP Agent (acting at the written direction of the Required DIP Lenders) delivered by email to counsel to the Debtors invoking the Carve-Out, which notice may be delivered at any time after the occurrence, and during the continuation, of an Event of Default (as defined below).

(b)    *Professional Fees Account.* Consistent with the DIP Documents, the Debtors shall, on a weekly basis, transfer cash proceeds of the DIP Facility or cash on hand (other than the Net Cash Proceeds (as defined in the DIP Documents)) into a segregated account not subject to the control of the DIP Agent, the DIP Lenders, the Prepetition Financing Lenders, or the Prepetition Financing Agent (the "Professional Fees Account") in an amount equal to the good faith estimates of Professional Persons for the amount of unpaid fees and expenses incurred during the preceding week by such Professional Person. Upon the delivery of the Carve-Out Trigger Notice, the Debtors shall deposit all available cash on hand (other the Net Cash Proceeds (as defined in the DIP Documents)) into the Professional Fees Account until such amounts therein equal the Carve-Out. The Professional Fees Account, and all funds held therein, shall be held in trust exclusively for the benefit of the Professional Persons, and shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Agent and DIP Lenders (i) shall not sweep or foreclose on any such available cash of the Debtors until the Professional Fees Account is fully funded, and (ii) shall have a security interest on any residual interest in the Professional Fee Account available following satisfaction in cash of all Carve-Out expenses in subparagraph (a) above, and the priority of such lien on the residual shall be consistent with the DIP Liens. The Carve-Out provisions set forth in this paragraph 8 shall be referred to in this Interim Order as the "Carve-Out Provisions."

(c)     *Reservation of Rights*.  The payment of any fees or expenses of Professional Persons pursuant to the Carve-Out shall not, and shall not be deemed to, (i) reduce any of the DIP Obligations or (ii) modify, alter, or otherwise affect any of the liens and security interests of such parties, except as provided herein.

(d)     *No Direct Obligation to Pay Allowed Professional Fees*.  The DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Persons or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     *Payment of Carve-Out on or After the Carve-Out Trigger Date.* Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees incurred thereafter shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

9.     *Limitation on Use of DIP Proceeds and Carve-Out.*  No portion of the Carve-Out or the proceeds of any DIP Obligations may be used to (or support any other party to) litigate, object to, contest or challenge in any manner or raise any defenses to the debt, collateral position, liens or claims of the DIP Agent and DIP Lenders, whether by challenging the validity, extent, amount, perfection, priority or enforceability of the indebtedness under the DIP Facility or the validity, extent, perfection, priority or enforceability of any mortgage, security interest or lien with respect thereto or any other rights or interests or replacement liens with respect thereto or any other rights or interests of the DIP Agent and DIP Lenders, or by seeking to subordinate or recharacterize

the DIP Facility (or amounts outstanding thereunder) or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or by asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the DIP Agent, DIP Lenders, or any of their respective officers, directors, agents, or employees, in each case in their respective capacities as such.  In addition, no proceeds of DIP Obligations shall be used in connection with (a) preventing, hindering or delaying the DIP Agent's or DIP Lenders' enforcement or realization upon the DIP Collateral or the exercise of rights by the DIP Agent or DIP Lenders once an Event of Default has occurred and is continuing or (b) selling or otherwise disposing of the DIP Collateral other than as expressly permitted under the DIP Documents or with the consent of the Required DIP Lenders.  For the avoidance of doubt, nothing herein shall limit, waive, or otherwise affect the right of any party to object to, investigate, or challenge in any manner the legality, validity, priority, perfection, or enforceability of claims, liens, rights, or interests (including the Prepetition Liens) held by or on behalf of the Prepetition Secured Parties related to the Prepetition Secured Obligations, or to assert, commence, or prosecute any claims or causes of action whatsoever (including under chapter 5 of the Bankruptcy Code) related thereto.

10.    *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors (without the need to file any proof of claim), with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under section 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, but only to the extent allowable by the Bankruptcy Code, whether or not

such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable in accordance with the DIP Documents, including this Interim Order; provided that the Carve-Out shall have priority over the DIP Superpriority Claims and the DIP Liens, except the DIP Agent and DIP Lenders shall have recourse against the Professional Fees Account following the repayment in full of all Carve-Out expenses in paragraph 8(a), as set forth in paragraph 8(b). The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision is modified or reversed on appeal.

11.    *DIP Liens.*

(a)    As security for the DIP Obligations, effective and automatically and properly perfected as of the date of this Interim Order without the necessity of the execution, recordation or filing by the Debtors, the DIP Agent, or the DIP Lenders of mortgages, security agreements, control agreements, pledge agreements, financing statements, notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Agent or DIP Lenders of, or over, the DIP Collateral, the DIP Agent and DIP Lenders are granted valid, binding, continuing, enforceable, fully perfected, and non-avoidable security interests and liens in accordance with the following priorities:

(i)    first priority security interests and liens on all of the Debtors' rights in property of the Debtors' estates (whether tangible, intangible, real, personal, or mixed and wherever located) as of the Petition Date that, as of the Petition Date, was unencumbered (including, without limitation, but subject to any Permitted Prior Liens, (A) the proceeds of the Debtors' interests in FAP-2286

26

and in and under that certain *License and Collaboration Agreement* (as may be amended, restated, modified, or otherwise supplemented from time to time, the "3BP License"), dated September 20, 2019, by and between 3B Pharmaceuticals GmbH and Clovis (collectively, but excluding a lien on the 3BP License itself, the "FAP Assets"), inclusive of any proceeds realized by the Debtors in connection with the Sale Transaction and all amounts deposited in the Lockbox Account, (B) the Debtors' interests in all other assets to be sold or otherwise transferred pursuant to the terms of the Sale Transaction, and any proceeds thereof, and (C) the Debtors' interests in the agreements governing the Sale Transaction and any proceeds thereof), and, subject to entry of the Final Order granting such relief (but retroactive to the Petition Date), the proceeds of estate causes of action under chapter 5 of the Bankruptcy Code), whether now existing or hereafter acquired or arising (collectively with the FAP Assets, the "Unencumbered Assets"); and

(ii)     second priority security interests and liens on all of the Debtors' rights in property of the Debtors' estates (whether tangible, intangible, real, personal, or mixed and wherever located) as of the Petition Date that (x) constitutes Prepetition Collateral, or (y) is subject to a Permitted Prior Lien.

The collateral and liens described in clauses (i) and (ii) above are referred to herein as the "DIP Collateral" and the "DIP Liens" respectively.  For the avoidance of doubt, the DIP Liens on FAP Assets shall not extend to the 3BP License itself, but shall extend to all right, title, and interest of the Debtors to receive payments under, in respect of, on account of, or otherwise in relation to the 3BP License or any rights related thereto, with the assignment and sale of the 3BP License pursuant to the Sale Transaction being free and clear of all DIP Liens, claims, and encumbrances (including free and clear of any right, title, and interest of the Debtors to receive payments under, in respect of, on account of, or otherwise in relation to the 3BP License or any rights related thereto), with the DIP Liens, as part of consummation and closing of the Sale Transaction, being released against the FAP Assets pursuant to the terms and conditions set forth in the DIP Documents, and attaching solely to the proceeds of such Sale Transaction or any other transfer or disposition of the 3BP License and other FAP Assets on a first priority basis.

27

(b)    This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens and security interests granted herein, including the DIP Liens.  For the avoidance of doubt, the DIP Liens are not subject to any reversionary rights affecting the DIP Collateral.

12.    To ensure the validity, perfection and enforceability of the DIP Liens granted over the capital stock in, and assets of, the Guarantors in (as well as any other DIP Collateral located in), Ireland and the United Kingdom, such Guarantors (and the holders of their capital stock and/or applicable other DIP Collateral) shall execute and deliver Irish and English law, as applicable, governed security documents (and deliver and record the relevant notices and filings) in form and substance reasonably satisfactory to the Required DIP Lenders by a deadline to be agreed upon by the Debtors and the Required DIP Lenders.

13.    *No Obligation to Extend Credit*.  The DIP Lenders have no obligation to make any loan under the DIP Documents unless (and subject to the occurrence of the Closing Date) all of the conditions precedent to the making of such extension of credit under the DIP Documents have been satisfied in full or waived by the DIP Agent (acting at the written direction of the Required DIP Lenders) in accordance with the terms of the DIP Documents.

14.    *Disposition of DIP Collateral*.  Other than pursuant to the FAP Sale Transaction and the Rubraca Sale Transaction, in each case, consummated in accordance with the Milestones and with the proceeds thereof applied in accordance with the DIP Term Sheet, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as permitted by the DIP Documents (including, for the avoidance of doubt, in connection with the Sale Transaction) or consented to in writing by the DIP Agent (acting at the written direction of the Required DIP Lenders) at least five days (or such shorter period as the DIP Agent, at the written

direction of the Required DIP Lenders, may agree) prior to the date on which the Debtors seek the Court's authority for such use, sale, or lease.  Except as otherwise provided under the DIP Documents (including with respect to Net Cash Proceeds in connection with the Sale Transaction), in the event of any such sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes DIP Collateral, the Debtors are authorized and shall promptly pay, without further notice or order of this Court, the DIP Agent, for the benefit of the DIP Lenders, one-hundred percent (100%) of the net cash proceeds resulting therefrom (less any customary deductions for taxes, brokerage fees, and similar expenses) no later than the second business day following receipt of such proceeds.

15.    *Maintenance of DIP Collateral*.  Until the payment in full of all DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) and the termination of the DIP Lenders' obligations to extend credit under the DIP Facility, the Debtors shall continue to maintain and insure the DIP Collateral as required under the DIP Documents.

16.    *Insurance Proceeds and Policies*.  As of the date of entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent, for the benefit of the DIP Secured Parties (as defined below) shall be deemed to be and shall continue to be, as applicable, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral and in accordance with the priorities set forth herein.

17.    *Perfection of DIP Liens.*

(a)    The DIP Agent is authorized, but not required, at the written direction of the Required DIP Lenders, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law)

financing statements, intellectual property filings, notices of lien, or similar instruments in any jurisdiction, including as may be reasonably required or deemed appropriate in the discretion of the DIP Agent, at the written direction of the Required DIP Lenders, under applicable local laws, to validate the liens and security interests granted to them under this Interim Order and hereunder (the "Perfection Actions"). All such documents will be deemed to have been recorded and filed as of the Petition Date. Whether or not the DIP Agent shall take such Perfection Actions, the liens, mortgages, and security interests granted under this Interim Order and the other DIP Documents shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination.

(b)      A certified copy of this Interim Order may be filed with or recorded in filing or recording offices by the Borrower in addition to or in lieu of such financing statements, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept a certified copy of this Interim Order for filing and/or recording, as applicable, without any requirement to pay transfer or mortgage recording taxes; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)      The Automatic Stay shall be modified to the extent necessary to permit the Debtors and the DIP Agent to take all actions, as applicable, referenced in subparagraphs (a) and (b) above, including to (i) permit the Debtors to grant the DIP Liens and DIP Superpriority Claims; (ii) permit the Debtors to perform such acts as the DIP Agent or DIP Lenders may reasonably request to assure the perfection and priority of the liens and security interests granted herein; (iii) permit the Debtors to incur all liabilities and obligations to the DIP Agent and DIP Lenders under the DIP Documents, the DIP Facility, and this Interim Order, as applicable; and

(iv) authorize the Debtors to pay, and the DIP Agent and DIP Lenders to retain and apply, any payments made to it in accordance with the terms of this Interim Order.

(d)    The DIP Agent shall not have any duties or obligations except those expressly set forth in the DIP Documents that the DIP Agent is required to exercise as directed in writing by the Required DIP Lenders (or such other number or percentage of the DIP Lenders as is expressly provided for in the DIP Documents).

(e)    The Debtors are authorized to perform all acts and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby. The automatic stay of section 362 of the Bankruptcy Code is hereby modified to permit the Debtors, the DIP Lenders, and the Prepetition Secured Parties to accomplish the transactions contemplated by this Interim Order.

18.    *Preservation of Rights Granted under This Interim Order.*

(a)    Subject to the Permitted Prior Liens, as applicable, and the Carve-Out, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agent and DIP Lenders against the DIP Collateral shall be permitted while any of the DIP Obligations remain outstanding, and, except as otherwise expressly provided in this Interim Order, the DIP Liens shall not be: (i) subject or junior to any lien or security interest in the DIP Collateral that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest in the DIP Collateral, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens on the DIP Collateral arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any

federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the Debtors in the DIP Collateral.  As used in this Interim Order, "Permitted Prior Liens" shall mean liens on the DIP Collateral that are valid and non-avoidable senior liens in existence immediately prior to the Petition Date or a valid and non-avoidable lien in existence immediately prior to the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, except that existence of a Permitted Prior Lien may result in an "Event of Default" under the DIP Documents if not otherwise permitted thereunder.

(b)      If any or all of the provisions of this Interim Order are hereafter reversed or modified on appeal, such reversal or modification shall not affect: (i) the validity, priority, or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Lenders of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Carve-Out Provisions.  The DIP Agent and DIP Lenders shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Documents with respect to all DIP Obligations.

(c)      Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, and all other rights and remedies of the DIP Agent and DIP Lenders granted by the provisions of this Interim Order and the DIP Documents and the Carve-Out Provisions shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Cases; (ii) the entry of an order approving the sale of any DIP

Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in the Chapter 11 Cases; provided, that, for the avoidance of doubt, the DIP Lenders have agreed to convert any remaining DIP Obligations into CVRs upon the consummation of the Acceptable Plan, subject to the terms and conditions set forth in the DIP Documents.  The terms and provisions of this Interim Order and the DIP Documents shall continue in the Chapter 11 Cases, in any Successor Cases, and in any superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, and all other rights and remedies of the DIP Agent and DIP Lenders granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full, as set forth herein and in the DIP Documents, and the Carve-Out shall continue in full force and effect; provided, that, for the avoidance of doubt, the DIP Lenders have agreed to convert any remaining DIP Obligations into CVRs upon the consummation of the Acceptable Plan, subject to the terms and conditions set forth in the DIP Documents.

(d)    The Debtors shall not incur, create, assume, suffer to exist, or permit any lien, pledge, charge, security interest, or other encumbrance in, on, or of the 3BP License itself unless the DIP Agent and DIP Lenders are first granted a valid, binding, continuing, enforceable, fully perfected, and non-avoidable first priority security interest and lien on the 3BP License as security for the DIP Obligations.

19.    *Effect of Stipulations on Third Parties.*

(a)    The admissions, stipulations, agreements, releases and waivers set forth in this Interim Order (collectively, the "Prepetition Financing Lien and Claim Matters") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded

powers, any other estate representative and all creditors and parties in interest, and all of their successors in interest and assigns, including a Committee (if appointed), unless, and solely to the extent that, a party in interest (including the Committee, if any) with standing and requisite authority (other than the Debtors, as to which any Challenge is irrevocably waived and relinquished) (i) has timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, challenging the Prepetition Financing Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge"), by seventy-five days following the entry of this Interim Order (the "Challenge Deadline") for a Committee and all other parties in interest (other than the Debtors), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition Agent; provided that if a chapter 11 trustee is appointed or the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Deadline, the chapter 11 or chapter 7 trustee, as applicable, shall have until the later of (1) the Challenge Deadline or (2) the twentieth day after the appointment of the chapter 11 trustee or the conversion of the Chapter 11 Cases to a case under chapter 7, as applicable, to commence a Challenge and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.  Notwithstanding the foregoing, the timely filing of a motion seeking standing to file a Challenge consistent with applicable law and rules of procedure before the expiration of the Challenge Deadline, which attaches a draft complaint setting forth the legal and factual bases of the proposed Challenge, shall toll the Challenge Deadline only as to the party that timely filed such standing motion, and solely with respect to the Challenge(s) asserted in the draft complaint, until entry of an order granting the motion for standing to prosecute such

Challenge(s) described in the draft complaint and permitted by the Court, provided, further that if standing is denied by the Court, the Challenge Deadline shall be deemed to have immediately expired with respect to such Challenge(s).  For the avoidance of doubt, any trustee appointed or elected in these Chapter 11 Cases, or if the cases are converted to Chapter 7, until the expiration of the period provided herein for asserting Challenges, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estate), shall be deemed to be a part other than the debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgements, admissions, confirmations, and stipulations of the Debtors in this Interim Order.  Notwithstanding the foregoing, the timely filing of a motion seeking standing to file a Challenge consistent with applicable law and rules of procedure before the expiration of the Challenge Deadline, which attaches a draft complaint setting forth the legal and factual bases of the proposed Challenge, shall toll the Challenge Deadline only as to the party that timely filed such standing motion, and solely with respect to the Challenge(s) asserted in the draft complaint, until entry of an order granting the motion for standing to prosecute such Challenge(s) described in the draft complaint and permitted by the Court, provided, further that if standing is denied by the Court, the Challenge Deadline shall be deemed to have immediately expired with respect to such Challenge(s).

(b)    To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Financing Lien and Claim Matters, then, without further notice, motion or application to, order of or hearing before this Court, and without the need or requirement to file any proof of claim, the Prepetition Financing Lien and

Claim Matters shall, pursuant to this Interim Order, become binding, conclusive and final on any person, entity or party in interest in these Chapter 11 Cases and their successors and assigns for all purposes, and shall not be subject to challenge or objection by any party in interest. Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Financing Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Financing Lien and Claim Matters is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above, and only as to plaintiffs or movants that have complied with the terms hereof.

20.     *Application of Proceeds of Collateral*.  Subject to entry of the Final Order, as a condition to the entry of the DIP Documents, the extension of credit under the DIP Credit Facility and the authorization to use Cash Collateral, the Debtors, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, and the other Prepetition Secured Parties have agreed that, as of and commencing on the date of the Interim Hearing, net proceeds of:

(a)          DIP Collateral constituting Prepetition Collateral, including whether sold in the ordinary course, liquidated or otherwise, shall be applied as follows:

(i)      *first*, ratably to pay the Prepetition Financing Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Prepetition Agent until paid in full in cash;

(ii)     *second*, ratably to pay the Prepetition Financing Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Prepetition Lenders until paid in full in cash;

(iii)    *third*, ratably to pay Prepetition Financing Obligations constituting the Discharge Amount (as defined in the Prepetition Financing Agreement) until such amount is paid in full in cash;

(iv)    *fourth*, ratably to pay of all other Prepetition Financing Obligations then due and payable until paid in full in cash;

(v)    *fifth*, ratably to pay the DIP Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to DIP Agent until paid in full in cash;

(vi)    *sixth*, ratably to pay the DIP Obligations in respect of any fees and indemnities then due and payable to the DIP Lenders until paid in full in cash;

(vii)    *seventh*, ratably to pay interest then due and payable in respect of the DIP Loans until paid in full in cash;

(viii)    *eighth*, ratably to pay the principal of the DIP Loans until paid in full in cash;

(ix)    *ninth*, ratably to pay all other DIP Obligations until paid in full; and

(x)    *tenth*, as otherwise directed by the Bankruptcy Court; and

(b)    DIP Collateral not constituting Prepetition Collateral, including whether sold in the ordinary course, liquidated or otherwise, shall be applied as follows:

(xi)    *first*, ratably to pay the DIP Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to DIP Agent until paid in full in cash;

(xii)    *second*, ratably to pay the DIP Obligations in respect of any fees

and indemnities then due and payable to the DIP Lenders until paid in full in cash;

(xiii)    *third*, ratably to pay interest then due and payable in respect of the DIP Loans until paid in full in cash;

(xiv)    *fourth*, ratably to pay the principal of the DIP Loans until paid in full in cash;

(xv)    *fifth*, ratably to pay all other DIP Obligations until paid in full; and

(xvi)    *sixth*, as otherwise directed by the Bankruptcy Court;

The reduction of the Prepetition Financing Obligations is subject to the preservation of rights provided in paragraph 18 herein. Notwithstanding anything contained in the foregoing or in this Order, the Debtors shall be permitted to pay Novartis Innovative Therapies AG, including from the proceeds of DIP Collateral, any Court-approved break-up fee and expense reimbursement subject to and in accordance with any order of the Court approving such payments and subject to and in accordance with the Stalking Horse APA.

21.    *Credit Bidding.*  Upon entry of this Interim Order, for purposes of section 363(k), in connection with any sale process authorized by the Court, and whether effectuated through section 363, 725, or 1123 of the Bankruptcy Code, the DIP Lenders may credit bid for any of the DIP Collateral up to the full amount of the outstanding DIP Obligations (other than any contingent obligations for which no claim has been asserted), as applicable, including any accrued and unpaid interest, expenses, fees, and other DIP Obligations (each such bid, a "Credit Bid") pursuant to section 363(k) of the Bankruptcy Code; provided that the DIP Lenders shall not credit bid for any of the FAP Assets for so long as the Stalking Horse APA has not been terminated.

22.    *Proceeds of Subsequent Financing.*  Without limiting the DIP Lenders rights under the DIP Documents, if the Debtors, any trustee, any examiner with expanded powers, or any

responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Documents or this Interim Order at any time prior to the repayment in full of all DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) and the termination of the DIP Lenders' obligations to extend credit under the DIP Facility, then all the cash proceeds derived from such credit or debt shall immediately be applied to repay the DIP Obligations in accordance with this Interim Order and the DIP Documents.

23.     *Section 506(c) Claims*.  Subject to entry of a Final Order granting such relief, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the Prepetition Secured Parties, any of their respective claims, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Prepetition Agent, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

24.     *No Marshaling/Applications of Proceeds*.  Subject to entry of a Final Order granting such releif, the DIP Agent, DIP Lenders, the other persons entitled to indemnification or reimbursement under the DIP Documents (collectively with the DIP Agent and the DIP Lenders, the "DIP Secured Parties"), the Prepetition Agent, the Prepetition Lenders and the other Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order and the DIP Documents notwithstanding any other agreement or provision to the contrary.

25.    *Section 552(b)*.    Subject to entry of a Final Order granting such relief, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral.

26.    *No Superior Rights of Reclamation*.    Based on the findings and rulings herein regarding the integrated nature of the DIP Credit Facility and the Prepetition Financing Documents and the relation back of the DIP Liens, in no event shall any alleged right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) be deemed to have priority over the DIP Liens.

27.    *Payment of Fees and Expenses*.

(a)    The Debtors hereby are authorized and directed to pay, in accordance with this Interim Order, all DIP Consideration as such amounts become due and without need to obtain further Court approval, including without limitation, the Commitment Fee, the Upfront Fee, the Sale Proceeds Premium, the Non-Sale Proceeds Premium, the Contingent Value Rights, and any amounts due (or that may become due) in respect of indemnification and other reimbursement obligations under the DIP Documents.    The DIP Consideration shall be fully earned, non-refundable, and non-avoidable when paid or distributed (or, if earlier, as specified in the DIP Term Sheet), as applicable, and shall be payable in accordance with and at the times specified in the DIP Documents.

(b)    The Debtors hereby are authorized to and shall pay all DIP Expense Reimbursements, in each case as provided for in this Interim Order and the other DIP Documents. Subject to the review and objection procedures set forth in this paragraph 27, payment of any DIP

Expense Reimbursements shall not be subject to allowance or review by the Court.  Professionals

for the DIP Agent and DIP Lenders, as applicable, entitled to payment under this Interim Order

shall not be required to comply with the U.S. Trustee fee guidelines; however, any time that any

such professional hereinafter seeks payment of fees and expenses from the Debtors prior to the

effectiveness of a chapter 11 plan, such professional shall provide copies of its invoices (which

invoices shall not be required to comply with any particular format, may be in summary form only,

and may be in redacted form to protect privileged and confidential information) to the Debtors, the

U.S. Trustee, and any Committee (together, the "Review Parties").  Any objections raised by any

Review Party with respect to such invoices must be in writing, limited to reasonableness, and state

with particularity the grounds therefor and must be submitted to the applicable professional within

ten (10) business days after the receipt by the Review Parties (the "Review Period").  If no written

objection is received by 12:00 p.m., prevailing Eastern Time, on the end date of the Review Period,

the Debtors shall pay such invoices within five (5) business days thereafter.  If an objection to a

professional's invoice is received within the Review Period, the Debtors shall promptly pay the

undisputed amount of the invoice, without the necessity of filing formal fee applications,

regardless of whether such amounts arose or were incurred before or after the Petition Date, and

this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties

are unable to resolve the dispute consensually.  Notwithstanding the foregoing, the Debtors are

authorized and directed to pay, on or about the Closing Date, the Expense Reimbursements

incurred on or prior to the Closing Date, subject to the review and objection procedures set forth

in this paragraph 27.   If the Debtors are invoiced after the Closing Date for Expense

Reimbursements incurred prior to the Closing Date, the Debtors shall pay such Expense

Reimbursements promptly after receipt of such invoice, but subject to the procedures set forth

herein. No attorney or advisor to the DIP Agent and DIP Lenders shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

28. *Released Parties*. Effective as of the date of entry of this Interim Order, the Debtors absolutely and unconditionally release and forever discharge and acquit the DIP Agent, the DIP Lenders, and their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors, and assigns, each solely in such capacity (collectively, the "DIP Released Parties"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and indemnify and hold harmless from and for any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type (in each case, arising on, prior to, or after the date of this Interim Order), whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, in each case, arising in connection with or relating to the DIP Facility, the DIP Liens, and security interests or any of the DIP Documents; provided that nothing herein shall relieve the DIP Released Parties from fulfilling their obligations under the DIP Documents and/or this Interim Order. For the avoidance of doubt, the releases set forth in this paragraph 28 do not include the release of the Prepetition Secured Parties in their capacity as such.

29.     *Events of Default; Exercise of Remedies*. Except as otherwise provided herein, or to the extent the DIP Agent (acting at the written direction of the Required DIP Lenders) may otherwise agree in writing, (a) any violation of any of the terms of this Interim Order or (b) any occurrence of an "Event of Default" under the DIP Documents (including the failure to comply with any of the milestones set forth therein) shall be deemed to be an "Event of Default" under this Interim Order.  Unless this Court orders otherwise, the Automatic Stay shall be modified to the extent necessary to permit the DIP Agent and DIP Lenders to exercise, upon the occurrence and during the continuance of an Event of Default, all rights and remedies provided for under the DIP Documents, including accelerating the DIP Obligations, but subject to the terms of this Interim Order; provided that no less than five (5) business days' prior written notice (which may run concurrently with any notice required to be provided under the DIP Documents following an Event of Default) (the "Remedies Notice Period") shall first be provided via email to the DIP Notice Parties, which notice shall also be filed on the docket of the Court and served on the Committee. During the Remedies Notice Period, the Debtors shall be entitled to seek relief from the Court and all parties-in-interest may be heard, and the Court shall address such matters on an expedited basis, subject to the availability of the Court.  On the first calendar day following the end of the Remedies Notice Period, except as provided herein or unless otherwise ordered by this Court, the automatic stay under section 362 of the Bankruptcy Code shall be deemed immediately modified and terminated so that the DIP Agent and DIP Lenders may exercise all rights and remedies available under the DIP Documents or applicable law, including, without limitation, foreclosing upon and selling all or a portion of the DIP Collateral in order to collect any amounts payable to the DIP Agent and DIP Lenders pursuant to this Interim Order and the other DIP Documents and apply the same to the DIP Obligations.

30.     *Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order and the other DIP Documents, the provisions of this Interim Order shall govern.

31.     *Binding Effect; Successors and Assigns*. The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lenders, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, the Debtors, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estates of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Debtors, and their respective successors and assigns.

32.     *Exculpation; No Liability to Third Parties*. Nothing in this Interim Order, the other DIP Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent or DIP Lenders, solely by virtue of their capacity as such, of any liability for any claims arising from the activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  The DIP Agent and DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.  In their respective capacities as DIP Agent and DIP Lenders, including in connection with exercising any rights or remedies as and when permitted pursuant to this Interim Order, the

DIP Agent and DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute), nor shall the DIP Lenders owe any fiduciary duty to the Debtors, its creditors or estates, or shall constitute or be deemed to constitute a joint venture or partnership with the Debtors.  Notwithstanding anything to the contrary in this Interim Order or any DIP Document, the DIP Agent shall not be liable to the Debtors, DIP Lenders, or any other third party for special, punitive, consequential, or indirect loss or damage of any kind whatsoever (including, but not limited to, loss of profit), arising prior to, on, or after the date of this Interim Order, irrespective of whether the DIP Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  In no event shall the DIP Agent be liable for any act or omission under this Interim Order or DIP Documents except that such act or omission is finally adjudicated by a court of competent jurisdiction to have directly resulted from the DIP Agent's bad faith, gross negligence, or willful misconduct.

33.      *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof, to the extent permitted under applicable law.  Notwithstanding Bankruptcy Rule 4001(a)(3), 6004(h), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

34.     *Modification of DIP Documents*. The Debtors are hereby authorized, without further order of this Court, to enter into agreements with the DIP Agent (acting at the written direction of the Required DIP Lenders) and DIP Lenders providing for any consensual non-material amendments, modifications, waivers, or supplements to the DIP Documents, or of any other amendments, modifications, waivers or supplements to the DIP Documents necessary to conform the terms of the DIP Documents to this Interim Order, in each case consistent with the amendment provisions of the DIP Documents; provided, however, that notice of any material amendment, modification, waivers or supplement to the DIP Documents shall be provided to the DIP Notice Parties, each of whom shall have five (5) business days from the date of such notice within which to object, in writing, to the amendment, modification, waiver or supplement.  If any such party timely objects to any such material amendment, modification, waivers or supplement to the DIP Documents, the material amendment, modification, waiver or supplement shall only be permitted pursuant to an order of the Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material amendment, modification, waiver or supplement on an expedited basis.

35.     *Headings*. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

36.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

37.     *No Third Party Rights*. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

38.     *Discharge.*   The DIP Obligations shall not be discharged by the entry of an order confirming any chapter 11 plan in the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted), on or before the effective date of such chapter11 plan.  No chapter 11 plan shall be confirmed pursuant to section 1129 unless the DIP Obligations are paid in full or the DIP Lenders otherwise consent; provided, that, for the avoidance of doubt, the DIP Lenders have agreed to convert any remaining DIP Obligations into CVRs upon the consummation of the Acceptable Plan, subject to the terms and conditions set forth in the DIP Documents.

39.     *Survival.*   The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any chapter 11 plan in the Chapter 11 Cases; (b) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (c) dismissing the Chapter 11 Cases or any Successor Cases; provided that any order dismissing the Chapter 11 Cases or any Successor Cases or converting the Chapter 11 Cases to cases under chapter 7 shall be entered on appropriate notice but, in all instances, on not less than ten (10) days' prior written notice to the DIP Agent and DIP Lenders.  The terms and provisions of this Interim Order shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases notwithstanding the entry of any orders described in clauses (a)-(c) above, and all claims, liens, security interests, and other protections granted to the DIP Lenders pursuant to this Interim Order and/or the DIP Documents shall maintain their validity and priority as provided by this Interim Order until in respect of the DIP Facility, all the DIP Obligations have been paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted).

40.     *Necessary Action*. The Debtors and the DIP Lenders are authorized to take all actions as are necessary or appropriate to implement the terms of this Interim Order.  In addition, the Automatic Stay is modified to permit affiliates of the Debtors who are not debtors in the Chapter 11 Cases to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

41.     *Final Hearing*.  A Final Hearing shall be held on January 11, 2023 at 11:00 a.m. ET before this Court (or on such other date agreed to by the DIP Lenders and the Debtors).  The Debtors shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file a written objection thereto, which shall be served upon the Notice Parties, and shall also be filed with the Clerk of the United States Bankruptcy Court, District of Delaware, in each case to allow actual receipt by the foregoing no later than January 4, 2023 at 4:00 p.m., prevailing Eastern time.

42.     *Retention of Jurisdiction*. The Court shall retain exclusive jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

Dated: December 16th, 2022
Wilmington, Delaware

J. KATE STICKLES
UNITED STATES BANKRUPTCY JUDGE

48