<pre>
 1                   UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2
                                    .  Chapter 11
 3   IN RE:                         .
                                    .  Case No. 22-11292(JKS)
 4   CLOVIS ONCOLOGY, INC.,         .
     et al,                         .
 5                                  .  824 Market Street
                                    .  Wilmington, Delaware 19801
 6                    Debtors. .
 7   . . . . . . . . . . . . . . .  .  Friday, December 16, 2022

 8         TRANSCRIPT OF CONTINUED HEARING ON FIRST-DAY MOTIONS
          BEFORE THE HONORABLE J. KATE STICKLES UNITED STATES
 9                          BANKRUPTCY JUDGE

10   APPEARANCES VIA ZOOM:

11   For the Debtors:          Robert J. Dehney, Esq.
                               Andrew R. Remming, Esq.
12                             Matthew O. Talmo, Esq.
                               Michael Ingrassia, Esq.
13                             Brian Loughnane, Esq.
                               MORRIS, NICHOLS, ARSHT
14                             & TUNNELL, LLP

15
                               Rachel C. Strickland, Esq.
16                             Andrew S. Mordkoff, Esq.
                               Amanda Fang, Esq.
17                             WILLKIE, FARR & GALLAGHER, LLP

18   For the U.S. Trustee:     Rosa Sierra-Fox, Esq.
                               OFFICE OF THE U.S. TRUSTEE
19

20   Audio Operator:          Electronically Recorded
                               by Sean Moran, ECRO
21

22   Transcription Company:   Reliable
                               1007 N. Orange Street
23                             Wilmington, Delaware 19801
                               (302)654-8080
24                             Email:  gmatthews@reliable-co.com

25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
</pre>

1  APPEARANCES VIA ZOOM:  (Continued)

2  For 3B Pharmaceuticals
   GmbH:                         Paul Moak, Esq.
3                                Mark Eckard, Esq.
                                 REED SMITH, LLP
4
5  For Novartis:                 Ryan Bartley, Esq.
                                 Michael Nestor, Esq.
6                                YOUNG, CONAWAY, STARGATT
                                 & TAYLOR, LLP
7
                                 Benjamin Mintz, Esq.
8                                Rosa Evergreen, Esq.
                                 Ryan Trombley, Esq.
9                                ARNOLD & PORTER KAYE SCHOLER

10 For the Ad Hoc Committee
   of Holders of Convertible
11 Notes:                        Mark Felger, Esq.
                                 Simon Fraser, Esq.
12                               COZEN O'CONNOR

13                               Jacob Adlerstein, Esq.
14                               Brian Hermann, Esq.
                                 Kyle Satterfield, Esq.
15                               Stephanie Lascano, Esq.
                                 Gary Kavarsky, Esq.
16                               PAUL, WEISS, RIFKIND, WHARTON
                                 & GARRISON LLP
17
   For McKesson:                 Jeffrey Garfinkle, Esq.
18                               BUCHALTER

19 For TOP IV PSV GP, LLC:       Daniel DeFranceschi, Esq.
                                 Alexander Steiger, Esq.
20                               J. Zachary Noble, Esq.
                                 Zachary Shapiro, Esq.
21                               RICHARDS, LAYTON & FINGER, PA

22                               Jeffrey Saferstein, Esq.
23                               Garrett Fail, Esq.
                                 Lauren Tauro, Esq.
24                               WEIL, GOTSHAL & MANGES, LLP

25

1   (Appearances Continued)

2   For Alvogen, Inc.:              Gina Young, Esq.
                                    DENTONS BINGHAM GREENEBAUM, LLP
3

4   For the Bank of New York
    Mellon Trust Company, N.A.:     Thomas Pitta, Esq.
                                    EMMET, MARVIN AND MARTIN, LLP
5

6   Also Appearing:                Beth Brownstein, Esq.
                                    ARENTFOX SCHIFF, LLP
7

                                    Ashland Bernard, Esq.
8                                   Rose Bagley, Esq.
                                    KRAMER, LEVIN, NAFTALIS
9                                   & FRANKEL, LLP

10                                  Matthew Silverman, Esq
                                    Seth Lieberman, Esq.
11                                  Patrick Sibley, Esq.
                                    PRYOR CASHMAN
12

13                                  Erez Gilad, Esq.
                                    PAUL HASTINGS, LLP
14

                                    Bradley Giordano, Esq.
15                                  Jonathan Levine, Esq.
                                    Grayson Williams, Esq.
16                                  David Giattino, Esq.
                                    MCDERMOTT, WILL & EMERY, LLP
17

                                    Brya Keilson, Esq.
18                                  Eric Monzo, Esq.
                                    MORRIS JAMES, LLP
19

                                    Rachel Parisi, Esq.
20                                  Robert Schechter, Esq.
                                    PORZIO, BROMBERG & NEWMAN, PC
21

22                                  Dennis O'Donnell, Esq.
                                    Aaron Applebaum, Esq.
23                                  DLA PIPER, LLP (US)

24

25

1    (Appearances Continued)

2                                    Sarah Schultz, Esq.
                                     David Botter, Esq.
3                                    Gary Ritacco, Esq.
                                     AKIN, GUMP, STRAUSS, HAUER
4                                    & FELD, LLP

5                                    Colin Robinson, Esq.
                                     PACHULSKI, STANG, ZIEHL
6                                    & JONES, LLP

7
                                     Kyle Mason, Esq.
8                                    BRACEWELL, LLP

9                                    Gordon Gouveia, Esq.
                                     FOX ROTHSCHILD, LLP
10
                                     August Dinwiddie, Esq.
11                                   HUGHES, HUBBARD & REED, LLP

12                                   Nicholas Isaacson, Esq.
                                     SCHULTE, ROTH & ZABEL
13

14                                   Paul Gross
                                     CLOVIS ONCOLOGY
15
                                     Ulrich Reineke
16                                   Ellen Bergmann
                                     Christine (Christiane) Smerling
17                                   3B PHARMACEUTICALS GMBH

18                                   Zachary Singer, Law Clerk
                                     PAUL, WEISS, RIFKIND, WHARTON
19                                   & GARRISON LLP

20                                   Nova Alindogan, Esq.
                                     ROPES & GRAY, LLP
21

22                                   Michael Panacio, Auditor
                                     OFFICE OF THE U.S. TRUSTEE
23

24                                   Bijal Desai
                                     ALVAREZ & MARSAL

25

```
 1  APPEARANCES VIA ZOOM:   (Continued)

 2                              Benjamin Steele
                                Gabriel Brunswick
 3                              KROLL RESTRUCTURING
                                ADMINISTRATION, LLC
 4
                                Ilan Sender
 5                              Jonah Gorski
                                BRAIDWELL, LP
 6
                                Ryan Kennedy
 7                              WELLS FARGO SECURITIES

 8
                                Avi Lalvani
 9                              Nishant Patel
                                FTI CONSULTING
10
    Also Appearing:            Stephen Lam
11                              CORRE PARTNERS

12                              Jacob Czarnick
                                Richard Klein
13                              Louis Waxman
                                RAYMOND JAMES & ASSOCIATES
14
                                John Cesarz
15                              Sean Eghlimi
                                Sarah Heard
16                              PERELLA WEINBERG PARTNERS

17                              Randall Eisenberg
18                              ALIXPARTNERS

19                              Christopher Schaefer
                                Kristin Stenerson
20                              Richard Gervase
                                SIXTH STREET
21
                                Mitchell Sussman
22                              COWAN AND COMPANY, LLC

23                              Matthew Bolon
24                              TEMPUS LABS, INC.

25
```

1                                INDEX

2                                                              Page

3   STATUS RE:  DIP FINANCING                                    7

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Proceedings commenced at 1:05 p.m.)

2           THE COURT REPORTER:  Counsel, you are now live in

3   the courtroom and the hearing is about to begin.  Please

4   remember to state your name for the record when you speak and

5   every time you speak.  Please stay muted, and leave your

6   video off if you're not speaking to the judge, so the judge

7   can concentrate on the parties that are presenting at the

8   time.  Thank you.

9           THE COURT:  Good afternoon, everyone.  This is

10  Judge Stickles.  We're on the record in the case of Clovis

11  Oncology, Inc., Case Number 2211292.  This is a continued

12  first day hearing to address Debtors' financing.  I'll turn

13  the virtual podium over the Debtors' counsel.  Ms.

14  Strickland?

15          MS. STRICKLAND:  Good morning, Your Honor.  Can

16  you hear me okay?

17          THE COURT:  I can.  Good afternoon.

18          MS. STRICKLAND:  Great.  Good afternoon.  For the

19  record, Rachel Strickland, Willkie, Farr, and Gallagher on

20  behalf of Clovis Oncology.  As is becoming my terrible habit,

21  I'm going to start with the status, and ask Your Honor for a

22  little bit more time this afternoon.

23          We had a very successful day yesterday.  We --

24  after the hearing with Your Honor, we had an almost five hour

25  DIP auction, which resulted in a greatly improved Debtor in

1    possession financing facility that saves the estate and the

2    stakeholders approximately $60 million, and we also obtained

3    consensual use of cash collateral.  That has resulted in an

4    all-night session of new term sheets, new DIP order, and the

5    like.  We are almost done with those documents.

6              We have also been engaging with the Office of the

7    U.S. Trustee, who has been wonderful, I will say, in working

8    through us with all of these last minute changes.  We are not

9    fully resolved with the U.S. Trustee.  I imagine we will have

10   some issues to present to Your Honor, where you can call

11   balls and strikes.

12             But what I would like to do with Your Honor's

13   permission, is at least be able to get Your Honor a set of

14   documents, so I would like to finish the term sheet, which I

15   think we've got two paragraphs left to finish, incorporate

16   everything neatly into a form of order, so that I can give

17   you a -- an organized presentation with black lines, and take

18   you through the limited items that are disputed, resolve

19   those once and for all, and -- and hopefully have an order

20   that reflects your -- your resolutions, as well as whatever

21   issues Your Honor would like to see changed.

22             So I know you have a matter at 1:50 p.m. today.

23   What -- what on this fine Friday afternoon could you

24   accommodate after that?

25             THE COURT:  I can accommodate you this afternoon

1  after my hearing.  Probably at like, 3:30.  But it would

2  obviously be subject to other people's availability.  I see

3  Ms. Sierra-Fox has appeared on screen.

4       MS. SIERRA-FOX:  Good afternoon, Your Honor.  Rosa

5  Sierra-Fox on behalf of the United States Trustee.  Your

6  Honor, I'm absolutely available at any time.  The -- the only

7  concern I'd like to raise is -- and I don't -- I'm not 100

8  percent sure what Your Honor has been able to see in terms of

9  a revised DIP order at this point.

10       THE COURT:  Let me be clear --

11       MS. SIERRA-FOX:  But it's --

12       THE COURT:  -- I read Mr. Cesar, is that his name?

13       MS. STRICKLAND:  Cesarz.  Yes.

14       THE COURT:  Cesarz supplemental declaration.  I

15  have not seen a term sheet.  I have not seen a revised

16  proposed order.

17       MS. SIERRA-FOX:  Understood, Your Honor.  Well, I

18  think that that makes it clear that the Debtors need to get

19  documents to Your Honor.  I have -- I have had the ability to

20  see some of the documents, and in particular, a revised

21  order, and it's clear that there are going to be issues that

22  are not going to be resolved.  I don't imagine they're going

23  to take hours, and hours of hearing and argument, and

24  evidentiary presentation, but I am getting a little bit

25  concerned as -- as we push this back further that we are

1  going to be prejudiced in our ability to fully argue those

2  issue before Your Honor in a -- in a matter that -- in a --

3  in a timeframe that allows Your Honor to evaluate our -- the

4  issues that we have, and -- and rule upon them accordingly.

5          And I understand that this process has been

6  evolving quickly.  But the -- we also, as the U.S. Trustee,

7  have an obligation to -- to raise, and duty to raise our

8  issues, and -- and argue them before Your Honor.

9          THE COURT:  Well, let me ask you --

10         MS. STRICKLAND:  Your Honor, may I be heard?

11         THE COURT:  Certainly.

12         MS. STRICKLAND:  Your Honor, I believe that we are

13  going to be able to resolve these issues this afternoon

14  without any prejudice of -- of any party, including the --

15  the U.S. Trustee.  We've gone through all of the issues and -

16  - and ascertained what we can consensually agree to, and

17  what's still open.  And I think these are all issues that

18  Your Honor will be familiar; U.S. Trustee will be able to

19  argue them; we and the DIP lender will respond.

20         The most important thing I wanted to add, Your

21  Honor, is that we realize that we are creating an emergency

22  of our own making, so the other thing that we discussed with

23  our DIP lender last night was the fact that we are going to

24  be, as a result of our own actions, pushing back against a

25  deadline where we are not going to get funding today because

1  by the time Your Honor enters an order, it's going to be too

2  late for a bank to hit the button.  That's an -- an us

3  problem, not a you problem.

4          And so what we have agreed with our -- our

5  proposed lender is that they are going to allow us to use

6  cash collateral to the extent necessary in the event that we

7  are not allowed -- not able to get our initial draw today.

8  So I -- I -- we will definitely not prejudice any party, and

9  we have taken steps to negotiate for something where the

10 company will be fine from a liquidity standpoint to let this

11 play out.

12         THE COURT:  Well, I'm going to ask the obvious

13 question.  Since you have the ability to use cash collateral,

14 does it make sense to allow parties additional time?  I know

15 from a -- from a case perspective, I'm sure you want

16 financing this afternoon, but does it make sense to give the

17 parties the weekend to try to resolve issues?  Or the issue

18 (inaudible) --

19         MS. STRICKLAND:  Your Honor, we don't believe so.

20         THE COURT:  Okay.

21         MS. STRICKLAND:  The issues are not going to

22 resolve, and the one thing I will say is that the issues that

23 are going to be disputed are -- are -- are known to all, and

24 are -- you know, nothing new is going to be sprung upon the

25 U.S. Trustee, who I believe is the only party that's going to

1  be objecting.

2          The other thing I would note is that while funding

3  is something we have taken care of, we do have a milestone in

4  our Novartis stalking horse agreement that provides we have

5  to have an interim DIP order entered today.

6          So I would love to keep the hearing today.  We

7  will not prejudice anyone's rights, but I didn't want Your

8  Honor to feel under the gun that you had to rule, you know,

9  by 3:00 p.m. or 4:00 p.m. to make some sort of wire deadline.

10 We -- that there is no pressure.  We have alleviated that.

11         So as long as we finish today, and again, we'll

12 live with whatever Your Honor rules on these disputed items,

13 I think we'll be fine.  So if that works for the Court,

14 that's how we prefer to proceed.

15         THE COURT:  Okay.  Let me ask a few questions

16 because I don't have any transparency here at all with

17 respect to new terms; are the milestones going to be the same

18 milestones?

19         MS. STRICKLAND:  Generally speaking, yes, Your

20 Honor.  The -- the -- and -- and I'm also happy to take you

21 through since we are largely in agreement.  I can take you

22 through the big picture right --

23         THE COURT:  That would be --

24         MS. STRICKLAND:  -- now, if you prefer.

25         THE COURT:  -- that would be a huge help.

1    MS. STRICKLAND:  Okay.  Let's do that.

2    THE COURT:  Because even if we start at 3:30, if I

3    don't have time to review the proposed order before the next

4    hearing, or, you know, between the hearings, I'm going to

5    cause more delay.  So I was curious, like, vis-à-vis the

6    existing motion, and the proposed facility -- that's outlined

7    on Page 15.  You know, if you could kind of give me a sense

8    of where we are, are they -- is it even the same amount

9    that's being lent, et cetera.

10    MS. STRICKLAND:  Sure.  Why don't we do this, Your

11   Honor?  Let me give you what would have been my opening

12   remarks, and then we'll skip those get to 3:30, I'll give you

13   the big picture.

14    THE COURT:  That's terrific.

15    MS. STRICKLAND:  And then I can take you through

16   the -- the big things that have changed.  But again,

17   obviously, all of this is going to be subject to final Ts and

18   Is being crossed and dotted on the term sheet, and -- and the

19   order.

20    So let's -- let's start again, Your Honor.

21   Good -- good afternoon, Your Honor, Rachel Strickland of

22   Willkie, Farr, and Gallagher.  Today we're going to appear

23   before you on the DIP, and to seek an order granting the

24   Debtors the right to use cash collateral on a consensual

25   basis.

1          Your Honor will recall from the first day hearing

2    that Clovis Oncology has assets related to two drugs.  One is

3    Rubraca, and the other is called FAP, F-A-P.  FAP is

4    unencumbered.  And we have on file to motion to approve bid

5    procedures in stalking horse as a purchase agreement whereby

6    Novartis has agreed to make payments that could exceed $680

7    million if various milestones were met.  Our DIP lender is

8    going to, if Your Honor approves it, get a lien on those

9    payment streams.

10          The pre-petition Rubraca assets alone secure Sixth

11   Street's pre-petition liens.  The DIP is not changing that

12   priority.  When Rubraca is sold, the proceeds are going to

13   pay down Sixth Street's pre-petition facility.

14          Unfortunately, the value of Rubraca has been

15   materially impacted by regulators' actions to limit the

16   drug's label, which, in turn, greatly limits the patients

17   that will take the drug, and dampens future sales.  So the

18   goal of these cases is to make lemonade out of lemons.  So in

19   order for Sixth Street recovery to be maximized, we have to

20   try and find a buyer for Rubraca.

21          Happily, now on a consensual basis, we're going to

22   be seeking to use Sixth Street's cash collateral to pay for

23   the costs associated with Rubraca pursuant to 363(c)(2)(A).

24   Reinvestment of those proceeds back into the business for

25   payment of actual and necessary expenses necessary to

1  increase the value of Rubraca does adequately protect Sixth

2  Street.

3         We are also offering replacement liens on all

4  Rubraca collateral, junior liens on DIP collateral, and to

5  the extent of diminution in value, the administrative claim,

6  in -- in each instance, obviously limited to diminution of

7  value.

8         On the DIP financing, what we are going to be

9  seeking under 364(c) is a DIP facility that is identical in

10  overall size to the facility we sought originally, $75

11  million.  However, because we have the ability to use cash

12  collateral, we actually need less in terms of new money.  So

13  the way that facility works is we are going to get $45

14  million of new money from Sixth Street.  We have a roll up

15  where $30 million of the pre-petition secured facility is

16  going to be converted into the DIP loan.

17         So the aggregate dollar amount on the DIP loan is

18  $75 million, consisting of 45 of new dollars, and 30 of

19  rolled.  That is not all going to occur when Your Honor -- if

20  Your Honor approves the order.

21         Instead we would be getting $30 million of new

22  money on the interim order, and 20 of the 30 would roll on

23  the interim order.  The rest of the both new money, as well

24  as the roll would only occur after the final order.

25         We are, in exchange for that facility, going to

1  give our lender first lien on all encumbered assets, second

2  lien on Rubraca behind Sixth Street's pre-petition secured

3  loan, and obviously, we will have a requirement that we have

4  to adhere to a budget with customary variances.

5          On a -- the commitment fee was higher.  Now it's a

6  five percent commitment fee which will be paid in kind.  We

7  have, still, an eight percent paid in kind interest on the

8  facility with the same 2 percent interest -- I'm sorry,

9  increase in interest in the event of a default.  We have a

10 1.5 percent upfront fee, which is also paid in kind, and a 3

11 percent exit fee.

12         After Novartis closes, and we pay down the DIP to

13 the extent possible after the effective date, there will be

14 some DIP that is unpaid.  That's what makes this DIP so

15 unusual.  On the effective date, we are not going to have the

16 post-petition facility repaid in full, it's not going to

17 convert into ownership of the company, it's just going to be

18 a residual deficiency claim, if you will, of the DIP that

19 will come first in priority.

20         What is happening on the effective date, after we

21 pay down as much as possible, is that number is going to

22 convert into a contingent value right, which is the same way

23 it was going to work with the -- the prior facility.  That

24 CBR contingent value right will no longer accrue interest.

25 It is what it is as of that date.

1          And then, when the Novartis milestone payments,

2    which could be as much as an additional $630 million, come in

3    on the post-effective date, it pays off the CBR, and account

4    of the residual DIP first, and the remainder would go to

5    unsecured Creditors pari passu.  That was the key reason why

6    this DIP facility was so much better than the prior one.

7          With the cost of the prior facility, we were going

8    to have a hurdle of that contingent value, right, that had to

9    be paid before unsecured Creditors could be paid of

10   approximately $93 million because that DIP was just more

11   expensive.

12         This DIP, because we're able to use cash

13   collateral, is going to be much less expensive, where we

14   estimate that the residual hurdle will only be approximately

15   $34 million before it goes to pay down all of the unsecured

16   claims out of that -- that strain.  So in essence, it's a

17   much better facility, it's much less expensive.  So that's --

18   that's the way it's structured.

19         Your Honor asked about the milestones.  The

20   milestones, generally speaking, are the same with one

21   exception.  With respect to Rubraca, previously, where the

22   lenders were going to be the convertible note holders, the

23   convertible note holders were going to have a second lien

24   behind the pre-petition facility on Rubraca.

25         Because Rubraca has faced regulatory headwinds,

1  there is a significant risk that there will be absolutely no

2  value after the first lien recovers.  In fact, the first lien

3  is likely to have a significant deficiency claim that will be

4  sharing with other unsecured Creditors.

5          So as a result of that, when we have the note

6  holders as our lenders, they didn't really have as much of an

7  economic incentive to deal with Rubraca.  Here, with Sixth

8  Street as our lender, where whether it's on account of their

9  pre-petition lien, or their post-petition lien, their pre-

10 petition loan principally is going to be repaid, first and

11 foremost, by the Rubraca value.

12         So because of that, we have agreed with our pre-

13 petition lender, subject to the board remaining at the helm

14 and of course, our fiduciary duties, in effect, they are

15 going to call the shots about Rubraca, and in the manner in

16 which it is marketed, sold, and how long that takes.  And

17 they're going to permit us to use cash collateral to the

18 extent that the process requires additional cash.

19         But the milestones are something with respect to

20 Rubraca that if they would like more time to play it out, and

21 sell it to another party, or credit bid for it, or any other

22 alternative, they have the ability to do that.  So the

23 milestones with respect to Rubraca are different.

24         The milestones with respect to FAP are exactly the

25 same.  We have no changes with respect to the FAP collateral,

 1  and no changes vis-à-vis the relationship that the company

 2  has with its licensor 3BP, and no changes with respect to our

 3  stalking horse, which is Novartis.  All of that is exactly

 4  the same.  It's really just different to allow more

 5  flexibility and leeway where we can partner with the pre-

 6  petition lenders/DIP lenders on the timing and process for

 7  the disposition of Rubraca.  But otherwise, the milestones

 8  remain exactly as they were originally.

 9          THE COURT:  Okay.  Thank you.

10          MS. STRICKLAND:  What else can I tell Your Honor

11  in terms of making it easier to --

12          THE COURT:  Let me --

13          MS. STRICKLAND:  -- to get through this afternoon?

14          THE COURT:  Are we going to be discussing cross-

15  collateralization, marshalling, liens on Chapter 5 avoidance

16  actions?  Many of the issues that are addressed in our Local

17  Rule 4001-2.

18          MS. STRICKLAND:  Some of them, Your Honor.

19  Much -- many of those things, at the request of the U.S.

20  Trustee are going to be deferred for a final hearing.  Some

21  of them we are going to be discussing potentially today.

22          But -- but what I would submit, Your Honor, and

23  this is subject to everyone's ability to be heard on this,

24  this afternoon, when all of the -- the dust settles is the

25  Debtors are agreeing to stipulate with our DIP lender that we

1   are not seeking a 506(c) waiver, we are not challenging their

2   liens, we are stipulating to the amount of their pre-petition

3   debt, and that they're fully secured.

4           We are also stipulating to the fact that the cash

5   we have at Clovis constitutes their cash collateral.  That

6   does not mean, however, that anyone else is stipulating to

7   that.  And we are not seeking to impose those stipulations on

8   others.

9           So all rights will be reserved for a committee

10  when it is appointed, and I expect that those are issues that

11  other people may want to raise in the future, but the ship

12  that we'll be sailing today, Your Honor, is a stipulation of

13  the company that we will not be seeking that.  But with

14  respect to the -- the committee, their rights are reserved.

15          THE COURT:  And so the revised order --

16          MS. STRICKLAND:  But I expect --

17          THE COURT:  -- is going to contain an

18  investigation period?

19          MS. STRICKLAND:  Yes, Your Honor.

20          THE COURT:  Ms. Sierra-Fox, did you want to be

21  heard?

22          MS. SIERRA-FOX:  Yes, Your Honor.  Part of the

23  reason why I made my -- my first initial comment about the

24  pushing back of the hearing -- I certainly agree with

25  Debtors' counsel.  I don't think this needs to wait until

1  over the weekend.  It was mostly to suggest that if Your

2  Honor had seen some version of the order that -- to suggest

3  that I could -- we could begin the presentation now, and to

4  the extent -- and get into argument to the extent that we got

5  there in order for Your Honor to have a preview of the

6  issues.

7            Your Honor, if I may be allowed, since we are

8  discussing how it has changed, there is a provision that was

9  not highlighted by counsel that is very concerning to the

10 U.S. Trustee that is one of the issues that I'd like to

11 preview for Your Honor this -- this afternoon.

12            THE COURT:  Okay.

13            MS. STRICKLAND:  Your Honor, you may -- I --

14 apologies.  Can I -- I didn't realize we were going to do

15 this.  Can I set the table on the issue?

16            THE COURT:  Certainly.  I just -- I think it

17 would -- if we could streamline a little bit where we're

18 going this afternoon, it would be helpful since I've not seen

19 any papers, and rather than for me to say, look, I haven't

20 seen anything, we're going to move this to next week, if we

21 are going to deal with this in two hours, I'd rather have

22 some sense of what's standing out there.  And I know the

23 Debtors are anxious to go finalize papers -- to get me

24 papers, but I assume other people in the team are looking at

25 that.

1    So if you could just, at least, preview that

2    issue, it would be helpful because unlike private practice, I

3    don't have staff here all night.  So I need to be sensitive

4    to other people's time.  So if I -- if I could preview what

5    are the major threshold issues, knowing that I have not

6    looked at them, and I don't have it in front of me, but it

7    would be helpful.

8    MS. STRICKLAND:  Certainly, Your Honor.  So I

9    am -- I am going to do a page flip without Your Honor having

10   the benefit of the pages.  I'm just going to touch upon the

11   issues.  And again, I'm not going to argue them, I'm just

12   going to articulate what they are.

13   THE COURT:  That would be --

14   MS. STRICKLAND:  And that way you'll have a sense.

15   THE COURT:  -- that would be helpful.  Thank you.

16   MS. STRICKLAND:  So the -- the first issue that

17   is -- is a concern of the U.S. Trustee is that on the interim

18   period, $20 million of the pre-petition obligations are --

19   are to be rolled up into the facility.  So we will argue why

20   we believe that is necessary and appropriate, but I think

21   that one speaks for itself in terms of what their -- what

22   their -- their question is.  The -- or objection is, rather.

23   The second relates to the payment of certain fees,

24   and what is going to be incurred and approved on the interim

25   versus the final basis.  Also, I think, an issue that we can

1  all understand, and -- and appreciate.  The perfection of

2  adequate protection -- the perfection of adequate protection

3  liens on the interim hearing.

4        The -- the next one is -- the next one is unusual.

5  So as Your Honor knows, we -- we really got here because we

6  had a competing facility.  We negotiated what was by far,

7  head and shoulders, the best facility we could get in

8  connection with the petition date with our pre-petition

9  convertible note holders.  They expended an enormous amount

10 of time and effort to get us that facility, and commit to it.

11       As Your Honor knows, when we sought to open this

12 up to a competitive process, one of the things that I noted

13 on the record yesterday was that we were going to send -- we

14 had sent Word versions of all of the documents that

15 represented our pre-petition convertible note holder DIP, and

16 asked people to piggyback off of that work, and send us black

17 lines.  And that's how we arrived where we arrived today.

18 They bid in good faith, and vigorously, I might add, in order

19 to save the estate that $60 million we talked about last

20 night.  It's been a long haul.

21       When we left last night, at the auction, the pre-

22 petition noteholders noted that they still had a lot of

23 concerns about what was going on.  And that they had expended

24 a lot of effort, and were, in fact, effectively our stalking

25 horse for the DIP, which they were.  The company had an

1  agreement, as is very customary with parties that are

2  providing financing with that party to provide compensation

3  for their fees, and expenses in getting to where we got, and

4  they had a deficiency of amounts that were not covered by a

5  pre-petition retainer of approximately $325,000 that was

6  unpaid.

7  And what we said to them last night is listen, we,

8  the company, would greatly appreciate it if we could have an

9  uncontested hearing tomorrow.  Leave aside whatever issues

10  come in the future.  We need this DIP financing.  We've all

11  participated together in an open and transparent way as to

12  how we got here.  And we acknowledge the benefit that the

13  convertible noteholders have provided in, frankly, helping us

14  get here.  We -- we piggybacked off of them in order to get

15  this far superior DIP.

16  Our DIP lender agreed that they thought that the

17  $325,000 payment to the counsel of the convertible note

18  holders was reasonable and appropriate.  The company, in its

19  business judgment, thinks it is -- it's completely

20  reasonable, and it -- save for the issues, which I -- I don't

21  want to minimize with U.S. Trustee -- is allowing us to

22  participate in -- in seeking consensual use of cash

23  collateral in a largely uncontested hearing today.

24  So in the order, because we wanted to be totally

25  up front, and transparent with everybody, we are asking to

1  pay $325,000 for the reasonable and documented fees of the

2  convertible noteholders.  And, again, I know I've said more

3  on this than I should for someone who's not arguing, but we

4  will be asking Your Honor later for approval to pay that

5  amount.

6          I think the U.S. Trustee wants to see further

7  motion practice on that.  And wants to see, you know,

8  pleadings filed.  The estate would -- would frankly prefer,

9  since we think we can make a record on it today, to put it

10 into the order, and ask Your Honor to go forward with it,

11 without incurring additional administrative expense.

12          But that is not the usual suspect, so I wanted to

13 flag it for Your Honor that it is in the order and is

14 something we'll be talking about later this afternoon, and

15 I -- I recognize that it's unusual.  And -- and think that

16 that's why that the U.S. Trustee has an objection and a

17 concern about that.

18          Let me just see what else there is.  I'm also

19 looking at my highlights if I miss one.  Is that it?  That's

20 it, Your Honor.  That's what we'll be discussing later today.

21          THE COURT:  Okay.

22          MS. STRICKLAND:  Unless --

23          THE COURT:  -- let me -- I'd like to hear from Ms.

24 Sierra-Fox, being mindful that we're not presenting argument,

25 but I would like to know if that properly characterizes your

1 concerns?

2          MS. SIERRA-FOX:  Your Honor, I believe that mostly

3 captures our concerns, and in particular, as Ms. Strickland

4 highlighted, we are very concerned about a first day request

5 to pay the fees of unsecured noteholders.  I won't make any

6 argument on that, but I will -- I will reserve that until

7 the -- when we proceed to -- to the hearing later today.

8          THE COURT:  Okay.

9          MS. SIERRA-FOX:  I --

10          THE COURT:  And --

11          MS. SIERRA-FOX:  -- that's it.  Yeah.

12          THE COURT:  -- and was that the only -- were the

13 other concerns accurately represented?

14          MS. SIERRA-FOX:  Your Honor, I think they were

15 accurately represented, and I'd just like to be a little more

16 specific, just because he -- being the party raising them, I

17 think we -- we -- we know what -- we know -- I guess I -- I

18 can, for ourselves, better describe what the issue is.

19          Your Honor, the -- the order -- the -- the

20 structure of the -- of the revised DIP, financially, I think

21 it looks very similar to the other one.  What's fundamentally

22 different, and I think from our perspective is that, whereas

23 the prior DIP was going to be -- was proposed by previously

24 unsecured noteholders, this one involves pre-petition

25 lenders.

1          So the other contains the more usual bells and

2    whistles of adequate protection, challenge periods, releases,

3    stipulations, and whatnot.  So I think one of the -- our

4    overriding concerns with the order is that, in particular

5    with respect to the adequate protection grants, that those be

6    subject to the challenge period, and make clear that they're

7    subject to the challenge period in the event of a successful

8    challenge, then any adequate protection payments be subject

9    to disgorgement, or whatever remedy this Court could -- could

10   fashion.  So that's one of the issues.

11         And then -- and I think something that might be an

12   issue based on -- and I appreciate that Your Honor has not

13   seen a revised order, and that I have seen some -- based on a

14   revised order I got minutes before this hearing is the

15   release -- I'm sorry.

16         In the challenge paragraph, we've also requested

17   some language to protect the Chapter 7 Trustee, or another

18   Trustee in these cases, to benefit from any filed adversary

19   proceeding or challenge.  And I don't know if that's been

20   accepted or not, but it does not look like it has, so that is

21   also one of our issues.

22         THE COURT:  Okay.  Thank you.  With that, when do

23   the Debtors think that they'll be in a position to file a

24   draft order and term sheet?

25         MS. STRICKLAND:  I'm only pausing so that I don't

1  lie to you again, Your Honor.

2          THE COURT:  I understand the situation, and I

3  would not characterize it that way.  Well, let me just put it

4  this way.  I guess I'll get it when I get it.  And I think

5  probably -- I really do appreciate the parties previewing the

6  issues because at least tells me where we are in the scheme

7  of things.  And I have a sense of what the terms are now.  So

8  I will proceed with my next hearing, and then why don't we

9  resume at 3:30?

10         MS. STRICKLAND:  Thank you, Your Honor.  And what

11 I will say is the minute one piece of paper stops moving, we

12 will send it to you.  We will do it on a rolling basis so

13 that you have everything as soon as humanly possible.  And we

14 very much appreciate it.

15         THE COURT:  Certainly.  Is there anything else we

16 need to discuss before we get back on the record at 3:30?

17         MS. STRICKLAND:  No, Your Honor.

18         THE COURT:  And let me just say to the parties, I

19 appreciate being flexible in your schedule, particularly on

20 the United States Trustee's Office.  Thank you.  So we stand

21 adjourned until 3:30.

22         MS. STRICKLAND:  Thank you, Your Honor.

23         (Off the record at 1:37 p.m.)

24         (On the record at 3:55 p.m.)

25         THE COURT:  Good afternoon, everyone.  This is

 1  Judge Stickles.  We are back on the record in the case of

 2  Clovis Oncology, Case Number 22-11292.  I'll hear from

 3  Debtor's counsel.

 4          MS. STRICKLAND:  Good afternoon, Your Honor.  Can

 5  you hear me?

 6          THE COURT:  I can.  Good afternoon.

 7          MS. STRICKLAND:  For the record, Rachel

 8  Strickland, Willkie, Farr & Gallagher on behalf of Clovis

 9  Oncology.  Your Honor, being mindful of the time, I will not

10  reiterate the preliminaries of earlier this afternoon.  We

11  are here before you seeking authority to use cash collateral

12  with the consent of our pre-petition secured lender under

13  363(c)(2)(A) and also seeking approval of Debtor in

14  possession financing under 364(c).

15          As part of our case, Your Honor, I would direct

16  your attention to Mr. Cesarz Supplemental Declaration, which

17  we filed at the docket, Docket Number 107.  In that

18  declaration -- and I would note, Your Honor, that Mr. Cesarz

19  is on the Zoom and available for cross-examination -- Mr.

20  Cesarz notes that we had a very rigorous process with respect

21  to looking for financing.  It bridged many months.

22          Perella contacted 36 parties, ultimately went to

23  NDA with 8 of them, and we ended up ultimately getting down

24  to the 2 Creditor groups that Your Honor is familiar with

25  were interested in providing financing.  Those Creditor

1 groups were only interested in providing financing on a

2 secured basis, so we were unable to obtain financing on an

3 unsecured basis, as the code requires us to try.

4         I would also note that there are two other

5 elements to Mr. Cesarz's Supplemental Declaration.  One is

6 noting that the overall terms and conditions of the Sixth

7 Street facility that we are before you at on today are very

8 much so the very best terms available.

9         We saved the estate approximately $60 million from

10 the next best proposal, and notwithstanding the fact that

11 there is a rollup feature in here, A, it is a rollup of pre-

12 petition secured debt to post-petition secured debt.  It is

13 also at the lowest ratio of rollup I have ever seen, which is

14 at for every dollar of new financing, the rollup is under a

15 dollar or .6 -- or 67 cents of pre-petition financing.

16         The ratio being sought at this interim hearing of

17 the new money to the rollup, it's the same.  So we are

18 seeking 30 out of the $45-million new money facility and 20

19 out of the 30 of the rolled-up facility today.  So it is

20 limited in terms of the interim relief.

21         And Your Honor, we -- we were not able to do any

22 better, and in light of where we started, both pre-petition

23 and certainly as of where we were before you just a couple of

24 days ago, this DIP is -- it's far and away the best we could

25 get, and we think very fair, reasonable, and appropriate.

1          We did have a board meeting this morning.  The

2 Clovis Board unanimously approved entering into the Debtor in

3 possession financing, subject to the approval of Your Honor.

4          The other thing that I would note in the

5 supplemental declaration is the discussion of the process.

6 We not only did the usual process where our banker reached

7 out to a variety of parties, both that were involved in the

8 case and not involved in the case, and asked whether or not

9 they would provide financing, but we also ran the two parties

10 head-to-head in a live auction that occurred yesterday

11 afternoon for over four hours.

12          It is without a doubt that both of the parties

13 that participated in that added enormous value to the

14 process, both in terms of the party Sixth Street, who is

15 providing the financing that we seek approval of, as well as

16 the party that is no longer providing us financing but

17 offered on a committed basis to do so prior to the petition

18 date that, effectively, served as our stalking horse.

19          I raise that issue because, as Your Honor knows,

20 we have an issue with respect to some consideration to that

21 party that we'll be addressing in connection with the U.S.

22 Trustee concerns.

23          Other than the U.S. Trustee and -- and not in any

24 way to minimize their role, we have no other parties that are

25 contesting entry of the interim order today.  And so as

1  opposed to having to come down and have lots of witnesses in

2  a very expensive and contested process before Your Honor,

3  we've come a long way and are pleased with where we've

4  landed.

5          I would move to admit Mr. Cesarz's declaration

6  as -- as support for the -- the relief requested.  I would

7  note that Your Honor previously admitted the prior

8  declarations, which were three.  It was Mr. Eisenberg, Mr.

9  Gross, and the original Cesarz's declaration, which was

10  Docket 36.  We're simply adding to it Docket 107 at this

11  time, if Your Honor will permit us to admit it.

12          THE COURT:  Okay.  Does anyone here object to the

13  admission into evidence of the Supplemental Declaration of

14  Mr. Cesarz, Docket Number 107?

15          Okay.  I hear no one.  Does anyone wish to cross-

16  examine Mr. Cesarz regarding the content of his declaration -

17  - his supplemental declaration?

18          Okay.  I hear no one.  The declaration is admitted

19  without contradiction.

20          MS. STRICKLAND:  Thank you, Your Honor.  What I

21  would propose to do next, unless Your Honor prefers a

22  different approach, is walk you through the interim order

23  that is proposed.

24          What I would -- would propose, Your Honor, is that

25  we go to the sections where the U.S. Trustee has -- has

1  raised objections, but I -- I first want to make sure that

2  Your Honor doesn't prefer to go through her own comments or

3  questions first, so we can proceed however -- however you see

4  fit.

5          THE COURT:  I think I would like to first address

6  the U.S. Trustee's concerns.  And I don't know if that means

7  that Ms. Sierra-Fox would rather present her objection, than

8  rather have the Debtors control the message with respect to

9  her objections.

10          MS. SIERRA-FOX:  Good afternoon, Your Honor.  Rosa

11  Sierra-Fox on behalf of the U.S. Trustee.

12          THE COURT:  Good afternoon.

13          MS. SIERRA-FOX:  Can you still see me?

14          THE COURT:  I cannot see you.

15          MS. SIERRA-FOX:  Sorry.

16          THE COURT:  Now I can see you.

17          MS. SIERRA-FOX:  I had a glitch there.  Your

18  Honor, it would be my preference to articulate what our

19  issues are from our perspective.

20          THE COURT:  Okay.  So let me ask this: would

21  you -- would the Debtors and the U.S. Trustee prefer to

22  address just straight-up the U.S. Trustee's issues or are

23  there other issues besides any issues I have with respect to

24  the order?  Or the -- or are issues limited solely to U.S.

25  Trustee?

1          MS. STRICKLAND:  Solely limited to the U.S.

2   Trustee, Your Honor.

3          THE COURT:  Okay.  Well, I think it would be

4   helpful if -- if I had the U.S. Trustee address their issues

5   first.  And then to the extent that we continue to go

6   forward, I'll have a couple of issues.  But I'm not sure

7   they're -- if they're not duplicative, so I'll have Ms.

8   Sierra-Fox commence with her objections.

9          MS. SIERRA-FOX:  Thank you, Your Honor.  So before

10  I begin, I'd just like to confirm -- I -- I -- the best way I

11  can think to do this is to reference the -- I guess, the most

12  -- the most recent redline I have, and I'd just like to

13  confirm that Your Honor has that.  It's about 60 pages.

14         THE COURT:  I have -- I have a redline that I've

15  been through.  I don't have a docket number on it, so I don't

16  know what the number of it is.  But I'm assuming --

17         MS. SIERRA-FOX:  Okay.

18         THE COURT:  -- we're working off the same thing.

19         MS. SIERRA-FOX:  Okay.  All right.

20         THE COURT:  And if it doesn't make sense, I will

21  let you know.

22         MS. SIERRA-FOX:  Certainly, Your Honor.  Your

23  Honor, and -- and then one final question.  Would you like me

24  to walk through our issues in the order as they appear on the

25  -- in the order provision-by-provision?  Or I, certainly,

1  have certain issues of more gravity or -- than -- than

2  others, so more minor ones as opposed to more serious ones,

3  so whatever your preference is.

4            THE COURT:  I want to hear all your issues.

5            MS. SIERRA-FOX:  Okay.

6            THE COURT:  So if you -- I think it would make

7  most sense if you went in the -- in the order -- sequentially

8  through the order.

9            MS. SIERRA-FOX:  Got it.  Okay.  Thank you, Your

10  Honor.

11            So Your Honor, I just -- to begin, just to make a

12  few remarks, I think that most of our issues and most of the

13  comments that we have go to the issue that, despite what's

14  transpired in the couple -- last couple hours and the

15  different proposals that there have been, this is still a

16  first-day hearing, and under -- and notwithstanding, under

17  Rule 6003, the Debtors should only be granted the relief that

18  they need in order to avoid immediate and irreparable harm.

19  And I think in certain respects, this order goes beyond that

20  standard.

21            So the first point, Your Honor -- and I'm going to

22  have to find my place here on my issues list.

23            THE COURT:  And I think as you go through these

24  that I'll rule when we get to the very --

25            MS. SIERRA-FOX:  Right.

1          THE COURT:  -- end because I want to give you a

2    fulsome opportunity to both address your issues, and then

3    I'll address them collectively.

4          MS. SIERRA-FOX:  Okay.  Thank you, Your Honor.

5          Your Honor, I think the first point, by my

6    calculation, relates to one of the findings.  It's finding in

7    the last cut -- I think it was Finding F.

8          THE COURT:  On Page 6?

9          MS. SIERRA-FOX:  It -- yes, but the -- it's -- in

10   one of the subparagraphs, it's, actually, the beginning of

11   Page 8.

12         THE COURT:  Okay.  I'm there.

13         MS. SIERRA-FOX:  Okay, Your Honor.  So this

14   paragraph, as I understand it, basically, makes a finding

15   that is, also, ordering the Debtors to establish a segregated

16   account under the control of the DIP agent and to deposit

17   into such account the net cash proceeds from the sale

18   transaction.

19         Your Honor, we have an objection to that, and

20   basically, our objection is that I think it's premature to

21   say today where -- in what account and where the sale

22   proceeds need to be deposited.  I -- we see that as an issue

23   for the sale transaction and to be discussed, hopefully, with

24   a committee, if appointed, in connection with a sale order.

25   So that's our first issue.

1            Now I'm going to --

2            THE COURT:  Do -- do the Debtors want to respond

3 to that?

4            MS. STRICKLAND:  Certainly, Your Honor.  I didn't

5 know if you wanted to go one-for-one.  With respect to the

6 lockbox, I'm a little confused by the objection.  So if we

7 have an approved DIP facility, the DIP lender has a lien on

8 proceeds of the sale of their collateral.  In order to

9 perfect cash, possession is a perfection device of cash.

10            So I see no difference between this provision and

11 a provision that says a DIP lender gets perfection of their

12 liens by a court order.  What this does not say is, what is

13 the extent and amount of the -- of the pre-petition claim.

14 It does not say what the extent and amount of pre-petition

15 secured versus unsecured deficiency claim.  All of those

16 things are preserved.

17            All this says is, I'm a DIP lender.  I am being

18 granted a DIP lien, and I have the right to have my

19 collateral be perfected, which in the case of cash, is

20 perfected through possession.  So this is just explaining the

21 mechanic by which the DIP lender will be perfected.

22            THE COURT:  Well, is the concern here really that

23 the DIP lender's only going to have a partial lien on the FAP

24 assets?

25            MS. STRICKLAND:  The DIP lender has a complete and

1  total blanket lien on the FAP assets, and I want to clarify

2  that just so I don't have another party jumping in.  The

3  liens that are granted on the DIP liens are the Debtors'

4  rights to receive proceeds.  The actual license itself is not

5  collateral, and the -- the assets being sold to Novartis are

6  not collateral.

7         What is collateral is the -- the payments that

8  Novartis makes in cash, they have a lien on that, and

9  that's -- there's no partial lien.  It's a blanket lien.  So

10  this is just saying when the asset comes in that we have a

11  blanket lien on, we want to do what is required to perfect

12  cash, which is keep it in our possession and control.  Has

13  nothing to do with the challenge period.

14         THE COURT:  Ms. Sierra-Fox?

15         MS. SIERRA-FOX:  Your Honor, if -- it was -- we

16  stand by our objection.  I understand that the -- the lenders

17  are being granted a blanket lien.  I understand that the

18  proceeds will be subject to their liens.  I, personally, have

19  never seen -- and -- and maybe it's just something that I

20  haven't seen -- a DIP order dictating where events will sell

21  proceeds or where the -- in what account and where they need

22  to go.  I've always seen that as a function of the sale

23  order, once there are actually proceeds in the estate

24  following the sale.  And that's -- that's, basically -- to

25  reiterate, I mean, I think that is not necessary in order to

1  approve the DIP today and get them the financing that they

2  need.

3           Your Honor, our next point is at ordered Paragraph

4  3-A.  And this, by my calculation, is on Page 17.

5           So Your Honor, this objection and to the extent

6  it's applicable in other parts of the order, this -- our

7  objection here is to the rollup of the $20 million in pre-

8  petition debt and to the fact that the rollup has not been

9  explicitly made subject to the challenge period specified in

10 Paragraph 19.

11          So Your Honor, with respect to the rollup, I

12 guess, here in particular, I'm -- we're concerned about the

13 rollup where there is -- there do appear to be unencumbered

14 assets, so this is, basically, elevating the prior priority

15 or the status of the pre-petition debt on unencumbered -- on

16 previously unencumbered assets.  So it's not an -- you know,

17 it's not insignificant and potentially -- to other Creditors

18 to be granting this rollup of $20 million on a first-day

19 basis.

20          In addition to that, even if Your Honor were to

21 grant the rollup and allow it today, it's very common to

22 make -- and -- and should, I think, be -- it should be made

23 subject to the challenge period, that being, if there is a

24 successful challenge to any extent to the pre-petition

25 lender's pre-petition liens that any rollup previously

1  granted on account of those liens should be made subject to

2  the challenge period and appropriate remedy in that

3  situation.

4         THE COURT:  Okay.  Ms. Strickland?

5         MS. STRICKLAND:  Thank you, Your Honor.  Rollups

6  are not prohibited by the Bankruptcy Code, particularly here

7  where the obligation that is being rolled is a pre-petition

8  secured obligation going to a post-petition secured

9  obligation.

10         This is a package deal where when we went out to

11  Sixth Street and we said, on what terms will you lend us

12  money, they said, here's the total package; here's the total

13  package for use of cash collateral; here's the total package

14  for the loan.

15         As I noted, if you -- if you compare apples to

16  apples, this with the prior commitment that we had for $75

17  million, it assumed that we were also going to need to get

18  contested use of cash collateral.  And it also contained a

19  provision that said, when we -- when we received the sale

20  proceeds, it was going to have fees that were going to

21  multiply by one and a half times and be added to the

22  principal of the loan.  So overall, that was going to cause a

23  $93-million hurdle before general and secured Creditors could

24  be paid.

25         Even with the rollup, this is $60 million cheaper,

1  provides a much better distribution to general unsecured

2  Creditors, and also, does not run afoul of any provision of

3  the Code.  When we were first negotiating this and the reason

4  we did not go with Sixth Street originally, they were asking

5  for a rollup of four to one.  They showed us comparable cases

6  that were approved in the District of Delaware where there

7  were significant rollups well in excess of this and that were

8  approved by the Court under 364 and 105.

9         This, in -- in contrast, is a 67 cents for every

10 $1 roll, so less than 1-to-1, and is reasonable and necessary

11 by the fact that the next best loan we could get was going to

12 cost us $60 million more.

13        So what I don't want to have happen is, you know,

14 they can't get the package that they're looking for, and

15 we're back to a much more expensive loan, assuming the

16 converts would even agree to re-up their commitment.  That

17 would be to the detriment of the estates and all of their --

18 all of their Creditors.

19        The other thing I would note about the interim

20 period is, they're not doing a full roll on the interim

21 order.  The rollup that's contemplated is $30 million, and

22 only 20 of it rolls, if Your Honor permits it at the interim

23 order.  That corresponds to us borrowing 30 out of the $45

24 million of new money.

25        So I think that we have evidence in the record, as

1  established by the Cesarz declaration, that we did our level

2  best to compete with this and under no circumstances could we

3  have gotten as favorable of a financing without this feature,

4  and this is not a severable agreement.  We have to get all of

5  it, or they don't have to fund us.  And that would be a

6  disaster, Your Honor.

7            THE COURT:  Well, I appreciate your totality of

8  the circumstances argument and the fact that, given as a

9  whole, there's been a $60-million savings.  But isn't the

10  rollup subject to challenge?

11            MS. STRICKLAND:  Your Honor, the rollup is not

12  subject to challenge.  What is subject to challenge is the

13  extent to which the pre-petition agreement -- the pre-

14  petition loan, rather, is secured as valid liens and the

15  extent to which they are secured or unsecured.  I would note,

16  however, one obvious feature, which is the Debtors' leave

17  aside the -- the stipulations.  We all know the stipulation

18  that a borrower makes that someone if fully secured or not

19  subject to surcharge is the art of the deal.

20            But I just want to point to practical facts.

21  Today, we have in our bank account approximately $30 million.

22  We make money through -- we have one source of revenue.  That

23  source of revenue is the sale of Rubraca.  Proceeds of the

24  sale of Rubraca are the pre-petition lender's collateral.

25            So even if we end up going to market on Rubraca

1  and it ends up being worthless, which would be not what we

2  think is going to happen or terrible, the company has cash

3  which is collateral of the pre-petition agent today that

4  exceeds this.

5          So the notion that what they are rolling up today

6  in this $20-million roll is in some way later on down the

7  road going to be successfully challenged is, you know,

8  practically speaking, not possible because I know what their

9  collateral is today at a minimum, and maybe lots of other

10 parts of their total $347-million loan will be deemed to be

11 unsecured or under-secured.  Maybe someone will challenge

12 aspects of certain of the liens.

13         But where you have a lien on cash -- and I know

14 what our opening cash balance is as of the effect -- as of

15 the petition date -- I know they are secured as to the

16 amounts that they are rolling.

17         So I would submit that there is a very low risk

18 that someone is later going to be able to successfully

19 challenge it, and I need it to get the deal done.  So I think

20 that the -- the give-up, if you will, for someone to later

21 challenge it is extraordinarily de minimis.

22         The parts that are going to be able to challenge

23 with respect to the $347 of the totality of the pre-petition

24 claim, they can have at it when a committee is formed,

25 notwithstanding my stipulation.  But the piece that I'm not

1  only stipulating to for contractual purposes but also

2  representing to the Court I think is incredibly low-hanging

3  fruit are just the facts on the ground that we have today.

4          THE COURT:  Okay.  Thank you.  Ms. Sierra-Fox?

5          MS. SIERRA-FOX:  Your Honor, we stand by our

6  objection on that -- on that point, and just to reiterate,

7  even if -- the evidence in the record is what it is with

8  respect to whether the rollup ended up, for lack of a better

9  word, giving the -- the Debtors a better deal.

10          But I think the challenge point just follows, and

11  notwithstanding Ms. -- Ms. Strickland's analysis, the fact

12  remains that this is the first 24-48 hours of a case.  And no

13  other parties has -- has had the ability, except the Debtors,

14  to investigate the pre-petition lender's liens and look into

15  the case and raise whatever issue they have with their liens,

16  and this -- not making this subject to the challenge could

17  be -- at least, if the committee, you know, is appointed and

18  at the final stage wants to make the same assessment that Ms.

19  Strickland just made, that's fine.  But they should be given

20  the opportunity to do so.

21          THE COURT:  Thank you.

22          MS. SIERRA-FOX:  All right, Your Honor.  Let me

23  move to our next point.

24          Your Honor, so the next point is, actually, just

25  follows from -- in the next subparagraph, so Page 19.  And

1  I'm just flagging it here because I think it's the first

2  instance in the order that mentions the payment of all fees,

3  premiums, and expenses.  I do think that there is another --

4  there -- there, certainly, is another part of the order that

5  makes it clear that on an interim basis the Debtors are

6  obligated to -- to pay -- to pay or commit themselves to the

7  obligation to pay the upfront fee, the sale fee, and I

8  believe the premium fee.

9          Your Honor, our objection here is simple.  Not --

10 like I said, the record and the evidence is what it is with

11 respect to the price of these fees and how they compare to

12 the other -- to the other DIP proposal.

13         But Your Honor, I think, again, limiting the

14 relief today to only what's absolutely necessary to avoid

15 immediate and irreparable harm, I think the approval of a

16 commitment to pay these fees today, without having the --

17 without having given the opportunity to unsecured Creditors

18 or other parties in interest -- because it's not only

19 unsecured Creditors here; there's equity holders that are

20 interested in the case; there's several other parties -- an

21 opportunity to weigh in on this part of the deal and

22 whether -- and how this affects their ultimate bottom line I

23 think is prejudicial.  So we -- we think those fees should be

24 made subject to entry of final -- of a final order granting

25 that relief.

1              THE COURT:  Ms. Strickland?

2              MS. STRICKLAND:  Thank, Your Honor.  I want to

3  note one thing, which is that there is an error in the form

4  of order in 3 and the whole -- in this paragraph that

5  references a sale fee.  The sale fee was a very expensive fee

6  that pertained to the convertible DIP facility.  There is no

7  sale fee for this.

8              And I think that dovetails nicely into my -- my

9  response, which is the fees that are coming due on -- upon

10 entry of the interim order commitment fee, which is happening

11 contemporaneously; the lenders have already executed a

12 binding commitment letter in favor of the company --

13             THE COURT:  That's --

14             MS. STRICKLAND:  -- the upfront fee.

15             THE COURT:  That's the 1.5?  Is that what it is?

16 Yeah, I believe so.

17             MS. STRICKLAND:  Yes, Your Honor.

18             I'm sorry. 1.5.  Yes, Your Honor.

19             THE COURT:  Okay.

20             MS. STRICKLAND:  And then there is -- so there's

21 the commitment fee, the upfront fee, which are exactly as

22 they -- as they sound, and that is for a commitment that we

23 are receiving today.  So it is a -- to -- to borrow a phrase

24 from another part of the Bankruptcy Code -- a contemporaneous

25 exchange of value.

1        And then, Your Honor, what this paragraph goes on

2   to talk about are the contingent value rights and expenses of

3   Counsel.

4        The contingent value rights really only say, hey,

5   I'm giving you a DIP loan.  To the extent you can't pay me

6   back at the end of the case, I get a note, and albeit, a note

7   that doesn't even incur interest.  So I, as -- as a

8   representative of the Debtors, want to lock that in right now

9   for sure because it's almost unheard of in this -- in this

10  capacity.  And then expenses of professionals are

11  professionals that are already retained and have -- that I've

12  spent an enormous amount of time with over the last handle of

13  days.

14       So I would submit that I think one of the red

15  herrings about this is that the sale fee was inadvertently in

16  there, which makes it look like somebody's getting a fee on

17  something that hasn't yet happened.  That is not the case.

18       The other thing I would note is that the fees are

19  paid in kind.  They are not cash payments, so they are

20  accruals.  And we tried desperately to get a free DIP, but

21  one can't.  So this is -- is part and parcel of the -- of the

22  deal.

23       THE COURT:  So it's a 5 percent commitment fee,

24  the 1 and a half upfront fee, and essentially, the

25  professional fees.

1          MS. STRICKLAND:  That's right, Your Honor.  And

2  just to note, those fees are -- are lower than the comparable

3  fees that were in the proposal that we filed originally.  So

4  I would say that not only are they reasonable and necessary,

5  they've been extensively market tested and were -- were much,

6  much higher under the prior proposal.

7          THE COURT:  Thank you.

8          MS. SIERRA-FOX:  Your Honor, I have no further

9  argument on that point.  I can -- I can move on to the next.

10         THE COURT:  Okay.

11         MS. SIERRA-FOX:  Okay, Your Honor.  The next point

12  relates to ordered Paragraph 6, and that is at Page -- starts

13  at Page 24.

14         THE COURT:  Yes.

15         MS. SIERRA-FOX:  So Your Honor, the provisions

16  here that I think are very common, the Debtors are granting

17  the pre-petition lenders certain adequate protection,

18  payments, liens, lien -- replacement liens, adequate

19  protection liens to priority claims on account of the use of

20  their pre-petition collateral, et cetera.

21         Again, this is similar to the objection we have

22  with the rollup.  It's, in my experience, customary to make

23  it explicitly and abundantly clear in a DIP order that

24  whatever adequate protection payments or liens or claims

25  might be granted, they are subject to -- and in the case of

1   an appropriate -- of -- of a successful challenge, subject to

2   an appropriate court remedy of disgorgement or whatever the

3   Court may think is necessary, in the event that the pre-

4   petition liens are successfully challenged.  And the -- the

5   logic being that the grant of adequate protection is premised

6   on the assumption that the pre-petition liens are valid and

7   the Debtors' stipulations as to those.

8          So that is -- that is the comment there.  I

9   believe -- oh, I thought there was -- yes.  I believe

10  starting at ordered Paragraph 7, the last sentence of that

11  paragraph.

12          THE COURT:  The last sentence?

13          MS. SIERRA-FOX:  Yes.  It start --

14          THE COURT:  For the avoidance of doubt?

15          MS. SIERRA-FOX:  Yes.  I believe that was the --

16  the Debtors' attempt to resolve our objection on this point,

17  but I don't think it goes as far as it should go in stating

18  that it's, also, not only -- not only does the grant of

19  adequate protection not impact the challenge rights, but

20  should there be a successful challenge, the Court, if

21  appropriate, may fashion an adequate remedy with respect to

22  any adequate protection payments or whatever may have been

23  made prior to that.

24          THE COURT:  Ms. Strickland?

25          MS. STRICKLAND:  Thank you, Your Honor.  I want to

1   start where Ms. Sierra-Fox began, which is to say payments

2   and liens, and I think there's a big difference between those

3   things.  This is not a situation where we are paying interest

4   payments currently as adequate protection.  That would be the

5   type of situation where you would have a disgorgement

6   scenario or something of that nature.

7           Instead, the only cash payments that are being

8   made as part of adequate protection are the payments of -- of

9   a fairly modest amount of professional fees.  Everything else

10  that's being proposed here in the form of adequate protection

11  is a lien.  And I would note that all of these liens are

12  subject and only to the extent of diminution in the value of

13  the collateral.

14          So what does that mean in terms of what happens

15  later with the challenge period?  It means that, if there's a

16  challenge in any regard by the committee, that there is no

17  diminution in the value of collateral because there was no

18  collateral, let's say.  Let's say they go for the wild

19  argument that they are wholly unsecured and not entitled to

20  anything.  Having a lien on something that is later

21  determined to be zero doesn't grant you anything.  There's

22  nothing to disgorge.

23          Having the lien just says, today, I am letting you

24  use my cash, and you are using that cash, I would say, in a

25  pretty risky scenario where for Rubraca, which what the cash

1  collateral relates to -- I don't have a stalking horse, and

2  we are going to have to maintain that and preserve it and

3  hunt for a buyer.

4          And so if I were a pre-petition lender, I would be

5  evaluating whether or not I want to say, no, thanks, I'm not

6  going to let you use my cash collateral.  Instead, I'm going

7  to take all of your bank accounts and pay myself down today.

8  But they haven't done that.  They've consented and said, give

9  me a lien.  And that lien, again, is only subject to -- is

10 only equal to diminution of value of the collateral.  And the

11 quantum of what that diminution looks like is entirely

12 subject to challenge because there's nothing about these

13 paragraphs that grant a fixed lien that doesn't move as to

14 the amount.

15         So I would submit that other than the dollars that

16 are going to pay professional fees, which are actual

17 payments, there's nothing here that is irrevocable in terms

18 of practical effect, and it is absolutely reasonable and

19 appropriate to give adequate protection liens in the form of

20 replacement liens, junior liens on the DIP, and

21 administrative claims solely to the extent of diminution of

22 collateral, which that extent is a TBD, subject to challenge

23 later.

24         So I don't think there's anything in here that is

25 an overreach or not market, and it -- we would be pretty

 1  hard-pressed to get consent for use of cash collateral

 2  without granting a form of adequate protection today.

 3          And as Your Honor knows, we are in desperate need

 4  of cash collateral, so much so that when we -- again, due to

 5  our own issues -- had to move to today, we had to go in and

 6  seek emergency use of cash collateral yesterday to make sure

 7  that we had some payroll funded.  So this is a critical need

 8  and a very fair ask on the part of the pre-petition lenders.

 9          THE COURT:  Ms. Sierra-Fox?

10          MS. SIERRA-FOX:  Your Honor, just to briefly

11  respond to that, I think just to make clear, we are not

12  contesting the adequate protection.  Where, I think, the

13  order would be -- would better serve the parties and interest

14  in this case if it made the point about this -- the

15  interrelation between the adequate protection grant and the

16  challenge period and the potential challenges more clear.

17  And that -- I think that is what we ask for.

18          THE COURT:  Was proposed -- I know this has been

19  very fluid and documents have been, you know, flying by

20  quickly today.  Was proposed language for the U.S. Trustee's

21  office suggested to the Debtor and -- and the lender?

22          MS. SIERRA-FOX:  Your Honor, I looked at an

23  order -- my first cut of the order at 8:00 in the morning

24  today, and I raised the issue.  I didn't propose specifically

25  just because I was trying to move it through as quickly as I

1  could, but we later got on a call with the lender's counsel,

2  and I told her what we were looking for subject to the

3  challenge period and in the event of (inaudible) challenge,

4  an appropriate court remedy.

5            And in fact, I've worked with counsel in --

6  involved in these case -- not Willkie, but some of the local

7  counsel involved in these cases where we've used that

8  language in -- in other cases, and I referred them to that,

9  as well.  So I did not redline the order as I typically do,

10  given the timing.

11            THE COURT:  Understood.

12            MS. SIERRA-FOX:  But I do believe I proposed

13  language or got --

14            THE COURT:  I'm just curious, since you're not

15  contesting adequate protection, what -- what type of language

16  might satisfy the U.S. Trustee's concerns and at the same

17  time be acceptable to the Debtor?  That's all I was asking.

18            MS. STRICKLAND:  Your Honor, we -- we, certainly,

19  don't have any qualms whatsoever with how proactive Ms.

20  Sierra-Fox has been.  She's really been incredible and

21  available around-the-clock with a very fast-paced situation.

22            We did, after having the discussion, as Ms.

23  Sierra-Fox noted, add the for the avoidance of doubt section,

24  which says that the granting of adequate protection doesn't

25  in any way protect the challenge rates, including the amts of

1  the claims.

2          So I go back to, if there is a successful

3  challenge to literally everything, there is no remedy for the

4  Court to fashion.  It is self-executing, other than with

5  respect to the payment of professional fees.  The grant of a

6  lien that is later determined to be a lien, subject to an

7  amount of zero, is not a grant that needs to be undone.

8          So I don't think that there is any harm to the

9  estate whatsoever, and I think if we were -- I think -- I

10  would submit, Your Honor, that payment of professional fees

11  of a party providing cash collateral that's the life blood of

12  the Debtors to get through these cases is a very minor horse

13  to let out of the barn that can't be recouped, and this

14  language does not prejudice a challenging party one iota

15  other than that.

16          THE COURT:  Okay.  Let's move on to the Trustee's

17  next issue.

18          MS. SIERRA-FOX:  Your Honor, our next issue is at

19  ordered Paragraph 21, which is on Page 45.

20          THE COURT:  Okay.

21          MS. SIERRA-FOX:  Your Honor, this --

22          THE COURT:  Which paragraph?  I'm sorry.  You said

23  Page 45.  Which paragraph?

24          MS. SIERRA-FOX:  21.

25          THE COURT:  Okay.  On credit bidding?  Okay.

1        MS. SIERRA-FOX:  Yes, that's right.  Your Honor,

2   our objection here, again, is simply, and I think it's in

3   line with our typical comment on first-day DIP orders --

4   interim DIP orders relating to 506(c) waivers, 552(f)

5   waivers.  We -- we think it's appropriate, especially where

6   there -- the lender here was a pre-petition lender to subject

7   the credit bidding right to final order granting such relief.

8   This paragraph makes it looks like it makes it -- the credit

9   bidding approval effective upon entry of an interim order,

10  and that is -- that's our objection there.

11        THE COURT:  Ms. Strickland?

12        MS. STRICKLAND:  Your Honor, I would submit that

13  the pre-petition lender has this by virtue of the existence

14  of 363(k) of the Code, which provides that a sale of property

15  that's subject to a lien allows the secured Creditor to

16  credit bid.  So they have that right.  There's nothing Your

17  Honor is granting them afresh as a part of this.  I've never

18  seen that right be subject to a challenge.  It just exists by

19  virtue of the Code.

20        I do take Ms. Sierra-Fox's point that they have to

21  establish that they are, actually, a secured Creditor.  They

22  are, to a certain extent.  The extent to which they are a

23  secured Creditor is something that can be evaluated at the

24  time.  But I think that this is a premature objection and a

25  limited issue for -- for a couple of reasons.

1          One, because we have a stalking horse bidder for

2  the FAP asset, the stalking horse bidder, as a condition to

3  going forward, wanted to make sure that they were not going

4  through the trouble of putting together all of this, only to

5  have a DIP lender turn around and -- and credit bid.  There

6  is already an agreement that the DIP lender will not Creditor

7  bid for FAP.  And so that is the new lien that they're

8  getting by virtue of the DIP facility.

9          The existing lien that the pre-petition lender has

10 on Rubraca, the asset that we do not have teed up for sale at

11 this time, but were tomorrow, let's say, someone to come out

12 of the woodwork and say, I'll pay $1 for Rubraca or $100 for

13 Rubraca or whatever it is, the pre-petition secured lender

14 would have the right to credit bid what it -- to the extent

15 of its security interest under 363(k) right now.  So I guess

16 on this one, I don't -- I don't see the linking with the

17 challenge period, and we think that this is reasonable and

18 appropriate.

19          MS. SIERRA-FOX:  Your Honor, just in response to

20 that --

21          MR. SAFERSTEIN:  Your Honor --

22          THE COURT:  I think maybe the DIP lender wants to

23 be heard first, and then you can, also, respond to him.

24          MR. SAFERSTEIN:  Thank you, Your Honor.  Jeffery

25 Saferstein from Weil Gotshal & Manges on behalf of Sixth

1  Street as both pre-petition lender and proposed post-petition

2  lender.

3          Your Honor, I just want to point out in Paragraph

4  21, this -- this only relates to our DIP -- our DIP, not the

5  pre-petition.  And that's being, hopefully, granted today.

6  There's no issues with -- there's no challenge rights with

7  respect to the DIP.  This is just the DIP.  There's no

8  questions about -- about its, you know, authenticity or any

9  other issues with respect to the DIP.  We should be able to

10  credit bid that.  As Ms. Strickland said, under 363(k), we're

11  not dealing with our pre-petition debt in this paragraph.

12          THE COURT:  Ms. Sierra-Fox?

13          MS. SIERRA-FOX:  Yes, Your Honor.  Just to -- just

14  to clarify Your Honor, so this -- we -- we've been

15  negotiating for a couple of hours leading up to this hearing,

16  and this paragraph didn't always look like this.  At one

17  point, it was subject to a final order.

18          So I -- I'm fully aware that it only references

19  the DIP collateral.  I wasn't 100 percent sure in advance of

20  the hearing whether that -- whether that defined term picks -

21  - does or does not pick up pre -- the pre-petition

22  collateral.  So I understand Mr. Saferstein's point, and if

23  that's -- I'd like to clarify that.  But if --

24          THE COURT:  Okay.

25          MS. SIERRA-FOX:  -- if that's the case, I

1  understand.

2          THE COURT:  So if Mr. Saferstein could come back

3  on screen.

4          MR. SAFERSTEIN:  Yes, Your Honor.  Yep.

5          THE COURT:  If we could resolve that issue, that's

6  one down at quarter to 5:00.

7          MR. SAFERSTEIN:  Your Honor, again, it's just with

8  respect to our DIP.  It does have the roll components.  I

9  don't want to hide the ball on that, but as Ms. Strickland

10 said, you know, she believes -- the Debtor believes that's

11 fully secure for that amount that's being rolled.  But it is

12 the DIP loan and the DIP collateral, and we've agreed not to

13 credit bid for -- for FAP, so long as the stalking horse APA

14 has not been terminated.  So hopefully, that clarifies it.

15         THE COURT:  Does that satisfy your issue, Ms.

16 Sierra-Fox?

17         MS. SIERRA-FOX:  Your Honor, I mean, I think

18 the - - the fact that it includes the rollup of a pre-

19 petition debt is an issue.  And Your Honor, just further,

20 363(k) says what it says, but it, also, leaves the -- it has

21 very clear language that says unless the court orders

22 otherwise.  So it does give the -- it's not an automatic

23 grant.  It does gives parties in interest the opportunity to

24 say, you know, the -- the -- whatever secured party should

25 credit bid.

1      And if we -- if we -- if Your Honor grants this

2  today, we're, effectively, foreclosing whatever party might

3  want to raise that issue, you know, later or whenever it's

4  appropriate.  So I think we'll -- we'll stand by our

5  objection on that point.

6      THE COURT:  Okay.  Your next issue, Ms. Sierra-

7  Fox?

8      MS. SIERRA-FOX:  Yes, Your Honor.  Sorry.  I lost

9  my place.

10      THE COURT:  No, that's okay.

11      MS. SIERRA-FOX:  Okay, Your Honor.  The next

12  issue -- and I think it's the final one -- is at Page -- it

13  starts at Page 48.

14      THE COURT:  C?

15      MS. SIERRA-FOX:  48 toward the bottom at little C,

16  subparagraph C.  Your Honor, this concerns the issue that we

17  previewed earlier today.  I think as -- as -- it appears that

18  as part of the agreement not to contest today's DIP financing

19  motion, that the Debtors have agreed to pay up to $325,000 of

20  pre-petition professional expenses of the ad hoc, unsecured

21  noteholder committee that previously proposed the -- the

22  prior DIP -- DIP financing package.

23      Your Honor, we have a couple of issues with

24  this -- with this paragraph.  And I'll start with how I began

25  the presentation, which is Rule 6003 and granting relief

1 that -- only granting relief in the first 21 days of the case

2 that is necessary to avoid immediate and irreparable harm.

3          Your Honor, the parties have -- have their DIP

4 financing package, and Your Honor will either approve it or

5 not.  The payment of the expenses of the professionals of the

6 ad hoc unsecured noteholders committee do not in any way

7 relate to the business operations, the liquidity, or the

8 ability for the Debtors to continue running their business

9 and to continue the sales and marketing process and whatever

10 else they need to do to get -- keep this Chapter 11 case

11 going.

12          So my first point is that I don't believe, and the

13 U.S. Trustee does not believe, that this relief is necessary

14 in an interim DIP financing order because it's not necessary

15 to avoid immediate and irreparable harm.

16          Your Honor, the -- the second point is that this

17 is particularly egregious here where the Code contemplates, I

18 think, a procedure or at least a process for the payment of

19 fees of a professional -- or of a professional associated

20 with a creditor on a substantial contribution theory, and

21 that's under 503(b)(4), I believe, Your Honor.

22          So the -- I think previously Ms. Strickland

23 mentioned that the U.S. Trustee wants more motion practice on

24 this point, and it's not motion practice for the sake of

25 motion practice, Your Honor.  It's motion practice in an

1  application before the Court so there's transparency, so

2  there -- there is a record developed, so Your Honor has the

3  benefit of seeing declarations, evidence, a quantification of

4  exactly how value was contributed to the estate by this --

5  this group of noteholders, why this is warranted, an

6  itemization of their invoices, the cornerstones of

7  transparency and disclosure of the Bankruptcy Code, Your

8  Honor.

9          So that's why it's our position that not -- this

10 shouldn't just be made subject to entry of a final order or

11 something of that.  It should be deleted and stricken from

12 this order and subject to further application.

13         If the parties -- if the party requesting this and

14 the Debtors' estate believe that value was brought into the

15 estate by the ad hoc committee, then a substantial

16 contribution motion under 503(b)(4) can be proved up, and

17 your -- the party -- parties in interest will have the

18 benefit of that record, Your Honor.  So I think for those

19 reasons we object to -- to this provision, the inclusion of

20 this provision.

21         And just to add, Your Honor, this is pretty -- I,

22 certainly, haven't seen this before, and I, certainly, would

23 hope that something like this does not open the door to this

24 type of request in other cases because that -- we see that as

25 something that is very problematic.

1    THE COURT:  So I want to make sure I understand

2  your argument.  Well, do you dispute that there was a

3  contribution here made by the noteholders or are you just

4  saying that if there was a contribution, it needs to be

5  requested by motion practice?

6    MS. SIERRA-FOX:  Your Honor, I don't dispute that

7  the noteholders participated, and I mean, I don't want to

8  concede any points that I -- that my -- you know, and

9  prejudice my client.

10    THE COURT:  Understood.  Yeah, it was probably an

11  unfair question.

12    MS. SIERRA-FOX:  But they certainly participated

13  and could file an application to get these fees paid, sure.

14    THE COURT:  Okay.  I see that Mr. Adlerstein is

15  on.  Do you want to be heard or the Debtor?

16    MR. ADLERSTEIN:  I'm happy to go after the Debtor.

17  I didn't know whether Ms. Strickland intended to address the

18  issue, but I did want to make a few remarks afterwards.

19    THE COURT:  Okay.

20    MS. STRICKLAND:  I do, Your Honor.  Your Honor, I

21  just want to back up factually, although I did articulate

22  some of this earlier today by way of background.

23    When the Debtors found themselves with no great

24  alternatives for debtor-in-possession financing, they turned

25  to a subset of noteholders in their capacity as pre-petition

1  noteholders, although, obviously, people who hold debt in a

2  capital structure are interested in maximizing value.

3         But the DIP facility that was being offered was

4  new money.  It didn't involve any treatment of the pre-

5  petition obligations that they had against the company.  And

6  when we entered into an agreement with them, the company

7  executed a customary form of fee letter that said that the

8  fees and expenses associated with the proposed DIP lender

9  documenting things, and drafting with us, and negotiating

10  around the clock would be covered.

11         And they received a retained from the company,

12  which was done in every case I've ever been involved in.

13  When we found ourselves in a situation where it was going to

14  be a competitive process, we continued to lean on this

15  proposed DIP lender and piggyback off of their work, causing

16  them to be used as a stalking horse so that we could better

17  the deal.

18         The DIP facility term sheet, as you noted, would

19  connote, Your Honor, from the blackline we've submitted to

20  the Court, and on the docket are blacklines of the term sheet

21  and the order that were prepared by our prior proposed DIP

22  lender.

23         The question about itemization and things like

24  that are not at issue here because lenders are not required

25  to file fee applications.  There's not itemization

1   requirements.  We have noted that there only up -- going to

2   be dock -- only going to be reimbursed for actual documented

3   costs.  So there's not a made-up number here.  It will be the

4   actual fees that were incurred in excess of the retainer that

5   they received.

6           So because we have a fee letter and post-petition,

7   the work was done, we terminated the fee letter as soon as we

8   went with someone else.  But in between the period of time

9   when we decided to go with someone else and we -- and we

10  signed the letter, there were both prepetition expenses that

11  were incurred that have already been paid and then, now,

12  there are post-petition expenses that were incurred.

13          I would also say that what 503 says is upon motion

14  and upon notice and hearing.  And here we are, we're at a

15  hearing.  We didn't -- we weren't trying to hide the ball.

16  We put it directly in the order.  We've covered it on an

17  evidentiary basis.  We have a record through the Cesarz's

18  declaration about the process and the value that was added.

19          And I would also say the Court can take notice of

20  the process and the value that was added in light of the

21  several stops and starts that we've had before Your Honor

22  since we first appeared in this case.

23          So from the Debtor's perspective, it is

24  reasonable, it is necessary, and to add to those dollars that

25  the estate would be paid, additional dollars for more

1  process, when the issue that it is deserved is plain on its

2  face seems to just take more administrative dollars than we

3  are already seeking here.  So we would ask that this be

4  approved.

5          I don't think it's a slippery slope.  This is a

6  completely bizarre situation.  In the couple of decades I've

7  been doing this, I've been involved in this never, so I don't

8  think you're going to see this in every case, and I don't

9  think Ms. Sierra-Fox has a slippery slope issue that we

10 should be worried about here.

11         THE COURT:  Thank you.

12         MR. ADLERSTEIN:  Your Honor, just briefly.  It's

13 Jacob Adlerstein, from Paul, Weiss, Rifkind, Wharton &

14 Garrison, on behalf of the ad hoc committee of convertible

15 noteholders and the parties that had interviewed the DIP

16 lenders in this matter at the outset of the cases.

17         I echo Ms. Strickland's comments and just a couple

18 things to point out in response to the concerns raised by the

19 United States Trustee.  I don't believe substantial

20 contribution is the only lens in which you need to consider

21 the possibility of the propriety of the reimbursement sought

22 here.

23         But I do believe that there's an evidentiary

24 record that would fulfil that requirement.  And you only have

25 to -- you can look at the declarations that have been

1    submitted into the record already and at the first-day

2    hearing without any objection in terms of the statements made

3    by Mr. Cesarz and as well as in the first-day declaration

4    that go the time and effort spent by the perspective DIP

5    lenders to both provide the capital, commit the capital,

6    provide the baseline financing that was ultimately what the

7    Debtors intended to pursue in the first day in the case,

8    serve as a baseline for which competing offers came

9    afterwards.

10            As Ms. Strickland said, many -- a lot of the

11   documentation that's before the Court was initially based on

12   work and effort and and expense incurred by the members of

13   the ad hoc committee to prepare that documentation and is now

14   serving a baseline for the competing DIP lender that's coming

15   through Sixth Street.

16            So I do believe not only the economic terms and

17   the significant benefits that insure to the estate are a

18   result of the prior DIP proposal, but also the noneconomic

19   terms and the noneconomic expense supports the request that's

20   being made.

21            And then, I'd also just echo the notion that there

22   was a fee letter executed prior to the petition date, that

23   the letter contemplated the payment of fees in connection

24   with the provision of a potential DIP financing.  And there

25   was significant work as Your Honor as seen.  You obviously

1  have seen the tip of the iceberg, but you can imagine what

2  was going on in the background post-petition connection with

3  those potential services.

4         Lastly, to the extent the Office of the United

5  States Trustee was concerned about the notion that there

6  wasn't a kind of governor on what constitutes reasonable and

7  documented, although obviously, the Debtor is -- the State

8  fiduciary that would look closely at those types of invoices,

9  if that is the basis for the concern, we would be happy to

10 make our post-petition invoices subject to some reasonable

11 review period for reasonableness for the U.S. Trustee.

12         THE COURT:  Ms. Sierra-Fox?

13         MS. SIERRA-FOX:  Yes, Your Honor.  Your Honor, I

14 guess I'd like to take -- make a response and take some of

15 the comments in turn.  With respect to the comment that

16 503(b) requires notice in a hearing, and that's what we're

17 getting today, what we're getting today is an emergency

18 first-day hearing with notice to a limited set of parties

19 where, effectively, the U.S. Trustee is the only party at

20 this point with the real ability to raise the concern --

21 raise concerns that impact the more general creditor body

22 here.  Your Honor, so I would submit that this is not the

23 notice and the hearing that 503(b) contemplates.

24         Second, Your Honor, I think a clarification was

25 made that this pre-petition fees of the professionals of the

1  ad hoc unsecured noteholders committee have already been

2  paid, so this request is with respect to the post-petition

3  expenses of those lenders or noteholders.

4         Your Honor, again, to the extent -- I was under

5  the understanding this also encompassed prepetition fees, and

6  my point there is to the extent that it does encompass pre-

7  petition fees, then, there -- whatever's unpaid is no

8  different than any general unsecured claim at this point.

9         To the extent that it doesn't and it only applies

10  to the post-petition expenses, Your Honor, again, I think

11  503(b) makes it clear what is the requirement to get these

12  type of fees paid as essentially administrative expenses of

13  the estate, Your Honor.

14         And I think inserting this in DIP -- interim DIP

15  order that no parties have had -- or that not many parties

16  have gotten notice of and the ability to participate in when

17  there is a lot of outstanding trade debt and other parties

18  and interests here that I'm sure would also like their fees

19  paid is totally inappropriate, Your Honor.

20         And I think, Your Honor, just to respond to Mr.

21  Adlerstein's suggestion that this is just about the

22  documentation and the submission of invoices to the U.S.

23  Trustee, it's not just about that, Your Honor.

24         I think 503(b), the structure of 503(b), and the

25  provisions of it that go to the substantial contribution

1  and -- are geared towards transparency and disclosure.  And

2  that was my point in bringing up the point about invoices and

3  the documentation of those fees.

4           I think strictly speaking, the noteholders are no

5  longer and are not the DIP lenders, so to the extent that

6  they're totally unsecured parties that are seeking to have

7  the fees of their professionals paid, the code contemplates a

8  way to do that.  And it's not in an interim DIP order that,

9  quite frankly, Your Honor, only -- I don't even think has

10 been filed on the docket yet.  So thank you.

11          THE COURT:  Thank you.  Does anyone else wish to

12 be heard with respect to that issue?  Okay.  Is that your

13 final issue, Ms. Sierra-Fox?

14          MS. SIERRA-FOX:  Yes, it is, Your Honor.

15          THE COURT:  I'm going to take a break --

16          MS. STRICKLAND:  Your Honor?

17          THE COURT:  Yes.

18          MS. STRICKLAND:  I just wanted to note there's a

19 hand up, and I wasn't sure if that was someone answering your

20 questions or gesticulating and have the computer respond.

21          THE COURT:  Unfortunately, I can't see a hand up.

22 So is there a hand up?

23          MS. STRICKLAND:  It's --

24          MALE VOICE:  Yes.

25          MR. MALBRIS:  Your Honor, I guess I wonder if I

1  could have permission to speak as a shareholder.

2          THE COURT:  Yes.  Could you identify yourself,

3  please?

4          MR. MALBRIS:  My name is Jan Michel Malbris, and I

5  have been --

6          THE COURT:  Could you also turn on your camera,

7  sir?

8          MR. MALBRIS:  Yes.

9          THE COURT:  You wish to be heard regarding the

10 proposed financing?

11         MR. MALBRIS:  It is some general concerns that I

12 have had, and I'm sure many of the shareholders agree with

13 me.  Maybe -- you know, I've never been in a bankruptcy

14 court, so I don't know if this is the right moment to express

15 my concerns or you will -- we will have another chance to

16 speak.

17         THE COURT:  Well, sir, this a public hearing, so

18 you'll always have an opportunity to speak at a public

19 hearing.  I don't know what your questions are, but are they

20 questions that perhaps you would like to speak to one of the

21 Debtor's counsel about?

22         MR. MALBRIS:  Yes.  Because I think the -- I know

23 so much that the shareholders are last in line to receive

24 anything from the bankruptcy court, but there have been so

25 many question marks here that I can't understand why we

1 should be in a bankruptcy court because I have been invested

2 in this company for -- since 2019, invested very heavily.

3       And this company -- and I've always felt that this

4 company leadership has never had the shareholder -- the

5 interest of shareholders in focus, and we have never -- been

6 neglected all the time.  And we have always seen, like, the

7 illusion of the stocks increasing, the number of shares,

8 like, the only way to fund the operations, which is

9 understandable to some extent.  I understand that.

10       But the last time that we had seen a proposal at

11 our 2022 annual meeting, they had a proposal of a reverse

12 stock split and a new ATM program which would meant a huge

13 dilution of the stock again.  And this proposal was turned

14 down by the shareholders from majority retail investors.

15       And then, we were told that the company is also

16 exploring various partnership or license agreements for the

17 products or product candidates, which we saw at the Lifeline.

18 And for me, I mean, strange thing is so today, we have --

19 they have actually succeeded in the latter by entering this

20 agreement to sell FAP 2286 to Novartis.

21       But we never were expecting, like, this good news

22 to come with a filing for Chapter 11, which would left all of

23 us out there and that -- in other words, to throw all the

24 shareholders under bus.  And I mean, and now, I hear, like,

25 their comments about the Rubraca being, like, not worth

1  anything.  This is exactly the opposite of what have been

2  told.

3          I mean, so -- under so many year that Rubraca is

4  not, like, it is worthless, and the whole company was built

5  on Rubraca, and the money and everything that it brought it.

6  So I just -- that's -- therefore, I just -- I would like to

7  humbly ask the judge to take all the current shareholders'

8  rights and interests into account and not just let the

9  company just --

10         I mean, just throw all the shareholders under bus,

11  and go through the Chapter 11, and just come whole on the

12  other end. and just being able to issue, I don't know, 100

13  million new shares and just -- that would be business as

14  usual.  So that would be so unfair to all the shareholders

15  that have invested all their life savings in this company --

16             THE COURT:  Well, so --

17             MR. MALBRIS:  -- and not getting anything.

18             THE COURT:  Okay.  Thank you, sir.  I appreciate

19  your comments.  Do you have any specific comments with

20  respect to the proposed financing that is being discussed

21  today or the proposed form of order?

22             MR. MALBRIS:  I don't have a lawyer right here.  I

23  am not a lawyer, but the whole -- I mean, the set up, it

24  looks like it doesn't take the rights of the shareholders

25  into account at all.  As the U.S. Trustee mentioned, I mean,

1  maybe all the parties involved would need some more time, I

2  mean, just to change --

3          THE COURT:  Sir --

4          MR. MALBRIS:  -- I mean, a couple of days before

5  Christmas, with the bankruptcy and not giving everybody

6  enough time.  I mean --

7          THE COURT:  Well, sir, this would be an interim

8  order, and you would have an opportunity to come forward

9  before the final hearing.  And Debtor's counsel can correct

10 me if I'm wrong, but I believe the final hearing is January

11 11th.

12          MS. STRICKLAND:  That's correct, Your Honor.

13          THE COURT:  So sir, you have the opportunity to

14 object to the final order in this case, to the relief sought.

15 Your objection deadline is 4:00 p.m. on January 4th.

16          MR. MALBRIS:  Okay.

17          THE COURT:  So you have the right to come forward

18 and object.  You also can reach out to the Debtor's counsel.

19 I'm sure that Ms. Strickland could provide us with someone

20 who is the appropriate contact for inquiries that you or

21 other equity holders might have.

22          MR. MALBRIS:  Okay.  Thank you.

23          THE COURT:  Okay?  So for now, I'm going now ask a

24 few questions about the form of sale order, and then, I'm

25 going to -- I mean, DIP order, excuse me.  And then, I'm

1  going to take a break and go over my notes, and then, I'm

2  going to come back and rule, okay?

3        On Page 2, this provides for filing of the DIP

4  credit agreement and then, it gives five business days for

5  response.  Obviously, the committee would have more time

6  because of our local rules with respect to committees.  But

7  is there any reason this couldn't be extended for a couple of

8  days given the time of year?

9        MS. STRICKLAND:  Your Honor, I'm going to pause

10  and see if Mr. Saferstein's going to come on.

11        THE COURT:  Okay.

12        MR. SAFERSTEIN:  Yep, no problem, Your Honor.

13  What do you suggest?

14        THE COURT:  I don't know.  But I was just thinking

15  that five business days is next Friday, right before the

16  Christmas holiday.  So I mean, seven business days, ten

17  business days?

18        MR. SAFERSTEIN:  Seven would be fine.

19        THE COURT:  Okay.  And that is in this document

20  twice.  Hopefully I have marked where I saw it elsewhere.

21  Mr. Saferstein, you might want to just stay on screen for a

22  minute.

23        MR. SAFERSTEIN:  Yep, I'm on.

24        THE COURT:  Paragraph -- it's Page 11 of the

25  blackline.  It's Paragraph G, ii, it talks about all the

1  Debtor's cash, including cash in deposit accounts.  Does this

2  include the remainder of funds related to the capital rise

3  that's addressed in Mr. Eisenberg's declaration?

4        MR. SAFERSTEIN:  Your Honor, I don't know if

5  that's a question for me or for Ms. Strickland.  I mean, they

6  know their cash.  I believe it's all of their cash.

7        MS. STRICKLAND:  It is all of our cash, Your

8  Honor.

9        THE COURT:  Okay.  The other place the deadline

10 needs to be modified is Paragraph 5 on Page 22.  In Paragraph

11 7, I'm about eight lines up from the bottom of the paragraph,

12 and it provides the prepetition secured parties may in their

13 sole discretion file a photocopy of this order.  I don't know

14 if that's what another recording office or whatever is going

15 to allow you to do.  So I'd like you to modify this to say to

16 the extent permitted by non-bankruptcy law.

17       MR. SAFERSTEIN:  That's fine, Your Honor.

18       THE COURT:  Thank you for inserting about the

19 challenge period.  Just -- this is Paragraph 19 on Page 41,

20 just a nit comment.  About halfway the page, there's an

21 parenthetical, whether commenced by such trustee.  Just

22 missing the Y.

23       Paragraph 20, starting on Page 42 and running

24 through 44, this, to me, appears to be a Debtor's

25 stipulation.  This appears inappropriate for the Court to be

1  ordering on an interim order.  And it's a re -- in some ways,

2  a rewrite of the code.

3          MS. STRICKLAND:  Your Honor, I will attempt this

4  one, which is to say that I think it is a clarification in

5  the sense that the pre-petition lender has a first lien on

6  the -- on Rubraca.  And so they are first in line with

7  respect to that collateral.  And then, the DIP lender has a

8  first lien on that collateral.

9          So where it's talking about the DIP collateral

10  constituting pre-petition collateral, that's referring to

11  Rubraca, and it's saying that if Rubraca is sold, it is

12  clarifying that the DIP lender doesn't get it first because

13  that's not the way the agreement works under the term sheet.

14          It's instead going first to the pre-petition

15  lender in accordance with its documents, and then only if

16  there is sufficient value of Rubraca would it go to the DIP

17  lender.  So I believe that's why this is in here.  So it's

18  not anything other than providing full context for the

19  agreement at hand.

20          THE COURT:  Well, isn't it a Debtor stipulation,

21  though?

22          MS. STRICKLAND:  I would say it's -- I don't --

23          THE COURT:  I don't think it's something the Court

24  enters on interim relief.

25          MR. SAFERSTEIN:  Your Honor, I think it's

1 protection for us as DIP lender in how the -- and pre-

2 petition lender -- in how, as Ms. Strickland said, the

3 collateral when it's sold gets distributed because we have

4 both.  We have both the prepetition lien and a DIP lien, and

5 we just want to make sure that everybody understands how

6 that -- when that collateral is sold how it is allocated.  I

7 think it's just as simple as that.

8           THE COURT:  It is something that's required today

9 or is it -- could it be something that's entered on a final

10 basis?

11          MR. SAFERSTEIN:  We could push it to the final

12 hearing, Your Honor.

13          THE COURT:  Okay.  Subject to entry of a final

14 order.  I think those are the other minor comments I had.

15 We're going to take a recess until 6 o'clock, and I'll come

16 back and address the objections of the U.S. Trustee and make

17 the ruling, okay?  Is there anything else --

18          MS. STRICKLAND:  Thank you, Your Honor.

19          THE COURT:  -- that I could hear before we go off

20 record?  Okay.  Then, we stand in recess until 6:00 p.m.  And

21 in the interim, could the Debtor reach out with respect to

22 inquiries for shareholders who they could contact?

23          MS. STRICKLAND:  Certainly, Your Honor.

24          THE COURT:  All right.  Thank you very much.  We

25 stand in recess.

1              (Off the record at 5:19 p.m.)

2              (On the record at 6:06 p.m.)

3              THE COURT:  We're back on the record in the case

4    of Clovis Oncology, Case Number 22-11292.  When I was on the

5    bench earlier, I forgot to ask.  I had two questions about

6    the term sheet.  One is on Page 5 of the term sheet, and we

7    discussed this briefly in the context of the order.  But the

8    1.5 percent upfront fee is payable to each DIP lender.  How

9    many DIP lenders are there?

10             Oh, I'm sorry, I think -- you're -- Ms.

11   Strickland, your line's muted.  Or let me just check.  Is our

12   line muted?

13             MALE VOICE:  No, it's not.

14             THE COURT:  Mr. Saferstein, can you hear us?

15             MR. SAFERSTEIN:  Yep, yeah, I can hear you, Your

16   Honor.  The DIP lender is Sixth Street and affiliates of

17   Sixth Street, if that's -- we're not syndicating the debt.

18   It's all Sixth Street.

19             THE COURT:  Okay.  So is it just -- is it -- so

20   it's just 1.5 or is it 1.5 per lender or 1.5 per rata?

21             MR. SAFERSTEIN:  It's just 1.5 on the number.

22             THE COURT:  Oh, okay, all right.  Thank you.  And

23   then, you'll probably know the answer to this, as well.  Page

24   6, it states the DIP agent fees paid annually, and I assume

25   that means annually, yearly; is that correct?

1              MR. SAFERSTEIN:  That's my understanding, Your

2    Honor.

3              THE COURT:  Okay.  So I mean, I know that sounds

4    silly.  But who makes the payment when FAP is sold or for the

5    other entity?  I can't think --

6              MS. STRICKLAND:  Rubraca.

7              THE COURT:  Rubraca.  Thank you.  Rubraca.

8              MS. STRICKLAND:  Does this work?

9              MR. SAFERSTEIN:  Yes, we hear you now.

10             THE COURT:  Oh, we hear you now.

11             MS. STRICKLAND:  Thank goodness.

12             THE COURT:  Do you want to correct anything he

13   said?

14             MS. STRICKLAND:  No.  I agree with everything that

15   he said.  Who makes the payment?  The payments are always

16   made by Clovis Oncology to the lenders.

17             THE COURT:  Okay.  All right.

18             MS. STRICKLAND:  Because it's -- they're

19   distributing proceeds.

20             THE COURT:  Right.  Okay.  All right.  All right.

21   Well, I'd like to thank everyone for their thoughtful

22   arguments this afternoon, and I appreciate your time, and

23   particularly the discussion on your respective positions with

24   respect to objections to the form of order.

25             I should ask the U.S. Trustee online?  Oh, she is.

1  Okay.  I just want to make sure I didn't start without you.

2  Given the time and the need for an order today,

3  I'm going to skip straight to the ruling.  I'm going to

4  overrule the U.S. Trustee's objections, with the exception of

5  Paragraph 27C in the proposed order.

6  The payment of the post-petition ad hoc committee

7  fees is not relief necessary to avoid irreparable harm.  It's

8  also subject to Section 503(b).  So I ask that you delete

9  that paragraph.  The ruling, of course, is without prejudice

10  to their right to file an application for those fees.

11  So based on the record before me, including the

12  first-day declaration of Paul Gross at Docket Number 30, the

13  declaration of Randall Eisenberg at Docket 29, the

14  declaration of John Cesarz at Docket 35, and his supplemental

15  declaration at Docket 170, I'm prepared to enter the interim

16  order.

17  The Debtors have established that they lack

18  sufficient funds on hand to meet their operating needs and

19  conduct the contemplated sale process in Chapter 11.  The

20  Debtors have also established that they've had a robust and

21  competitive financing process, having considered multiple

22  competing financing offers, and engaged in negotiations with

23  the pre-petition secured lender and the pre-petition

24  noteholders, including multiple days of extensive, arm's-

25  length negotiations following the bankruptcy filing.

1        Ultimately, following a four-hour negotiation

2   yesterday to consider the DIP financing proposals, the

3   Debtors determined that the final DIP financing proposal

4   submitted by the pre-petition secured lender contain more

5   favorable terms as compared to the ad hoc committee DIP

6   facility.

7        Based on the uncontroverted supplemental Cesarz

8   declaration, the economic terms and conditions of the DIP

9   facility are fair and competitive.  The terms and condition

10  of the DIP facility are generally consistent with market

11  terms for debtor-in-possession financing.

12       And the fees, and expenses, and premiums

13  associated with DIP financing, as well as the rollup, are

14  appropriate and represent the best terms currently available

15  to the Debtors.  The DIP facility is necessary to avoid

16  immediate and irreparable harm to the Debtor's estates and

17  creditors.

18       Access to the proposed DIP facility and cash

19  collateral will preserve the value of the Debtor's estate and

20  allow the Debtors to conduct the contemplated sale process

21  for the benefit of their estate and creditors.

22       So I'll enter the revised interim order with the

23  modification addressed earlier, and I'd ask that the Debtors

24  submit that under certification of counsel with a clean

25  blackline order.  I assume that that's something you want

1  this evening, correct?

2          MS. STRICKLAND:  Yes, Your Honor.

3          THE COURT:  Okay.  So can you give us a sense of

4  timing of when we might expect that certification and

5  proposed order?

6          MS. STRICKLAND:  Certainly, Your Honor.  We have

7  turned all the comments in anticipation and hoping you would

8  rule this way, so it'll be very shortly.  We are incredibly

9  appreciative of the fact that you and your staff have given

10 us first-day hearings three days in a row, and we know it is

11 late on a Friday night.

12         THE COURT:  That's okay.  I just want to make sure

13 that you share the blackline with Ms. Sierra-Fox.

14         MS. STRICKLAND:  Absolutely.

15         THE COURT:  And then, we'll be watching for the

16 proposed order and get it docketed.  Is there any -- are

17 there any other housekeeping matters tonight?  Okay.

18         MS. STRICKLAND:  No, Your Honor.  Thank you very

19 much.

20         THE COURT:  You're welcome.  I just want to note

21 for shareholders who are on the line and have inquiries, they

22 should contact Kroll at 888-391-2243, domestically, and

23 internationally, the number is 646-330-4352.

24         Also, you do not need to send a cumulative

25 blackline because I believe the earlier one was filed with

1  the Court and has been docketed.  So you can just simply do a

2  redline from the comments made since the commencement of the

3  hearing.

4             MS. STRICKLAND:  Thank you, Your Honor.  We'll do

5  so.

6             THE COURT:  Okay.  So again, I'd like to thank

7  everyone for their thoughtful comments, and I certainly

8  appreciate everyone working together.  I know this has been

9  very fluid and a difficult situation, and I appreciate Ms.

10  Sierra-Fox's time and your comments on the proposed order.

11             So other than that, I will see everyone January

12  11th for the second-day hearing, and I hope you all have a

13  very restful weekend because I'm certain you all need that.

14  So we stand adjourned.  Thank you.

15             MS. STRICKLAND:  Thank you, Your Honor.

16             MALE VOICE:  Thank you, Your Honor.

17

18

19

20

21

22

23

24

25

1                         CERTIFICATION

2

3   I certify that the foregoing is a correct transcript from the

4   electronic sound recording of the proceedings in the above-

5   entitled matter to the best of our knowledge and ability.

6

7   /s/ WENDY SAWYER                         December 21, 2022

8   WENDY SAWYER, CDLT

9   Certified Transcriptionist

10  For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25