1                 UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF DELAWARE
2

3 IN RE:                  .   Chapter 11
                     .   Case No. 22-11292 (JKS)
4 CLOVIS ONCOLOGY, INC.    .
   *et al.,*              .   (Jointly Administered)
5                      .
                     .   Courtroom No. 6
6                      .   824 Market Street
               Debtors.   .   Wilmington, Delaware 19801
7                      .
                     .   Friday, January 20, 2023
8 . . . . . . . . . . . . . . .   1:00 p.m.

9

               TRANSCRIPT OF ZOOM HEARING
10         BEFORE THE HONORABLE J. KATE STICKLES
           UNITED STATES BANKRUPTCY JUDGE

11

12 <u>APPEARANCES</u>:

13 For the Debtors:        Rachel C. Strickland, Esquire
                     Andrew S. Mordkoff, Esquire
14                    787 Seventh Avenue
                   New York, New York 10019
15
For the Official
16 Committee of Unsecured
Creditors:           Benjamin W. Butterfield, Esquire
17                    Lorenzo Marinuzzi, Esquire
                   MORRISON & FOERSTER, LLP
18                    250 West 55th Street
                   New York, New York 10019
19
(APPEARANCES CONTINUED)
20 Audio Operator:        Sean Moran, ECRO

21 Transcription Company:  Reliable
                   The Nemours Building
22                    1007 N. Orange Street, Suite 110
                   Wilmington, Delaware 19801
23                    Telephone: (302)654-8080
                   Email: <u>gmatthews@reliable-co.com</u>
24
Proceedings recorded by electronic sound recording,
25 transcript produced by transcription service.

1   APPEARANCES (CONTINUED):

2   For TOP IV
    Talents, LLC:              Jeffrey D. Saferstein, Esquire
3                              WEIL, GOTSHAL & MANGES, LLP
                               767 Fifth Avenue
4                              New York, New York 10153

5   For Novartis
    Innovative
6   Therapies AG:              Benjamin Mintz, Esquire
                               ARNOLD & PORTER KAYE SCHOLER, LLP
7                              250 West 55th Street
                               New York, New York 10019
8

9   For the US Trustee:        Rosa Sierra-Fox, Esquire
                               UNITED STATES OFFICE OF THE TRUSTEE
10                             J. Caleb Boggs Federal Building
                               844 King Street
11                             Suite 2207, Lockbox 35
                               Wilmington, Delaware 19801
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                  INDEX

2   MOTIONS:                                                   PAGE

3   Agenda
    Item 19:   Debtors' Motion for Entry of Orders (I) (A)         4
4              Authorizing the Debtors to Obtain Senior
               Secured Superpriority Post-petition Financing,
5              (B) Granting Liens and Providing Claims With
               Superpriority Administrative Expense Status,
6              (C) Modifying the Automatic Stay, and (D)
               Granting Related Relief; (II) Authorizing Use
7              of Cash Collateral and Granting Adequate
               Protection; (111) Scheduling a Final Hearing;
8              and (IV) Granting Related Relief
               (D.1. 28, filed 12/13/22).
9
               Court's Ruling:                                    69
10
    Agenda
11  Item 20:   [SEALED] Motion of the Debtors for Entry of        72
               Orders (l)(A) Approving Bidding Procedures
12             for the Sale of Substantially All of the
               Debtors Assets, (B) Authorizing Entry Into the
13             FAP Stalking Horse AP A and to Provide the FAP
               Stalking Horse Bid Protections Thereunder, (C)
14             Authorizing Procedures to Designate Additional
               Stalking Horse Bidder(s) and to Provide Bidding
15             Protections, (D) Scheduling an Auction and
               Approving the Form and Manner of Notice Thereof,
16             (E) Approving Assumption and Assignment
               Procedures, (F) Scheduling a Sale Hearing and
17             Approving the Form and Manner of Notice Thereof
               and (G) Granting Related Relief; and (II)(A)
18             Approving the Sale of the Debtors Assets Free
               and Clear of Liens, Claims, Interests and
19             Encumbrances, (B) Approving the Assumption and
               Assignment of Executory Contracts and Unexpired
20             Leases and (C) Granting Related Relief
               (D.I. 31, filed 12/13/22).
21
               Court's Ruling:                                    95
22

23  DECLARATIONS:                                              PAGE

24  1) Supplemental declaration of John Cesarz                 74

25  Transcriptionist's Certificate                            100

1    (Proceedings commenced at 1:00 p.m.)

2         THE COURT:  Good afternoon.  Please be seated,

3  everyone.

4         Good afternoon.  We're on the record in the case

5  of Clovis Oncology and its related cases at Case Number 22-

6  11292.  We're here today on the final DIP order and the

7  debtors' bidding procedures.  I believe that I've entered

8  orders, with respect to everything else that was scheduled

9  for today.

10        MR. MORDKOFF:  Good morning -- good afternoon,

11  Your Honor, the Andrew Mordkoff, Willkie Farr & Gallagher.

12  Yes, thank you to you and your team for entering 17 orders in

13  the last 48 hours.  We greatly appreciate it.

14        THE COURT:  Okay.  Before we begin today, I

15  thought I'd like to start by hearing from the Committee on

16  its open issues regarding the DIP financing order.  I have

17  reviewed the reply, the reply last night and the supplemental

18  declarations, as well as the blackline order, and I was

19  curious where we stood with the Committee, so I'd like to

20  hear from counsel for the Committee.  Just a brief highlight

21  identifying remaining issues.

22        MR. BUTTERFIELD:  Good afternoon, Your Honor.  Ben

23  Butterfield, Morrison & Foerster for the Committee.

24        So, look, we tried to narrow the issues a little

25  bit and, you know, we've knocked out some of the low-hanging

1  fruit, but I think there's still a lot of work to do.  The

2  main two issues for us are the waterfall, the proceeds

3  waterfall and the 506(c) waiver; those are unresolved.

4       The lender did agree that we could challenge the

5  rollup portion of the DIP, which we appreciate.  So, that

6  issue has been taken care of.

7       And we did give on some of, like, the smaller

8  issues that we put in our reply, for example, I believe we've

9  reached a deal on what, like, an acceptable plan would look

10 like and those consent rights, but most of the big stuff is

11 still there.

12      THE COURT:  Okay.  All right.  Thank you.

13      And so, with that preview, I will turn the podium

14 over to debtors' counsel.  And although the rollup issue has

15 been resolved, I do want to address the rollup briefly.  It

16 was never this Court's intention to roll up on secured debt

17 and as with anyone else, everyone else at this hearing, the

18 last hearing we had, we were all operating a little bit under

19 the gun, drinking from a fire hose, and reading from a stale

20 DIP motion.

21      So, my recollection was that the Court had asked

22 about and understood that the cash on hand was Sixth Street's

23 cash.  That said, I'm glad the parties have resolved the

24 rollup issue.

25      MR. BUTTERFIELD:  Oh, could I just clarify that?

1          THE COURT:  Certainly.

2          MR. BUTTERFIELD:  So, the roll-up issue is not

3   resolved in full.

4          THE COURT:  Okay.

5          MR. BUTTERFIELD:  So, basically, that we can

6   challenge the rollup to the extent they're not secured, the

7   liens have deficiencies, we can unwind it, but that really

8   doesn't solve our problem, because the portion of the Sixth

9   Street loan that's being rolled-up is the deficiency claim.

10  And so, yes, they may be secured, but all that security is

11  going to pay down a portion of the loan that's not being

12  rolled-up, as the order is currently drafted.  So, we are

13  definitely is it at odds over the application of proceeds.

14          THE COURT:  Okay.

15          MS. STRICKLAND:  Good afternoon, Your Honor.  For

16  the record, Rachel Strickland, Willkie Farr & Gallagher, on

17  behalf of the Clovis debtors.  We are seeking final approval

18  of the DIP facility and as Your Honor will recall from our

19  disjointed and continued first day hearing, this relief is

20  critical to our ability to maintain the value and dispose of

21  both of the major assets, both the Rubraca asset, which is

22  the only drug that is commercially available and actually

23  sold by the debtors, as well as FAP, which is scheduled to be

24  sold to Novartis, unless there is a higher or a better bid.

25          Our record to support the relief consists of the

1 declarations of Mr. Gross, the company's general counsel; Mr.

2 Cesarz, the company's banker; and Mr. Eisenberg, the

3 company's financial advisor.  Those are at Dockets 29, 30,

4 36, and 107.

5         The need for the facility is not in doubt.  The

6 record that this DIP is $60 million more beneficial for the

7 debtors and their stakeholders is uncontroverted.  The

8 Committee, the sole party objecting to the DIP understandably

9 wants a better deal, and who can blame them?  But that's not

10 enough to question the debtors' business judgment.

11        The UCC argues that it's unfair to first pay down

12 the pre-petition secured loan from at the proceeds of

13 Rubraca, but that's the only deal we've ever been offered by

14 anyone.  Our other alternative was for the DIP loan from our

15 pre-petition noteholders.  That was contemplated to be a

16 first lien on the FAP assets and a second lien on Rubraca,

17 exactly the priority and waterfall of what we have today.  In

18 that DIP, we either had to litigate contested use of cash

19 collateral or immediately shut down Rubraca.

20        Under this DIP, Sixth Street has consented to the

21 use of cash collateral and we are using it all.  This is the

22 only revenue we have coming in and our budget uses all of it.

23 Between now and April 30th, that's projected to be over

24 $63 million and that is indisputably Sixth Street's

25 collateral.  That doesn't even include the $31 million we had

1   in our accounts as of the petition date, which we do believe

2   is also Sixth Street's collateral.  If you count that, we are

3   using $94 million of cash collateral alone, and that's even

4   before we sell Rubraca and realize proceeds on the asset.

5           So, paying back Sixth Street's pre-petition loan,

6   pursuant to the waterfall, the same one that would have

7   existed on the third-party facility makes sense.  The rest of

8   the UCC's objection pertains to concerns about whether or not

9   Sixth Street is oversecured or unsecured, or undersecured,

10  rather.  That's not a today issue, nor in this case, I would

11  submit, particularly important.

12          First, the only pre-petition cash adequate

13  protection that Sixth Street got was $20,000 in fees.  There

14  are no fees on the roll-up portion.  Second, the $30 million

15  rollup is less than half of the cash that we have having come

16  into the estate from the sales of Rubraca post-petition and

17  about a third of our cash collateral overall.

18          Critically, is the challenge set aside in the DIP

19  order which allows the UCC to challenge the extent, validity

20  and priority of both, the remaining pre-petition loans and

21  rolled loans, including the right to seek to unwind the

22  rollup should address any concerns.  As for the rest of the

23  objections, we think they should be overruled, because this

24  case is not like other cases, this is not going to get paid

25  off on the effective date.  No one thinks it is.  It's a

1  risky loan.

2           We don't need a 506(c) claim here.  That was a

3  tool we absolutely preserved when we were dealing with a

4  third-party DIP that was not going to allow us to be able to

5  use the prepetition lender's cash to preserve Rubraca, but

6  they've already agreed that all of it can be used to preserve

7  that asset.  As a result, we think a waiver, which is

8  customary in a lot of cases, is certainly appropriate here.

9           We desperately need this DIP.  It is by far the

10 best one we could get and it's fair and appropriate and a

11 package deal that's in the best interests of the estates.

12          If Your Honor has specific questions about any of

13 the objectionable objection -- they're not objectionable

14 provisions -- they are provisions, which the UCC has objected

15 to, I'm happy to answer questions or just address the

16 arguments after their objection is put on the record.

17          THE COURT:  I think that I would prefer you

18 responding to their objections once they're put on the

19 record.

20          MS. STRICKLAND:  Great.  Thank you, Your Honor.

21          THE COURT:  And I think I'd like to proceed

22 through them all and then I'll take a quick break.

23          MS. STRICKLAND:  Thank you, Your Honor.

24          THE COURT:  Anyone want to be heard before the

25 Committee raises its opposition in like, an opening-type

1  statement?

2          MR. SAFERSTEIN:  Good afternoon, Your Honor.

3  Jeffrey Saferstein from Weil Gotshal & Manges, on behalf of

4  Sixth Street and certain of its affiliates.

5          Would Your Honor like to hear me first or to

6  address the objections of the Committee?

7          THE COURT:  I would prefer hearing your response

8  to the Committee's objections, but if you have any

9  preliminary statements, I'm happy to hear those.

10          MR. SAFERSTEIN:  No, I think Ms. Strickland

11  covered them.  You know, we think this is a different case

12  than a lot of the ones that come before the Court and, Your

13  Honor, given the auction dynamic here, but I'll save my

14  remarks for, you know, in response to the Committee's

15  objections.

16          THE COURT:  Okay.  Thank you.

17          MR. SAFERSTEIN:  Okay.  Thank you.

18          MR. BUTTERFIELD:  Thank you, Your Honor.  Ben

19  Butterfield, Morrison & Foerster for the Committee.

20          And thanks for making time for us.  We're all

21  still getting used to this in-person thing.  I realized this

22  morning that I forgot how to tie my tie without a mirror, so

23  that'll be something to work on, but it's great to be hear.

24      (Laughter)

25          MR. BUTTERFIELD:  So, turning to our objection, I

1  want to start by setting the stage.  So, this case is really

2  about two silos.  In silo one, you have the FAP business,

3  entirely unencumbered on the petition date.  We have an offer

4  to buy FAP for $680 million.  Fifty million of that is going

5  to come in at closing and the cost of running that sale will

6  be less than $50 million.  So, 50 million of immediate

7  proceeds.  We cover the costs with those proceeds and then we

8  net hundreds of millions of dollars down the road for

9  unsecured creditors; that's silo one.

10          Silo two, you have the Rubraca business.  A

11  different situation.  No stalking horse in Rubraca.  Look,

12  Rubraca was obviously worth a significant amount of money

13  quite recently, but now you have serious, unresolved

14  regulatory issues and that's definitely going to affect the

15  value of the asset.  And you have the Sixth Street loan

16  that's in silo two, $350 million, purportedly, of first lien

17  debt, which is subject to our challenge.  And even if the

18  sale of Rubraca is, like, moderately successful, I think

19  everyone expects that Sixth Street is going to have a massive

20  deficiency claim, and that means that unsecured creditors are

21  completely out of the money on Rubraca.  From the Committee's

22  perspective, we have nothing to gain from the sale of

23  Rubraca, at least that's how it looks today.  All right.  So

24  that's silo two.

25          So, what is the strategy?  The lender is seriously

1   undersecured on Rubraca so they want to break out of the

2   Rubraca silo and attach assets in the FAP silo and they're

3   doing this in two ways.  We make both of these points in our

4   objection.  So, one, application of proceeds, they're forcing

5   the debtors to satisfy what will surely be $30 million of an

6   unsecured deficiency claim with FAP assets and, two, the

7   506(c) waiver.  They want to use proceeds -- a portion of the

8   Rubraca sale is certainly going to with funded from the

9   Rubraca revenues and from the Rubraca cash collateral, but

10  not all of it.  They want to use a piece of the FAP DIP to

11  pay for the Rubraca sale.

12          And so the question for today is, I think, really,

13  it's just a legal one.  I mean, at a really high level, what

14  are the limits for, like, on DIP lenders for DIP lending?

15  So, what are the limits?  What's off limits?  Where's the

16  line?

17          Because, you know, one way to look at this, and

18  you just heard it, is the debtors held an auction and they

19  picked the best offer that was on the table and the unsecured

20  creditors just have to live with that.  Sorry.  I mean,

21  that's one perspective.

22          But another way to look at it is this situation is

23  really not that unusual.  You have this dynamic all the time.

24  This is just the normal power and balance between unsecured

25  creditors and funds like Sixth Street that can make DIP

 1 | loans.  The case law recognizes this.  Unsecured creditors
 2 | like, by March, can't make DIP loans and if these types of
 3 | cases just become pay to play, then smaller creditors are
 4 | just going to get completely squashed every single time.

 5 | And so, what you need to do is to force the lender
 6 | to stay over with Rubraca, stay in that silo.  As we were
 7 | thinking about this, you know, we asked ourselves, like, Are
 8 | there limits, right?  If you really -- if the debtor really
 9 | needs the money, isn't everything kind of negotiable?  And
10 | the answer is, no, there are limits.  Start with the easy
11 | ones, right, a challenge -- a lien challenge, right.  Like,
12 | imagine they said part of this deal is we have to waive the
13 | lien challenge right, just entirely.  Is that a DIP loan that
14 | can get approved?  I don't think so.

15 | Let's say they came in and said, We have a 60
16 | percent commitment fee and we're going to charge 70 percent
17 | interest.  Is that a loan that can get approved if, like,
18 | necessity required it?  No, I don't think so.

19 | If you want to be a DIP lender, you know the rules
20 | of the road, of the game and you have to play within them.
21 | You have to follow the rules.  You get a lot of rights as a
22 | DIP lender, but you have to follow the rules.  And so that
23 | brings me to our objection.

24 | So, look, one of the rules, and you said it
25 | earlier, is that, and we think it's a rule, is that you can't

1   roll up unsecured debt into a DIP.  And we got two replies,

2   both filed late last night, and I hoped them and I expected

3   to see a reference to a case that I missed, the case where in

4   an unusual circumstance, unsecured debt got rolled into a

5   DIP, but no.  No case law.  No examples.  And that's because

6   this is unprecedented.  It just does not happen in DIP

7   lending.

8           I mean, maybe it happens around the edges, where

9   you just, like, fix minor flaws with an all-asset lien, but

10  that's not this case.  What you don't see is dollar-for-

11  dollar, unsecured for secured.  And if you allow it here,

12  you're opening Pandora's box.  It's a terrible precedent to

13  set and it's going to affect a lot of unsecured creditors in

14  a lot of cases.

15          And Judge Shannon had a nice analysis on this in

16  Trico Marine.  He walked through it.  We cited the transcript

17  in our objection.  He said you look for good liens and then

18  you look for sufficient collateral, and then you look for a

19  coterminous collateral package, and if you have those three

20  things, then you can approve a rollup and it happens all the

21  time.

22          But here, you know, we're going to investigate the

23  liens, so we'll set that aside.  But the other two of the

24  three are completely missing.  This isn't -- there isn't

25  sufficient collateral.  No one is saying there's sufficient

1   collateral.  And the collateral package is no coterminous.

2   They are adding a brand new silo, the FAP silo.  So, the

3   Committee's view is that the application of proceeds

4   provisions, the waterfall provision just cannot be allowed as

5   a matter of law, and so that's the first issue.

6           And the second issue is that the lender wants

7   unsecured creditors to share in the cost of marketing and

8   selling their collateral, the 506(c) waiver.  And the problem

9   here, just to go back to our analogy, is that they are

10  ignoring the silos again.  There's no indication whatsoever

11  that unsecured creditors are going to recover anything from

12  Rubraca.  They're behind a first lien claim that could be as

13  large as $350 million, and if that is true, why are we

14  forcing them to fund the sale?  The cost of dealing with

15  Rubraca has to come out of the Rubraca silo, silo two.

16          And in their replies, the debtors and the DIP

17  lenders talk a lot about how this was heavily negotiated and

18  this is just one element of a larger deal and you can't pick

19  and choose, but the Committee completely rejects that line of

20  thinking.  If the lender wants the surcharge waiver, they

21  have to agree that all budgeted Rubraca expenses, including

22  shared overhead are funded from the Rubraca collateral.  They

23  have to agree.  That works.  That construct works.  This does

24  not.

25          And if they don't want to agree to that now, then

1  we can just kick-the-can on this and we can deal with it at

2  the end of the case, because this is not a today issue.  It

3  doesn't need to be resolved today.  And so, those are the two

4  main issues.  We think that they are bright-line issues.  The

5  Court can just call balls and strikes.

6           We have a list of smaller items.  I'm happy to run

7  through those now or we could save them.  There's truly,

8  like, second-order items, just, like, literally leading

9  through the order, but I'll stop there and see if Your Honor

10 has any questions.

11          THE COURT:  I don't.  I don't have any questions

12 right now.

13          MS. STRICKLAND:  Your Honor, that was an overly

14 simplistic argument.  The rollup is $30 million, so what the

15 Committee just said is that the overall pre-petition loan of

16 Sixth Street may be undersecured.  That's different from

17 whether or not it's an unsecured loan.  With respect to the

18 $30 million, noon is suggesting under any possible fact

19 pattern that they are secured to the tune of $30 million.

20 That is something -- those are dollars that are coming into

21 the estate every single day, which are the cash collateral of

22 Sixth Street, even without counting the $31 million we had

23 in.

24          So, if the Committee decides that they want to

25 challenge whether or not the dollars in the company's bank

1  accounts at the petition date are secured or unsecured

2  because a portion of them, the majority of them are not in a

3  lockbox, which again doesn't mean they're not Rubraca

4  proceeds and cash collateral, but if they want to go through

5  that analysis, the $30 million is fully secured, no questions

6  asked.

7            So, there's not a scenario here where dollar-for-

8  dollar, there's unsecured debt being rolled into a secured

9  DIP facility.  We are using 100 percent of cash collateral

10  for Rubraca and the reason why you heard that throw-in

11  argument of before you allocate the overhead is because the

12  only way that Rubraca is not fully covered by the amounts

13  that are cash collateral of the lenders is where you over-

14  allocate overhead and if the case costs, not the cost of

15  preserving or selling Rubraca, which is what a 506(c) waiver

16  would get you, but it's when you factor in the administrative

17  costs of the estate, which could be allocated a number of

18  ways.  But when we're talking about a 506(c) waiver of, I am

19  preserving and disposing of your collateral, which is what

20  the statute says and, therefore, I can use your money, we

21  are.  They've consented to that.  So, this waiver is much ado

22  about nothing.

23            The rollup, in terms of whether it's secured or

24  unsecured is not disputed.  It's secured.

25            Then, when it comes time for the sale of Rubraca,

1  the preservation and disposition of Rubraca has already been

2  paid by their collateral through the use of the cash.  If

3  there's proceeds of that, it goes to the party that has the

4  first lien on that.  They're going to be secured, to the

5  extent those proceeds exist.  If they don't and they don't go

6  to pay off the rest of their loan, I don't think we have any

7  disagreement.  SSP will have a large, unsecured deficiency

8  claim that will be *pari* with all of the other claims in the

9  case.

10         But to say that because a DIP lender is taking a

11 blanket lien, that's nothing new.  There's lots and lots of

12 debtors who have multiple assets and the DIP lender takes a

13 blanket lien.  Sometimes they had a pre-petition loan.

14 Sometimes they didn't have any at all, but they take a lien

15 on everything.

16         But here, there's not this massive cross-

17 collateralization that we're talking about.  The reality is

18 we needed a much bigger DIP before we were going to be able

19 to use consensual cash collateral.  The reason why this is

20 $60 million to the good is because the other DIP had to be

21 bigger because we didn't have the ability to use all of this

22 cash collateral and also because it had enormous fees

23 associated with it.  And I don't quibble with -- even the

24 term sheet we got on that one because this is an

25 extraordinarily risky DIP that's not getting paid back by

1    design.  It's already been predetermined what it's going to

2    roll into in an interest-free hope certificate.

3              So, I do think you have to break down each

4    individual piece and say, Am I rolling up an unsecured claim

5    into a secured claim?  I'm not.  I'm taking the secured

6    portion of what may prove to be an undersecured facility and

7    going secured for secured, but there's no prohibition on

8    that.

9              And I do believe that unless Rubraca is a total

10   homerun, there will be an unsecured deficiency claim and that

11   will have the exact same priority as every unsecured claim in

12   the case.  So, I don't think there's anything untoward here,

13   even when you break it down into its component parts if you

14   do it in an intellectually honest way.

15             Your Honor, I don't have anything else on this

16   particular point, but if we're going to go point by point,

17   perhaps Mr. Saferstein would like to address this point, as

18   well.

19             THE COURT:  Yeah, because --

20             MS. STRICKLAND:  Thank you.

21             THE COURT:  -- I'd like to hear from everyone on

22   this point.

23             MR. SAFERSTEIN:  Again for the record, Jeffrey

24   Saferstein from Weil, Gotshal & Manges on behalf of Sixth

25   Street.  Your Honor, I guess I would just make two points and

1 I would echo everything that Ms. Strickland said.  First of

2 all, I think the waterfall argument is really a red herring

3 here.  Once the prepetition debt is rolled into a post-

4 petition obligation, post-petition obligations are secured by

5 the FAP assets.  So, we're just respecting the two different

6 silos.  We now have a DIP facility that is secured by FAP and

7 we have a pre-petition facility that is secured by Rubraca.

8          We're not changing anything.  We were just

9 reciting -- because there are two separate assets -- we

10 wanted to be very clear that when the roll happens and it

11 becomes a DIP obligation, it is secured by FAP, as the rest

12 of the DIP obligations are and so we're respecting the two

13 assets and the two silos.  And so, I think people are trying

14 to confuse about what we're doing here.  We're not cross-

15 collateralizing.  It's becoming a DIP obligation and we are

16 secured by FAP.  So, that's point one.

17          And, again, I think courts, you know, in this

18 district have recognized rolls in a lot of cases, this roll

19 was done at less than 1:1.  I think certainly under the

20 circumstances, it is justifiable.

21          Again, I don't want to keep repeating myself, but

22 this is different than a lot of other cases, where the debtor

23 is negotiating with its secured prepetition lender.  It's

24 given terms and it pushes back as much as it can and then the

25 U.S. Trustee and the UCC push back and they see where they

1  can get to.

2          We had an auction and this was part of a package.

3  And so, we gave concessions as part of that package.  We

4  lowered interest rates.  We gave on fees.  We decided to PIK

5  things.  So, if this isn't given to us, do we get those

6  things back?  How does it work?  It was a package deal at an

7  auction, different than almost every other case I've

8  certainly ever been involved in.  I don't know how many DIP

9  auctions there have been -- very unusual.  And I think, you

10  know, it has to be viewed from that lens in that it was a

11  package deal.

12          The second point I want to make, the quantum here,

13  is the original DIP facility that was before the Court,

14  included a $93 million sale fee that was going to convert

15  into a CDR.  It was going to come directly out of the pockets

16  of unsecured creditors and that's in Mr. Cesarz's

17  supplemental declaration.  Through the roll, it has been

18  calculated that our CDR is going to be approximately

19  $34 million.  We could have not rolled anything.  We could

20  have said, you know what, we'll leave our prepetition debt

21  alone and we'll have a $34 million fee, sale fee.  It's less

22  than the $94 million or $93 million fee.  We'll just call

23  ours a fee and we wouldn't be having this conversation.

24          And we could do that.  We would have a larger

25  deficiency claim than at Rubraca, because when we roll, it's

1  a dollar-for-dollar reduction in the pre-petition debt.  We

2  would have a larger deficiency claim, ultimately, which would

3  then shared with unsecured creditors.

4         So, we decided not to play, you know, with the

5  debt -- with the proposal that we already had and just use

6  the roll, because we are a prepetition secured lender, but we

7  could have called it a fee, and we'd be competing fee against

8  fee, $94 million -- sorry -- 93 million against 34 million

9  and that would have been, as I said, a total different

10 discussion, but we didn't do that, so I think --

11        THE COURT:  But that's not really relevant because

12 the initial DIP isn't on the table.

13        MR. SAFERSTEIN:  It's not and Your Honor may not

14 have approved it, and I appreciate that.

15        My only point is to pick out one thing as part of

16 the package and say, We don't like that, but what does that

17 do to the rest of the package and where are we with the

18 things we gave up -- and we gave up a lot to save the estate

19 $60 million, which is benefiting the unsecured creditors

20 dollar-for-dollar.  $60 million is a lot of money.

21        So, again, I don't know where this leaves us.  You

22 know, the Committee, of course, they don't like certain

23 aspects, but I don't think you can cherry-pick the ones you

24 don't like and say, Hey, we like that you got lower

25 interest -- we like that you got lower -- an interest rate,

1  we like that you got PIK fees, but we don't like this one

2  component.

3         You know, from our perspective, that was a package

4  deal that was accepted by the debtors in their business

5  judgment.  It's the best deal.  Nobody has come forward to

6  beat our deal.  If the unsecured creditors don't like this,

7  well, you know, they were parties to the auction.  They could

8  have shown up.  They could have taken us out.

9         Nobody has shown up since the interim hearing.

10 Nobody has tried to take us out.  Nobody has offered better

11 terms.  So, I would submit this is, not only the best DIP

12 through an auction done with the debtors' business judgment,

13 it's the only DIP.  And, again, we view it that way from a

14 holistic perspective, as part of the package.  Thank you.

15         THE COURT:  Thank you.

16         MR. BUTTERFIELD:  Ben Butterfield, Morrison &

17 Foerster for the Committee.

18         Your Honor, we completely disagree with the

19 assertion that debtors' counsel made that this is secured for

20 secured.  That's sleight of hand.  There's 30 million of cash

21 that she's referencing.  Under this order, that cash is going

22 to be applied to the pre-petition loan, not the roll.  You

23 can't count it twice.  Either you apply it to the roll and

24 you call that the secured claim or you apply it to the pre-

25 petition loan and you call that the secured claim.

1           But you can't take $30 million and apply it in two

2   different places at the same time.  It only gets applied in

3   one place.  Under the order, as proposed, it's applied to the

4   pre-petition loan, which means we're now out of cash and the

5   roll-up portion is unsecured.

6           Agreed, at the exact same time, it's also been

7   cross-collateralized, but that's not the test.  You look at

8   it before the DIP liens.  This is a subordination agreement

9   that's basically baked into the DIP order.  It's very tricky.

10  It's sleight of hand.  But there's absolutely no way that the

11  Court should double-count the cash.  Thirty million gets

12  applied once and if you apply it to the DIP, it's rolled and

13  it's secured.  And if you apply it somewhere else, the roll

14  is not secured.

15          Okay.  So, what happens if Sixth Street walks?

16          MS. STRICKLAND:  Your Honor, may I just address

17  that one factual point?

18          THE COURT:  Yeah, because I -- really, this is a

19  big issue, I mean, to me, this is -- we need to really flush

20  this out.

21          MS. STRICKLAND:  Sorry.  I didn't mean to

22  interrupt, but --

23          THE COURT:  And, certainly, Mr. Butterfield, after

24  she finished, by I would really like to discuss this.

25          MS. STRICKLAND:  I don't understand the argument

1  that was just made, because it has to be the proceeds of

2  Rubraca.  The $31 million that we had in our accounts on the

3  first day and 100 percent of the estimated to be $63,250,000

4  that are going to be Rubraca receipts during the case, are

5  being spent on the case.  That is what is paying for Rubraca.

6  There's been no pay down of anything in the pre-petition.

7          What's happening is that $30 million from the pre-

8  petition facility, as a cost of the DIP, are being rolled

9  into the DIP and at the end of the case when Rubraca is sold,

10 the proceeds of Rubraca will first go down, to pay down the

11 pre-petition.  That 31 and the sixty-three two fifty are

12 gone.  The reason why our DIP borrowing needs are much lower

13 than they otherwise were, is because we are using 100 percent

14 of the cash collateral.  We are using it to preserve and

15 dispose of the Rubraca assets and to pay for the

16 administrative costs of these estates.

17          There is no double-counting, because the money

18 that's spent on this business and these cases is gone.  It's

19 not a paydown of $31 million as of the petition date, plus

20 the paydown of the Rubraca proceeds once the business is

21 sold.  There's only one paydown of the pre-petition and

22 that's at the end when the assets are sold and whatever that

23 is will be a paydown.  The rest will be an unsecured

24 deficiency claim.

25          The other reason why we know this is a secured --

1  by secured is because the cash piece, which again, is not

2  paying down the pre-petition -- we're using it as uncontested

3  use of cash collateral is $94 million, 31 of which was the

4  dollars on the petition date.  The rest are proceeds coming

5  in solely from the sales of Rubraca.  So, the sixty-three two

6  fifty can't even be argued to be anything else.  It has

7  nothing to do with lockbox, non-lockbox, all the rest of it.

8  And the roll is only $30 million, so there's absolutely no

9  double-counting.

10          The cash that we are using during these cases

11 belongs to someone.  It's their collateral and it's 100

12 percent getting spent.

13          THE COURT:  It is 100 percent the collateral of

14 Sixth Street?

15          MS. STRICKLAND:  Yes, but I want to break that

16 down so to make sure we don't have any misunderstanding.  So,

17 there's $94 million.  Sixty-three two fifty of it is sales of

18 Rubraca post-petition, dollars that are coming in from the

19 sale.  That cash is their collateral.

20          The pre-petition dollars that when we filed the

21 case, which is $31 million, there was three and change in a

22 lockbox.  No one can dispute that.  And the remaining you

23 know, 26 and change was sitting in general bank accounts of

24 the company.

25          So, could the Committee argue that that cash,

1 because it's not in a lockbox and there's not a possessory

2 lien is not their cash?  They could, however, because all we

3 sell is Rubraca, then the cash that we have on the petition

4 date, it is a very safe bet to say is their collateral.  We

5 did do capital raises.  We did have the raise of the notes,

6 but if we go through the UCC and how you perfect cash without

7 getting into a legal analysis that I don't have a record on

8 before you, so I will stipulate that this will be an open

9 point, it's going to be a very tough road to hoe to say

10 $31 million is not their cash collateral.

11 But at the very least, when we sell Rubraca,

12 yesterday, today, tomorrow, the day after, that's all their

13 cash collateral and it's twice as much as the roll.  So,

14 they're only getting a paydown of the unsecured -- of the

15 pre-petition secured loan one time at the end of the case

16 when Rubraca is sold.  All these other dollars that we're

17 talking about, which is their collateral, we're using.

18 That's what eliminates the need to get a much bigger DIP.

19 Any questions for me, Your Honor, on a factual

20 piece?

21 THE COURT:  No.  I feel like there's a factual

22 disconnect here between the parties and I'm not sure, now

23 that I understand the Committee's position, now that I do

24 understand your position or the debtors' position.

25 MS. STRICKLAND:  Okay.

1        THE COURT:  So, let me hear from the Committee.

2   And may you don't want to leave.  Maybe you want to stand up

3   there.

4        MR. BUTTERFIELD:  Ben Butterfield, Morrison &

5   Foerster for the Committee.

6        So, look, we don't disagree that there is $90

7   million of collateral proceeds before, subject to our

8   investigation and challenge, of course, right, but as of

9   today, just taking the facts and they're being asserted, we

10  don't disagree that there's $90 million of collateral

11  proceeds that are expected to come in, in cash before Rubraca

12  is sold.  We don't disagree.  Thirty million of that was in

13  cash in an account on the petition date and 60 million is

14  what debtors' counsel is talking about, which is just the

15  fact that Rubraca is sold and people buy it and they pay

16  money for that, and that's going to add up to $60 million

17  during the case.

18       What we don't know today is what it's going to

19  cost to operate the Rubraca business until we can close the

20  sale and also what it will cost to close the sale itself:

21  the restructuring costs, the banker fees, et cetera.

22       What she's telling you is that when it comes to

23  pay the -- when we have to pay the costs of operating the

24  Rubraca business, we're going to try to use the proceeds of

25  the business, but if we run out and that's in the enough,

1    we're going to go over to our FAP DIP and we're going to

2    borrow money, and that money coming out of the FAP DIP is

3    going to help us meet our operating costs.

4           But what never happens in this DIP is

5    reimbursement.  That does not get repaid.  And so it's --

6    what is -- and the result of that is unsecured creditors are

7    bearing the costs.  And so, there's not a dispute over the

8    90 million, but it's too soon to waive our right to look at

9    where the cards fall and where they -- and where this ends up

10   and what that cost is.  Nobody can tell you right now what

11   the sale is going to cost and then surcharge the collateral

12   to ensure that unsecured creditors are not paying for this,

13   okay.  That's to address the second point that she made.

14           THE COURT:  Right.

15           MR. BUTTERFIELD:  The first point, honestly, based

16   on this, it's like I feel like we're talking past each other

17   and we just need additional briefing on this point, a letter

18   briefing or something, because we're clearly talking past

19   each other on whether the rolled piece of the DIP loan is

20   secured.  We adamantly believe it's not secured and the

21   reason why is because you have a loan that's like

22   $350 million and right now you have, let's just assume

23   90 million of collateral.

24           And what the DIP order says is you can't use any

25   of that collateral to pay the roll.  You can't use any of it.

1  You use it all elsewhere.  You have to send all of that to

2  pay the pre-petition other costs, and so we have this roll

3  that is part of a secured loan facility, but it's the

4  deficiency portion of the security -- of the facility.  It's

5  not like the first dollar that's getting paid with the

6  collateral and that's only because the application of the

7  proceeds provision dictates that.

8         And so, all we're saying is if you want to

9  treat -- to call this secured-for-secured, well, what is it

10 secured by?  It's secured by pre-petition collateral.  And if

11 you want to call it secured-for-secured, you have to use that

12 collateral to pay the loan.

13        And if you don't, like, let's just use very, very

14 simple numbers, right.  Imagine this is a $60 million loan

15 and there's 30 million of collateral and they roll 30 of that

16 loan into the DIP.  Under this order they would now have a

17 fully collateralized loan because they could use the cash

18 that was their security on the day before the petition date

19 to pay the unrolled piece and they could use FAP to pay the

20 rolled piece.  So, we've turned a 50-percent secured loan

21 into a 100-percent secured loan.

22        That's why we're talking -- that's why the

23 deficiency portion of this is so important, because it's a

24 deficiency claim that gets moved over to the DIP and the pre-

25 petition collateral is used to pay the non-roll piece.

1          And we're happy to do more briefing.  I mean, I

2    know we're talking past each other.  I know, like, this is

3    complicated, but whatever Your Honor would find helpful.

4          THE COURT:  Okay.

5          MS. STRICKLAND:  Your Honor, I don't think we're

6    talking past each other and I don't think it's a matter of

7    briefing.  Let's break the legal issues down into pieces.

8          The first legal issue before you is, can you

9    approve the rollup?  Forget the first day order, let's say we

10   were standing before you right now and saying, We have a pre-

11   petition loan and a proposal for a DIP facility.  One of the

12   terms of the DIP facility is a $30 million roll.  Question

13   number one for Your Honor would be:  Is the $30 million that

14   is under the pre-petition facility secured?  Because Your

15   Honor is going to feel more comfortable approving the roll if

16   the $30 million is secured.

17         What Mr. Butterfield just said is we have

18   $94 million of collateral.  Your question is not, can I only

19   approve the pre-petition roll if that facility is fully

20   secured or oversecured?  That's not the issue.  The issue is,

21   am I rolling secured debt?  You are.  We have no need for

22   briefing.  We have no talking past each other.

23         If that 94 million -- and forget the 31.  If the

24   63 and change, which everybody says is fully secured, that

25   means that that pre-petition loan is at least secured on an

1 undisputed basis to the tune of $63 million even if we never

2 sell it and nothing else happens.  So, on question one, can

3 Your Honor approve a $30 million roll?  The answer is yes,

4 because it's not an unsecured claim being rolled; it's a

5 secured claim.  That's question number one.

6 　　　　　I think the questions are getting conflated and I

7 don't think this is a briefing issue and I don't think this

8 is a factual issue.

9 　　　　　Now, you have --

10 　　　　　THE COURT:  Let me ask, does the Committee dispute

11 that it's secured?

12 　　　　　MS. STRICKLAND:  That they're at least secured to

13 63 million.

14 　　　　　THE COURT:  Yes.

15 　　　　　MR. BUTTERFIELD:  So, the day before the petition

16 date, let's just -- what should we talk about?  Should we use

17 90 or 60 or 30?  The day before the petition date, there's

18 $30 million of cash in the bank account.  On that date, you

19 had a loan that was a hundred -- $350 million with

20 $30 million of security, plus whatever the business is worth.

21 　　　　　On the day after this order was entered, we have a

22 loan that was now $140 million because 30 of it had been

23 moved over to the DIP.  The 30 million of cash is being

24 applied to the 140, not the 170.  And so, from the secured

25 lender's perspective, they've just doubled-up.

1           And I think one thing that's very important to

2    know here because, like, when you think about this in the

3    context of an all-asset lien, this is not problematic, right.

4    And this is why in Judge Shannon's test, the coterminous

5    collateral packages are super important and it's part of the

6    test.  If it was an all-asset lien, this would basically be

7    just increasing the admin claim that needs to get paid before

8    the secured lender gets whatever's left over at the end of

9    the day.

10          So what she's describing makes complete sense if

11   there's an all-asset lien and there's just one silo.  But

12   there's not; there's two silos.  They don't have an all-asset

13   lien on the FAP side, and so there's completely unencumbered

14   value that's available to secure their deficiency claim and

15   that's what's happening, and we're 100 percent talking past

16   each other and we need more briefing.

17          MS. STRICKLAND:  Your Honor, we're not talking

18   past each other.  There's no party that has a lien on our

19   cash, none, other than Sixth Street.  They have a lien on our

20   cash, period.  This has nothing to do with the application of

21   anything.  This is as simple as Rubraca is sold and people

22   paying cash.  That cash is someone's collateral.  It is Sixth

23   Street's collateral alone.  There's no dispute.  We don't

24   need an all-asset lien for this first question.

25          The first question is, what do they have a pre-

1  petition lien on for which there is no senior lien

2  whatsoever?  And even if we had gone to a third-party DIP

3  provider, there would be no senior lien on that cash.

4  Rubraca cash is Sixth Street's under their pre-petition loan.

5         So, when we stop and we say, Is Sixth Street fully

6  secured?  Are they oversecured?  I don't know.  We haven't

7  sold it yet.  I wouldn't argue that to you.  I do not know

8  the answer to that.

9         But are you taking $30 million from a pre-petition

10  facility and are you worried that under any stretch of the

11  imagination that 30, that you are granting a rollup to and

12  putting in the DIP facility is unsecured?  That is not a

13  fear.  This is secured, by cash.  That is not disputed.  We

14  do not need to brief a single paragraph.  That is in the

15  record before you over and over and over again on an

16  undisputed basis.  They are secured by cash and they are

17  secured by cash that is a multiple of the amount of the roll.

18  That's question number one.

19         And we are not talking -- forget about application

20  of anything.  That's question two.  But question one,

21  $30 million, you're not taking an unsecured loan and giving

22  it a lien by rolling it into a DIP.  It's secured today.

23  It'll be secured tomorrow.  If Your Honor approves it, we

24  move to question two.

25         Question two is, okay, we now have two facilities,

 1   not one.  We have a DIP facility, which is now $30 million

 2   larger and we have a pre-petition facility that $30 million

 3   smaller, because they rolled it one-for-one, and they didn't

 4   charge it as a fee and leave it in the pre-petition.

 5           We run the case.  Now, during the case, we have to

 6   spend the money that is in the DIP budget for Rubraca and the

 7   money that is in the DIP budget to preserve and sell FAP, and

 8   we have the money in the DIP budget for administrative

 9   expenses, to pay our payroll, and to keep the lights on.

10   What are we using to do those things?  We are using the DIP

11   facility and we are using the cash, which is their

12   collateral.  And, again, I doesn't change the characteristic

13   of the fact that when you approved the roll, they're fully

14   secured creditors allowing you to do that, but now we say,

15   Okay, here's what we're doing.  We've got this money in our

16   wallet which consists of cash collateral that we are allowed

17   to consensually use and we have new proceeds under the DIP.

18   So, the money that is the cash collateral of Sixth Street is

19   gone.  When we get to the end of the case and we're

20   allocating proceeds, it's been used.  What has it been used

21   on?  It's been used on the gross-to-net expenses, which are

22   the expenses which we outlined for Your Honor at our first,

23   first day hearing of the costs every time we make a Rubraca

24   sale.  That's about 26 million.  And then we have the royalty

25   costs, which have to be paid every time there's a Rubraca

1  sale.  That's a little under -- estimated to be a little

2  under $6 million.  Then we have other costs.  Those costs are

3  associated with paying payroll and keeping the lights on.

4  And then we've got a whole bunch of expenses associated with

5  the cases themselves, but it's not the case that the dollars

6  that are coming in as a result of a sale of Rubraca don't

7  cover the direct costs of preserving Rubraca.

8          Now, might as a part of the accounting of the case

9  there be differences of opinion in terms of whether or not

10  Rachel Strickland's arguing at the podium is on account of

11  Rubraca or FAP?  Yes, and I will leave that to others to, at

12  a later time, brief that or whatever, but that is very

13  different from are they secured, are you comfortable with the

14  roll?  I would submit they are more than fully secured to the

15  extent of the roll, yes, you can approve that; and,

16  secondarily, when you sell Rubraca at the end of the case,

17  which has been funded by the cash collateral as a result of

18  the sale of Rubraca -- and maybe some overhead, but we know

19  that because that's what happens when you have a multi-asset

20  debtor, and those proceeds go to the first lien lender not of

21  the totality, there's no double counting, they go to the

22  party that has the first lien on Rubraca at the end of the

23  case.  It has nothing to do with the 31, it has nothing to do

24  with the 63 and 250, that is spent on the backs of our

25  prepetition lender.

1              So I would submit is, if you don't allow the

2    proceeds of Rubraca at the end of the day to pay down the

3    first lien lenders in Rubraca, that's where the double count

4    is to the benefit of unsecured creditors, and whatever

5    deficiency claim is left is going to sit in the waterfall.

6    Once you change over and you answer question one and say,

7    yes, I am authorized and permitted to approve this roll, it's

8    two different loans and they work in order of priority, as

9    the law says they should.

10             So I don't think there's double counting, I don't

11   even think we have a disagreement of facts.  I think the

12   committee just wishes they got a little extra, which, believe

13   you me, we tried.  And we got $60 million of extra, but we

14   don't have this cherry on top.  But it's not legally

15   questionable at all and we do believe it's in the debtors'

16   business judgment and the best interests of the estates.

17             THE COURT:  Thank you.

18             MR. BUTTERFIELD:  Your Honor, may I say a few

19   words --

20             THE COURT:  Yes.  No, just -- if we have to come

21   back Monday, we will.

22             MR. BUTTERFIELD:  Ben Butterfield, Morrison

23   Foerster, for the committee.

24             So, two points.  The first is their schedule just

25   said that right now we don't know what it's going to cost to

1  sell Rubraca.  She said that's for other people to brief in

2  the future.  That's our point.  If you waive the 506(c)

3  surcharge rights now, there is no briefing in the future;

4  it's already predetermined, it's set today.

5          Nobody really knows and I don't -- so the wasting

6  of Rubraca costs are -- they're a direct Rubraca cost that

7  are obviously Rubraca, right?  Those have to be paid by Sixth

8  Street, that's the cost of their collateral.  Like, in order

9  to sell product, they have to pay fees.  Paying fees that are

10 necessary to sell their product is a cost of maintaining the

11 collateral.  Those are direct costs, those are easy and we

12 agree, based on what I have been told by my financial

13 advisers, that those costs are less than the 90 million that

14 debtors' counsel keeps talking about.

15          So, after the payment of direct costs, which

16 should of course be surcharged against the collateral, there

17 is going to be money left over, but the direct costs are only

18 a small fraction of the Rubraca-related costs in this case.

19 The indirect costs, the overhead, the employees, it's a

20 massive expense, and neither debtors' counsel nor committee

21 can stand here right now and tell you exactly how those

22 should be allocated.

23          So we need to have a chance to deal with that down

24 the road.  If you grant the 506(c) waiver now, that's done,

25 and we're just left wherever the ball shakes out, we don't

1  have a chance to think about it, and it's a hundred percent

2  possible that secured creditors will end up getting --

3  unsecured creditors will end up getting tagged for the costs

4  of liquidating Rubraca.  That's point one.

5          Point two is about whether this is secured for

6  secured or unsecured for secured.  I think, if we just made

7  it really simple, right, let's say that all of Rubraca, the

8  cash, the business, everything, is worth a hundred million

9  dollars and it was sold the day before bankruptcy, Sixth

10  Street -- and let's say it's the net value -- Sixth Street

11  would net a hundred million dollars.  If you do that exact

12  same sale the day after this order is entered, they're going

13  to net 130, because the full hundred is going to go to the

14  prepetition loan and the roll-up is still going to be sitting

15  there.

16          And so, if you think -- if we think that secured

17  for secured means a hundred turns into 130, I don't get it,

18  but it doesn't.  There is a piece of the loan that is

19  unsecured that is getting paid in full.  It was unsecured and

20  now it's full, that's unsecured for secured.

21          Those are our two points.

22          MS. STRICKLAND:  Your Honor, I think that last

23  point is a moment of clarity, at least for me.  When you

24  conflate the question of is the roll appropriate under law

25  with do I like this deal and do I wish it were better, that's

1  how you do the hundred turns into 130.

2          We can't ignore the fact that we have been

3  provided with a DIP facility here that is facilitating the

4  entirety of these Chapter 11 cases, both Rubraca and FAP.

5  But for this DIP facility, we would have had to have shut

6  down Rubraca minute one and had a pretty challenging time

7  getting to the end of the movie with respect to FAP.  The

8  preservation of these estates and the benefit being brought

9  by the DIP facility is what people pay interest and fees and

10  benefits for.  One of those benefits is a $30 million roll.

11  Once something rolls, it can no longer be counted as the

12  prepetition being counted twice.

13          We have $60 million less debt on emergence than we

14  would have had with the other facility and we have the

15  benefit of running a sales process for Rubraca that maybe it

16  does give a hundred or 120.  And, by the way, that is a

17  benefit to all general unsecured creditors because, the

18  smaller the deficiency claim is, the more all general

19  unsecured creditors get on a pro rata basis from FAP.

20          So I think, again, you have two moments in time,

21  one is right now, will Your Honor approve the roll and is

22  there anything untoward happening.  The answer is, I don't

23  know whether Your Honor will approve it, that's up to you,

24  but there's nothing untoward.

25          THE COURT:  But once it rolls --

1          MS. STRICKLAND:  Yep.

2          THE COURT:  -- it can't be counted as prepetition.

3          MS. STRICKLAND:  Correct.  That's correct.  And

4   the prepetition facility is $30 million smaller and it's now

5   part of the DIP.  It's the price of the DIP that funded the

6   entirety of these cases for the benefit of all of Clovis'

7   stakeholders.

8          THE COURT:  Hence the DIP lenders' counsel's

9   position you could have just charged it as a fee.

10          MS. STRICKLAND:  Correct.  And, if he had charged

11  it as a fee, it still would have been $60 million less of a

12  fee than the one that we otherwise had as our best available,

13  and they could have just said, okay, I'm not going to use

14  that controversial roll.  I'll leave my prepetition facility

15  exactly as it is; I'll just take it as a fee, I'll get first

16  out of FAP.  And we would have said, great news, we saved all

17  this money, but they didn't because we pushed them and we

18  pushed them and we negotiated, and we took second and third

19  and fourth bites of the apple every round of the auction that

20  we took.

21          So this isn't the case where we need the committee

22  to take another bite of the apple and my concern because,

23  frankly, as debtors' counsel, you always hope the committee

24  gets a second, third, fourth bite of apple, that's better for

25  our client, but my real concern is that our DIP lender says

1  I'm not doing this deal.  I'm not going to give at the office

2  three times and then give again.  I'm out.  Good luck funding

3  your case.  Because if they truly are an under-secured

4  creditor and they're making a brand-new money DIP loan that

5  is not getting paid back in full, this is not that attractive

6  of a loan.

7          And so, as a result, I am worried on behalf of the

8  company.  Our board is worried that somebody takes a bite too

9  deep and our lender walks and we have a problem.

10          So there is nothing remotely illegal, which was

11  the first argument, about this DIP.  And then, once you have

12  a DIP that is the size that it is, secured by a hundred

13  percent of the assets, a blanket lien, FAP first, Rubraca

14  second -- and that Rubraca second may be worthless because

15  there may not be enough after the prepetition loan, but they

16  have it, everybody -- you know, they have a blanket lien on

17  it, and then on the Rubraca they have the first that they've

18  had all along.

19          So there is nothing factually in disarray, there

20  are no disagreements, it's just they want a better deal.

21  And, yes, I can't tell you whether or not it is ultimately

22  going to be argued that the podium argument I'm making, which

23  is what I said I can't answer right now, is attributable to

24  FAP or Rubraca or how the allocation is, but I can tell you

25  that the sale of that drug, the costs associated with selling

1  that drug, are more than covered by the amount of cash

2  associated with it, and that's before you even get to the

3  proceeds of actually selling the asset itself, which is also

4  an unknown, but it's more; we got seven bids in for it

5  yesterday.

6          So there isn't a scenario here where Your Honor is

7  being asked to do something that is questionable or shady or

8  where you should have a concern.  There's no double count or

9  double speak.  The issue is just should the committee take

10 one more bite.  And ordinarily I would say, off the record

11 and on the record, heck, yeah, but not in this case where

12 we've got a DIP not getting paid back in full and we already

13 beat them up through a six-hour auction and achieved $60

14 million of savings.  It's not worth betting the company for.

15 That's our client's business judgment and they're in the best

16 position to know.

17         THE COURT:  Let me -- before you sit down, with

18 respect to the 506(c) waiver, you have obviously indicated

19 you could appreciate the committee's position here, but talk

20 to me about why it would be inappropriate for the Court to

21 grant it.

22         MS. STRICKLAND:  Sure, Your Honor.  First, I'm

23 going to start with 506(c).

24         So 506(c) is recovering the reasonable and

25 necessary costs and expenses of preserving or disposing of

1   the property.  So the preserving and disposing of the

2   property is what we're talking about.  We know how much

3   Rubraca costs in terms of the operations of it and we know,

4   generally speaking, what the costs of disposing of it area.

5   What Mr. Butterfield is talking about is we don't know about

6   the bankruptcy piece.

7           I think we would have a heck of an argument to say

8   that administrative costs, let's say, of a challenge or an

9   investigation about avoidance actions, or all of the other

10  things that happen in Chapter 11 that cost a lot of money,

11  are preserving or disposing of such property.  That's not

12  what this is.

13          When we're talking about Rubraca, we are counting

14  things like how much does the investment banker get as a fee

15  for selling Rubraca.  That is a net cost.  It says right in

16  the agreement that comes off the top.  We negotiated for that

17  because we wanted the benefits, effectively, of 506(c)

18  without fighting for it.  So when we -- if you look at the

19  net proceeds definition in the documentation already, it

20  already takes that out.  That's net, that's not paying down

21  the prepetition loan.  And we know that the costs associated

22  with the laboratory and the sales of this stuff is covered.

23          I think what Mr. Butterfield is saying is, I would

24  like the ability to argue that all the stuff that happens in

25  here and the general costs of the case, which are hard to

 1   predict and are hard to allocate, we should preserve that.

 2   What I would say is there's a huge benefit to having a

 3   prepetition lender say you can use a hundred percent of my

 4   cash collateral, number one, and for a DIP lender to say, I

 5   will give you a DIP loan, but you have to waive 506(c) and

 6   the equities of the case?  That's in every order I've ever

 7   had.  That is absolutely customary, but here it's not only

 8   customary, it's also appropriate because they're already

 9   doing what the Code says they could if we argued for it,

10   litigated it, and ultimately won.

11           I think asking for that cherry on top to say,

12   well, if the professional fees run high, which, frankly, is

13   something else that we're in a little bit of a dispute about,

14   not -- how not to have the professional fees run high, I

15   don't think that is preserving or disposing of Rubraca.  I

16   think that's overall a Chapter 11 and kind of the costs of

17   doing business, and that should be paid by the DIP and it

18   probably will be paid by the DIP.

19           I don't know if I answered your question.

20           THE COURT:  Yes, you did.

21           MS. STRICKLAND:  Thank you, Your Honor.

22           THE COURT:  Yes, please.

23           MR. MARINUZZI:  Your Honor, excuse me, Lorenzo

24   Marinuzzi, Morrison & Foerster.

25           The 506(c) waiver issues are very big for

1  committees and I'm sure Your Honor appreciates that.  I've

2  represented I don't know how many committees over the past 25

3  years and, ultimately, when we advise the committee that it

4  makes sense to grant the 506(c) waiver as part of the

5  package, because the package has been the theme today, it's

6  because the committee is very comfortable that the funds

7  necessary to wind down the estate are there.  That includes

8  professional fees, it includes employees and it includes

9  payroll.  What makes this case different from so many other

10  cases is that there are many costs that are unknown and

11  unknowable and you can't really budget them.  And a lot of it

12  is based on the industry in which we find ourselves.

13          If Rubraca doesn't sell and the company has to

14  wind down Rubraca, there are clinical trials, there are lots

15  of things going on that just don't end.  And so you can't

16  tell patients who are undergoing clinical trials, I'm sorry,

17  we're done here.  There's a cost of continuing that

18  treatment.  How long it lasts, how much it is, I don't know,

19  I'm not sure anybody could tell me.

20          And so the situation that Mr. Butterfield alluded

21  to is one where we don't sell Rubraca, they take it back, and

22  trials are continuing, third parties that are providing

23  services for Rubraca are still doing what they're doing

24  because they have to, because the FDA requires it or some

25  other law requires it, and then they send the estate a bill

1  for those services.  And we're getting into a dispute about

2  whether it's in fact an administrative claim or they stand in

3  line with unsecureds, and who knows where that plays out at

4  the end of the case.  And, until we know how that falls, it's

5  really hard for this committee to say we think there's enough

6  in the budget, we're fine, let's move on and give them a

7  506(c) waiver.

8          So that's why it's a big issue for us in this

9  case.

10          THE COURT:  Well, let me ask you this.  Isn't it

11  the debtors' right to waive?

12          MR. MARINUZZI:  It is the debtors' right to waive

13  it, but the debtor doesn't really have negotiating leverage

14  over it, right?  And, just like Ms. Strickland said, it's in

15  every case.  It's in every case because the lenders require

16  it; the debtors don't have any right to fight it, basically,

17  because they need the money, then it falls on the committee.

18  And the committee, at least the ones I've represented, when

19  we agree to the 506(c) waiver, it's because we're comfortable

20  that, on balance, we're not going to be left footing the bill

21  for the liquidation of the lenders' collateral, and I'm not

22  sure that's the case here.

23          So that's why 506(c) is important here.

24          THE COURT:  Thank you.

25          MR. MARINUZZI:  Thank you, Your Honor.

1           MS. STRICKLAND:  Your Honor, that's also been

2    accounted for and already negotiated and it's in all of the

3    documentation, which is that Clovis has earmarked a wind-down

4    of 12 and a half million dollars in all of the budgets

5    preapproved that we can use cash collateral to pay for.  And

6    what that was on account of was, if we kept Rubraca alive and

7    spent money on it up to a certain point in time to see

8    whether or not we got a buyer and no buyer came, we said,

9    look, we did this for your benefit, we always have to make

10   sure that we can wind down those clinical trials and

11   transition patients.

12           So we baked in the wind-down costs for it, which

13   get triggered at whatever point we establish we don't have

14   enough money.  And we had a very significant negotiation with

15   the DIP lender where we said, listen, there was a suggestion

16   at one point that the DIP lender could -- I'm sorry, that the

17   prepetition lender could extend the period of time when

18   letters of interest and bids for Rubraca would be due because

19   they wanted to see whether the market would get frothier.

20   And we said we can only follow that direction if you agree to

21   pay for the additional costs of running Rubraca longer and

22   then, if you're wrong, having that wind-down period and

23   paying for it then.

24           And that plumbing is all already in the

25   documentation that is before you and that we are seeking

1 approval of.  So it's not as if Clovis didn't think of these

2 things.  They're very, very concerned about making sure that

3 they have sufficient cash both for the upside of if this

4 sells and has a profit and there are revenues to fight about,

5 but also the downside of, if it doesn't sell, making sure

6 that they can responsibly wind it down without harming

7 patients and without doing damage.  So both things are

8 already accounted for.  That was a hypothetical that, to us,

9 wasn't a hypothetical and is already baked into the DIP.

10          THE COURT:  Let me -- I'm going to take a break --

11 unless the committee wants to go forward with the rest of its

12 arguments right now?

13      (No verbal response)

14          THE COURT:  Maybe we should.  Let's go ahead with

15 the rest of the committee's arguments.  Looking at the time,

16 I want to make sure I hear all your argument.

17          MR. BUTTERFIELD:  Okay.  Thank you, Your Honor.

18 Ben Butterfield, Morrison & Foerster, for the committee.  Are

19 we talking about like the -- just like walking through the

20 order?

21          THE COURT:  Well, do you have other -- you had set

22 forth a list of issues you had with respect to the DIP --

23          MR. BUTTERFIELD:  Yeah --

24          THE COURT:  -- lender --

25          MR. BUTTERFIELD:  -- yeah, yeah, that's kind of

1   what I'm talking about.

2            THE COURT:  Okay.

3            MR. BUTTERFIELD:  Okay.  So I have an issues list

4   I sent around last night to the -- I actually added just the

5   budget issue to the bottom.  I can -- may I approach, Your

6   Honor?

7            THE COURT:  Certainly.

8            MR. BUTTERFIELD:  That may be helpful.

9            THE COURT:  Thank you.

10        (Pause)

11           THE COURT:  And these issues that are on here are

12  all currently outstanding?

13           MR. BUTTERFIELD:  Currently.  I think that some of

14  them are just like -- and I'll try -- I think some -- we've

15  been briefing this in trying to get to this hearing, so some

16  of these probably might be resolved.  I'll skip over the ones

17  that I think --

18           THE COURT:  Would you like a few minutes?  Okay.

19           MR. BUTTERFIELD:  Yeah, I'll just go for it.

20           THE COURT:  Okay.

21           MR. BUTTERFIELD:  We'll do that, the head-nod

22  method.

23           THE COURT:  If you've resolved something, please

24  feel free to jump up.

25           MR. BUTTERFIELD:  I'm just pulling up my copy of

1  the DIP order, Your Honor.

2              THE COURT:  And are you working off the blackline

3  that was filed last night?

4              MR. BUTTERFIELD:  I might be referencing -- I'm

5  working off a document I prepared for myself, but I'm going

6  to reference the paragraph numbers in what --

7              THE COURT:  Okay.

8              MR. BUTTERFIELD:  And, yeah, the language that

9  I'll be referencing is in the document that was filed last

10 night.

11             Okay, so 3(b).  In the parenthetical at the end of

12 the sentence we have the words -- so this --

13             THE COURT:  Can you bear with me one second?

14             MR. BUTTERFIELD:  Sure.

15             THE COURT:  You said 3(b)?

16             MR. BUTTERFIELD:  3(b), yeah, the numbered

17 paragraph 3(b).

18             MS. STRICKLAND:  Your Honor, we don't have an

19 objection on this one, we can skip it.

20             THE COURT:  Okay.

21             MR. BUTTERFIELD:  3(c) is the same, I assume?

22             MR. MORDKOFF:  Yes, same on 3(c).

23             MR. BUTTERFIELD:  Okay.  3(d)(iii).  We had

24 proposed language that basically said we know that the DIP

25 lender incurred costs related -- costs and fees -- and I

1  think we were thinking primarily of legal fees -- related to

2  the roll-up piece, and those fees have been paid.  And if

3  we're able to successfully challenge the roll-up, then we

4  should be able to recharacterize the payment of those fees as

5  principal payments, essentially, to reduce the balance of the

6  loan.  And that was struck in the version that was filed.

7           MS. STRICKLAND:  Just so I'm clear, is this the

8  $20,000?  Is that what you're referring to?  Because that's

9  the only --

10          MR. BUTTERFIELD:  So I know that --

11          MS. STRICKLAND:  -- prepetition amount that was

12  agreed to as part of adequate protection was $20,000.

13          MR. BUTTERFIELD:  I know that there were amounts

14  paid to the prepetition lender, but there were also amounts

15  paid to the DIP lender on account of the DIP roll-up, right?

16          And so maybe the prepetition lender fees for the

17  prepetition period were $20,000, but what I don't know is

18  what has been paid, starting on the petition date forward,

19  solely on account of the tranche B roll-up.

20          MR. SAFERSTEIN:  There are no fees payable on the

21  tranche B roll-up, Your Honor, it's all in the tranche A --

22          MR. BUTTERFIELD:  So has the --

23          MR. SAFERSTEIN:  -- because there's a commitment

24  fee, there's one other fee, and then --

25          THE COURT:  Can you use the microphone?  Only

1  because I want to make sure you're picked up.

2          MR. SAFERSTEIN:  Sure.  Your Honor, there are no

3  fees, commitment fees, et cetera, on the tranche B loans,

4  it's only on the tranche A.

5          THE COURT:  Okay.

6          MR. BUTTERFIELD:  Okay.  Look, I think we can drop

7  this one in the interest of, honestly, just time.

8          4(a), so what this order says is that the debtor

9  is ordered by the Court to spend its cash in accordance with

10  the budget and not to exceed the budget.  It's an order of

11  the Court.

12          So let's say the debtor breaches that.  Well, what

13  have you done?  It's not just a breach of contract anymore;

14  it's a violation of a Court order.  And what we usually see

15  in this provision is --

16          MR. SAFERSTEIN:  I'm sorry, I don't mean to

17  interrupt.  We're fine with that, Your Honor.  We don't --

18          THE COURT:  His modification you're fine with?

19          MR. SAFERSTEIN:  Yeah, we don't need it to be a

20  violation of the Court order.  It will be a default, if they

21  violate it, but not prohibited by the order itself.  And I

22  think that resolves the issue.

23          MR. BUTTERFIELD:  That does.  Thank you.

24          There's a similar issue in 9(y)(v) -- sorry, 9(y),

25  let's say little four because I'm bad at Roman numerals.

1          THE COURT:  Nine -- did you say Y, as in yellow?

2          MR. BUTTERFIELD:  Yeah.  So if you look at the

3   fifth line, you see the (y), and then you have to track

4   through the one, two -- little one, little two, little three,

5   and get to little four.

6          THE COURT:  Okay.

7          MR. BUTTERFIELD:  And there's a reference there --

8   we're fine with this order -- speaking of prohibiting things

9   -- we're fine with this order prohibiting acquisitions and

10  capital expenditures, but then it says any other expenditure

11  and, to me, that's the exact same thing.

12         So, hopefully, that's a modification --

13     (Pause)

14         MR. SAFERSTEIN:  Your Honor, the language that

15  Counsel is referring to says or any other expenditure.  We're

16  okay with saying that it's a default and not prohibited by

17  the Court order, but to the extent that there's any other

18  expenditure that's beyond what we've agreed to in the budget,

19  it should be a default.

20         So we're not okay taking the language out, but we

21  can clarify that it would just be a default and not

22  prohibited by the order.

23         MR. BUTTERFIELD:  That's acceptable.  And this

24  provision starts, no portion of the DIP obligations may be

25  used to do X, Y, Z, and so it's like a Court prohibition, but

1  we're --

2          THE COURT:  Understood.

3          MR. BUTTERFIELD:  So 9(y) -- so it's literally the

4  next provision, talking about the investigation budget.

5  We've asked for 175.  This is a very complicated loan.  Loans

6  of this nature -- and I'll describe the complicated part that

7  we're seeing immediately is that the debtors only borrowed

8  170 million and the total amount due got doubled to 350

9  without any additional consideration coming in from the

10  lender.

11          So, like, we don't know if that's un-matured

12  interest, we don't know if that's disguised equity, we don't

13  know what it is.  It's a complicated facility and we don't

14  think the $50,000 is sufficient.  This is not a plain,

15  vanilla facility.

16          MS. STRICKLAND:  Your Honor, my understanding of

17  the way this was sized is we completely acknowledge and

18  understand that the committee is going to look at this.  It's

19  a pure legal issue of whether or not a loan document that is

20  for an amount for a yet undeveloped pharmaceutical, whether

21  or not the issue of is it a matured interest or whatever,

22  these are Code issues.  There's not an investigation per se,

23  this is briefing -- this is briefing how a contract works, so

24  we thought that this request seemed pretty outsized for that.

25          MR. BUTTERFIELD:  Ben Butterfield, Morrison &

1  Foerster.

2           Your Honor, we heard this from the debtor and so

3  we thought about it.  And we found actually a complaint that

4  was filed, I think it was like last October, in this court

5  with Judge Silverstein, it was in the PhaseBio case, and it's

6  like attacking a very similar loan and we looked at it, and

7  there is a lot of factual stuff in there.  A lot of discovery

8  was obviously taken.  And so we think that the 175 is more

9  appropriate.

10          THE COURT:  Okay.

11          MR. BUTTERFIELD:  DIP liens.  So this is 11(a)(i).

12  We're asking for the -- so there's two problems with this

13  provision.  The first is that the provision actually -- if

14  you just read it very carefully, it actually suggests that

15  the DIP liens include the causes -- the Chapter 5 causes of

16  action themselves, not just the proceeds.  And so we think

17  that should be fixed, but also we think that the proceeds of

18  Chapter 5 actions should belong to unsecured creditors.

19          And, look, if we could get to like a deal that

20  resolves all of this, that's something that's currency, but

21  like, as it stands today, we need those avoidance actions.

22          MR. SAFERSTEIN:  Your Honor, if I may address

23  that?

24          THE COURT:  Certainly.

25          MR. SAFERSTEIN:  Your Honor, as we've said over

1  and over again, this DIP facility is different than a lot of

2  other ones.  We do not expect to be paid in full in cash on

3  the emergence date and we may not get paid in full at all.

4  So we think it's appropriate in this instance for the DIP

5  lender to have a lien on the proceeds of avoidance actions.

6  This is a DIP loan which is funding the case, funding

7  professionals, and we don't see why unsecured creditors

8  should, you know, recover with respect to any proceeds of

9  avoidance actions before the DIP is paid in full.

10         So it's simply that.  Once the DIP is paid in

11  full, if the FAP, you know, assets are enough to pay us in

12  full, then they'll get the proceeds of the avoidance actions,

13  but if they're not, you know, we just think in order of

14  priority, we think the DIP should be paid in full first.  It

15  would be quite unusual for unsecured creditors to have a

16  recovery when the DIP is, you know, impaired.

17         MR. BUTTERFIELD:  Your Honor, just to respond to

18  that.  The reason the DIP isn't being paid in full here is

19  because portions of the DIP are being used to fund Rubraca.

20  And if this DIP was just for FAP, $45 million would be plenty

21  -- would be plenty to fund the case.  We have a $50 million

22  check coming in in three months and we would pay the DIP in

23  full.  So this is not like an our problem, this is a them

24  problem.

25         MS. STRICKLAND:  Your Honor, without rearguing

1  everything we've already talked about, it's interesting to me

2  that Mr. Butterfield refers to FAP in a vacuum.  He's not

3  talking about the administrative costs of the estate or all

4  the other things associated with Chapter 11, which are not at

5  all being covered by $50 million.  So, sauce for the goose,

6  sauce for the gander.  That's just not the way it works.

7           MR. BUTTERFIELD:  Ben Butterfield, Morrison &

8  Foerster.  I'm just going to let that -- okay.

9           Okay, so 19(c).  This is the same issue that I

10  said I would pass over above, so I'll pass over it here.

11           20(a), this is application of proceeds and we've

12  talked about it, so I'm not going to rehash it.

13           21, credit bidding.

14           THE COURT:  Was this resolved by the proposed

15  modification to the order?

16           MR. SAFERSTEIN:  Your Honor, I think we're fine

17  with this.  If we don't have a claim, then we can't credit

18  bid, we understand that.

19           MR. BUTTERFIELD:  Okay, great.

20           23, 506(c), we've talked about.

21           24, marshaling application of proceeds.  Look, I

22  think this is subsumed in the discussion we had about the

23  proceeds waterfall.

24           So 28(a), payment of fees and expenses.  This is,

25  again, the issue I passed over, which is our right to claw

1  back basically legal fees and say that that money is

2  principal, but we'll just let it go.

3          THE COURT:  Okay.

4          MR. BUTTERFIELD:  28(b).  What we're asking the

5  Court -- you know, one way to resolve the 506(c) issue is to

6  kick the can and deal with it at the end of the case.  In

7  order to do that effectively, we need to know where money has

8  been spent.  And so what we asked is for professionals to

9  allocate to the best of their ability the fees incurred on

10 account of Rubraca and the fees incurred on account of FAP.

11 That was actually a concept that was in the initial DIP that

12 was proposed, that was filed, it was deleted in this order

13 and we want -- we think it should go back in with some

14 modifications to make it like very clear.

15         THE COURT:  Well, could I hear the response to

16 that request?

17         MS. STRICKLAND:  Your Honor, any time we're doing

18 something that is Rubraca-oriented, we fully intend to have a

19 separate task code for Rubraca.  We realize that's an

20 important issue.  So I don't know what the specific language

21 is, but we're doing that anyway.

22         MR. BUTTERFIELD:  Your Honor, we don't understand

23 why the language was omitted.  Right?  There must have been a

24 reason it was omitted and I'm -- you know, based on that

25 representation, I'm confident we can agree on language to put

1  back in that solves this issue.

2         THE COURT:  Okay.  Maybe -- is that acceptable to

3  the DIP lender?

4         MR. SAFERSTEIN:  Your Honor, with respect to time

5  detail?

6         THE COURT:  Yeah, like tracking professional fees?

7         MR. SAFERSTEIN:  I mean, they can track it however

8  they want to track it.  You know, I think it doesn't go to

9  the substance of the point, which is the 506(c) waiver, which

10 I think is where they're going, but I have no problem with

11 how they want to track their time.

12        MR. BUTTERFIELD:  It's not just -- Ben

13 Butterfield, Morrison & Foerster -- it's not just our time,

14 it's -- you know, if the estate is going to be charged for

15 the DIP lender's fees related to Rubraca, that should also be

16 noted so that it can be considered when we sort this all out.

17        MR. SAFERSTEIN:  Your Honor, I guess I don't see

18 the necessity for it if there's a 506(c) waiver, but, you

19 know, I'm happy -- you know, we do time detail with respect

20 to our time records, I don't know what else we could do.

21        MR. BUTTERFIELD:  Okay, so 29.

22     (Pause)

23        THE COURT:  Regarding release parties?

24        MR. BUTTERFIELD:  Yeah.  It wasn't clear why -- so

25 -- and the reason I bring this up, that was inserted in

1 | response to a markup we gave.  So it says in that second
2 | line, solely with respect to tranche B -- so subject to the
3 | rights of parties in interest under paragraph 19, solely with
4 | respect to tranche B term loans.  The release should be
5 | subject to paragraph 19, which is our challenge right, in all
6 | respects, especially with respect to the prepetition loan.
7 | So I don't know why it's limited solely to tranche B term
8 | loans.

9 |            MS. STRICKLAND:  So this is appropriately only
10 | limited to tranche B loans because what it's talking about is
11 | that the DIP agent, the DIP lenders are released.  The only
12 | aspect of the DIP that is subject to challenge is the role,
13 | which is tranche B.  Otherwise, you would just be saying the
14 | DIP is approved except only kidding if the DIP isn't
15 | approved.

16 |            So this is carving out of the DIP the only part
17 | that's subject to challenge, so that's why that is the case
18 | there, as well as the next one, which is 32, binding effect,
19 | which says we understand that the portion of the DIP that
20 | pertains to the prepetition roll-up, which is the tranche B,
21 | is subject to the challenge, but certainly the new-money DIP
22 | is binding and subject to the release.  So that's why those
23 | two were not -- were appropriately tailored in that way.

24 |            MR. BUTTERFIELD:  So -- Ben Butterfield, Morrison
25 | & Foerster -- so I think I'm right on one of these and wrong

1  on the other.  So for 29, I agree that because that provision

2  is limited to the release of the DIP-released parties and it

3  has the sentence at the end for the avoidance of doubt it

4  doesn't release prepetition secured parties that we don't

5  need the insertion -- or we can leave it as is, but 32 says

6  the provisions of this final order, including all findings

7  herein, shall be binding on all parties in interest, and I

8  just don't want to get in an argument that like somehow this

9  like trumps our challenge right.

10         So I think we should just make it subject to

11  paragraph 19 for -- you know, comma.

12         MS. STRICKLAND:  It does say it's subject to the

13  challenge right, it's just that it is not allowing there to

14  be a challenge as to whether or not the new-money DIP has a

15  binding effect, that is not up for grabs.  The only part that

16  is up for grabs in this is the part that relates to the

17  prepetition, which is the only thing the challenge applies

18  to.  So --

19         MR. BUTTERFIELD:  Your Honor, with that

20  representation, we're fine with it.

21         THE COURT:  Okay.

22         MR. BUTTERFIELD:  Okay, then the last issue is

23  just the budget.  So there's a line item in the DIP budget

24  for UCC professional fees, that line item is subject to a 25-

25  percent variance, but the number that's being used for the

1   committee is too low.

2           Look, normally we look at that and we say it

3   should be like 30 percent of what the debtors are spending,

4   25 or 30 percent, or maybe 35, if it's a really complicated

5   case.  There was a lot of work done prepetition by the

6   debtors and the DIP lender that is not reflected in the case

7   budget.  And so we're kind of like a step behind and having

8   to catch up to figure out like this APA that was negotiated

9   prepetition, you know, we haven't even -- we haven't even

10  looked at that.  That's not counted in their number, but it's

11  counted in ours.

12          So I think, you know, this is just about getting

13  the right number in there for the committee.  We've proposed

14  some line items, this is what we're going to be -- these are

15  estimates and we could come in low.  I think we usually

16  estimate conservatively.  But the goal here is to have a

17  budget that's not going to like create an event of default

18  if, you know, four weeks into the case we go over for a week

19  or for a month and now we have like a problem with our DIP

20  lender.

21          MS. STRICKLAND:  Your Honor, our issue with this

22  is that we got an email last night with these numbers in

23  them, there is no backup.  We had extensive conversations

24  with committee counsel when they were first hired and we said

25  we have sales processes that are very locked and loaded, if

1  you could talk to our management team before you make hires

2  and before you negotiate your numbers, we think we'll be able

3  to show you all the work that's been done that will alleviate

4  the need for a bunch of expenditures.  And then in our very

5  first call they showed up with a suite of professionals and

6  had already negotiated it.

7         So we think that, yes, it's true, a lot of work

8  was done prepetition and it's done.  So I have no problem as

9  a member of the bar paying appropriate fees, I'm in fact

10 super in favor of it, and I think we're going to be able to

11 work this out.  The idea that the prepetition lender to

12 Rubraca and the post-petition lender to the whole thing is

13 going to call a default over this week or that week.

14        All we said to the professionals is let's work

15 this out, come to us when you need something and we'll work

16 it out, but I think baking in an unsupported set of numbers,

17 which for a case like this are pretty high, gives Clovis a

18 lot of consternation.

19        So we will absolutely work with the committee if

20 they need more.  We are in favor of them doing their work and

21 taking bites of the apple wherever they can, but we just

22 can't at face value just accept this on a blanket basis and

23 shove it into the budget and assume that it's going to work

24 out because we're not being offered any additional funds

25 under the DIP.

1          MR. MARINUZZI:  Your Honor, this is really a

2   question of do we want to create a DIP default because the

3   fees that they estimated for the committee professionals are

4   too low.  We're not suggesting that the estate needs more

5   money to run the case; we're just saying that the line item

6   is going to trip a default at some point because of the

7   amount of work that we have to do.

8          And to address the specific point, we appreciate

9   that there was a management meeting early in the case when we

10  got retained, but if somebody gives me a list of industry

11  participants that were contacted for a sale process on a

12  half-a-billion-dollar asset, I wouldn't know what to do with

13  it.  And so the reason a committee hires professionals is

14  because they're fiduciaries for hundreds of millions of

15  dollars of unsecured creditors and they want to ensure that

16  the right parties were contacted, that the right process was

17  run, and you don't do that through committee counsel, you do

18  that through a banker.

19         And so it's not a surprise that we have financial

20  professionals as well as legal professionals to operate to

21  represent a committee in a case like this.  This is not a

22  small case; this is a fairly large case.  We're going to try

23  to keep fees reasonable.  There is a reasonableness standard

24  that applies to our fees and, if they're viewed as

25  unreasonable, I'm sure we'll hear from people.  This is

1  really a line item issue that we don't want to say the order

2  works when we know we're going to get to a point where we're

3  going to have to go to the DIP lender and say how do we

4  resolve this, and we don't know how.

5           So, if we anticipate that now, we should deal with

6  that now.

7           THE COURT:  I was going to say, have there been

8  discussions with the DIP lender?

9           MR. MARINUZZI:  There -- well, I think the DIP

10 lender could speak for themselves, but I think this is really

11 an issue of moving money around in the budget as opposed to

12 more money.  And I think I made that clear to the DIP lender.

13 We're not asking for more money, we just want to make sure

14 that we have an understanding that on the professional fee

15 line item it's going to be higher at various points.  We

16 don't want to create a default, but we might be headed there.

17          MS. STRICKLAND:  We don't want to create a default

18 under any circumstances and we are comfortable that we will

19 be able to take this as it comes.  We don't think this is a

20 today issue and receiving literally the exact same bullet

21 points that are on this list, which is all we've received so

22 far, does not give us enough time or information to

23 responsibly move around the budget and take things from one

24 line item to another line item.

25          So the company is confident that we are going to

1  be able to work through this issue and discuss it as it

2  comes.  If they need more money, we're not going to be -- you

3  know, we're not looking to begrudge anyone doing their job,

4  but we just -- we don't have the ability to pass off on this

5  and incorporate it into a budget with four bullet points.

6          So I don't think it's an issue for today.  I think

7  the DIP can be approved without regard to this issue and we

8  will work to make sure we always have the ability to modify

9  the budget and move things around as need be.  Our DIP lender

10  has been very accommodating with us with respect to changes

11  that we need for the business.  So my suggestion is we take

12  it as it comes.  I don't think there needs to be anything

13  ordered by Your Honor, who doesn't have any more of a record

14  or information than we have.

15          MR. MARINUZZI:  That's fine, Your Honor.  We're

16  happy to work with the company and the lender on this.  We

17  just wanted to make sure that the Court was aware that this

18  was an issue we're trying to resolve.

19          THE COURT:  An issue and I may hear more.

20          MR. MARINUZZI:  You may; I hope not, you may.

21  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          Okay, I want to take a recess.  I think I need

24  about a half hour, maybe a little less.  But before we break,

25  is there anyone else who wants to be heard with respect to

1  the DIP motion?

2       (No verbal response)

3            THE COURT:  Okay.  And with respect to bid

4  procedures, is there anyone objecting other than the United

5  States Trustee?

6            MS. STRICKLAND:  No, Your Honor.

7            THE COURT:  Okay.  And, Ms. Sierra-Fox, is your

8  issue down to two issues, the break-up fee and the super

9  priority?

10            MS. SIERRA-FOX:  That's right.

11            THE COURT:  Okay.

12            MS. SIERRA-FOX:  Yes, Your Honor.

13            THE COURT:  All right.  Thank you.

14            We're going to stand in recess.  We'll reconvene

15  at 3 o'clock.

16            COUNSEL:  Thank you, Your Honor.

17       (Recess taken at 2:32 p.m.)

18       (Proceedings resumed at 3:01 p.m.)

19            THE COURT:  I did want to ask debtors, you

20  referred to declarations today, but I don't believe that we

21  admitted them into evidence.

22            MS. STRICKLAND:  I believe they were all admitted

23  on the first day.

24            THE COURT:  Okay.  With respect to DIP financing?

25            MS. STRICKLAND:  Yes.

1          THE COURT:  Okay.  Terrific.  I just wanted to make

2    sure.

3          So based on the record before me I make the

4    following findings regarding the debtors' DIP financing:

5          Entering into the proposed DIP financing is an

6    exercise of the debtors' sound business judgment as supported

7    by the first day declaration and the Cesarz declarations at

8    Dockets 35 and 107.

9          The record establishes the absence of financing

10   and the use of cash collateral the debtors would be able to

11   operate as a going concern and preserve the business for the

12   benefit of creditors pending a sale.  Further, based on the

13   first day declaration and the DIP declarations, the proposed

14   DIP facility is, at best, presently available post-petition

15   financing option.

16         The terms of the DIP facility are the result of

17   extensive negotiation between the parties and are

18   significantly more favorable compared to the initial terms

19   that were brought forth in this case.  The Court is mindful

20   that the Sixth Street DIP facility saved the debtors' estate

21   approximately $60 million as compared to the ad hoc committee

22   facility that was initially proposed.

23         There are several points on which the Court heard

24   argument this afternoon and I am going to take them in the

25   order of the argument.

1          With respect to the waterfall the committee raised

2    the issue of how the proceeds of the DIP would be applied

3    including in a roll-up.  Here, the committee asserts the DIP

4    lender is proposing to roll-up unsecured deficiency claim

5    into a secured DIP loan.  The debtors assert that Sixth

6    Street is secured by the $30 million of cash.  Here, the

7    Court agrees with the debtors that Sixth Street has a

8    prepetition secured loan, this prepetition loan may be under-

9    secured, but that is not before the Court today.

10          What is before the Court is whether the $31

11   million in cash that the debtors had as of the petition date

12   is sufficient to roll-up $30 million of the DIP and once that

13   DIP is rolled up the prepetition debt will be reduced by the

14   $30 million.  This isn't a double charge, this is a reduction

15   of the prepetition debt that was, at least, secured as to the

16   $30 million as of the petition date due to the debtors' cash.

17          Sixth Street is adding new cash at a roll-up for

18   reduction in its prepetition debt to fund these cases and its

19   appropriate under the circumstances.  The DIP loan will be

20   secured in both FAP and Rubraca, but that is part and parcel

21   of running these cases to which will hopefully be a

22   successful sale.  As a result, the Court will allow the roll-

23   up in the final DIP order.

24          With respect to the 506(c) waiver, Section 506(c)

25   is the cost of maintaining and disposing of a collateral.

1  Here the DIP is being used for both FAP and Rubraca, and

2  various costs are already being allocated to each asset pool.

3  Here the cost of running these cases, including things like

4  attorney fees, will be somewhat difficult to allocate between

5  the asset pool and this is why the DIP loan is secured by

6  both asset silos.

7        Furthermore, Section 506(c) is the debtors to

8  waive. In this case the debtors have agreed to waive it.

9  Courts in this jurisdiction have waived Section 506(c) over

10  committee's objection including in front of Judge Sontchi in

11  the Exide Holdings case and I agree with Judge Sontchi's

12  analysis.  This part of a global package, a not unusual

13  global package at all for accommodation of new money from an

14  existing lender. I think they would be commercial

15  unreasonable if they were to lend under different terms.

16        The committee's ability to challenge the

17  prepetition liens as set forth in the revised proposed DIP

18  order is not being affected by the Section 506(c) waiver.  As

19  a result, I will approve a waiver of the 506(c) surcharge and

20  the other commercially reasonable waiver set forth in the

21  proposed order including marshaling and equities of the case.

22        With respect to the committee investigation

23  budget, the challenge budget, the Court can't force a lender

24  to lend and the Court isn't going to substitute its judgment

25  for the business judgment of the debtors, but hopefully in

1  your discussions regarding the budget the parties can come to

2  some agreement, but until such agreement is reached this

3  Court cannot enlarge the investigation budget.

4          With respect to Chapter 5 avoidance actions again,

5  the Court can't force the lender to give up its bargained for

6  collateral.  This is a heavily negotiated DIP and the lenders

7  bargained for the collateral package.

8          Finally, I understand the parties will continue to

9  work with respect to sufficient budget regarding the details

10  of the fees and expenses in the budget, and I encourage the

11  parties to reach an agreement with respect to that issue.

12          I think that covers all of the issues that are

13  before the Court today.  The parties, I ask that they -- I

14  know there are a few provisions within the DIP order that

15  need to be modified, if they work together and submit a clean

16  blackline under order of certification of counsel.

17          MS. STRICKLAND:  Will do, Your Honor.

18          THE COURT:  Thank you.

19          The next item is bid procedures?

20          MR. MORDKOFF:  Good afternoon, Your Honor.  Andrew

21  Mordkoff, Willkie Farr & Gallagher.

22          Yes, the final item on the agenda is bid

23  procedures.  I will try to speak to the presentation, Your

24  Honor, as I know there is limited time this afternoon.

25          The debtors filed their bidding procedures motion

1  within days of the petition date.  This was at Docket No. 33.

2  Currently the only objection pending is from the U.S. Trustee

3  with respect to the bid protections.

4          THE COURT:  Can I stop you there for a second, is

5  the committee is agreement with the proposed bid procedures

6  in the form of order?

7          MR. MARINUZZI:  Your Honor, for the record Leonard

8  Marinuzzi.

9          We are, Your Honor.  We reviewed the bidding

10  procedures.  We spoke to our investment banker.  They

11  consulted with the company's advisors.  We are okay with the

12  order the way it submitted, Your Honor.

13          THE COURT:  Okay.

14          MR. MARINUZZI:  Thank you.

15          THE COURT:  I knew you had filed a reservation of

16  rights and I just wanted to make sure there were no

17  outstanding issues.

18          My apologies for interrupting you.

19          MR. MORDKOFF:  Thank you, Your Honor.

20          The revised form of order that you mentioned was

21  filed with the Court last night at Docket No. 227.  This

22  incorporates comments from all of our stakeholders including

23  the committee, and the U.S. Trustee, and our other primary

24  stakeholders in this case.

25          In support of the motion the debtors filed earlier

 1  in the case the declaration of John Cesarz with Perella

 2  Weinberg Partners, debtors' financial advisor.  This was

 3  Docket No. 35 and this was previously entered into the record

 4  at the first day hearing.

 5          Last night the debtors also filed a supplemental

 6  declaration of Mr. Cesarz in further support of the bid

 7  procedures.  This was Docket No. 228.  We understand from

 8  discussions leading up to the hearing that none of the

 9  stakeholders intend to cross-examine Mr. Cesarz today.

10  Nevertheless, he is, for the record, in the Courtroom today

11  and is available for questioning.

12          At this time, we would ask to enter Docket No.

13  228, the supplemental declaration, in support of bid

14  procedures.

15          THE COURT:  Does anyone object to the admission of

16  the supplemental Cesarz declaration at Docket No. 228 for

17  admission into evidence?

18      (No verbal response)

19          THE COURT:  I hear no one.  Does anyone wish to

20  cross-examine the declarant regarding the contents of his

21  declaration?

22      (No verbal response)

23          THE COURT:  Okay, hearing no one the declaration

24  is admitted.

25          (Supplemental Cesarz declaration received into

1  evidence)

2          MR. MORDKOFF:  Thank you, Your Honor.

3          Just a few brief comments to the requested relief.

4  As set forth in our papers, we believe the procedures here

5  are customary and designed to yield the highest or,

6  otherwise, best price for the debtors' assets.  The requested

7  relief includes customary procedures governing the scheduling

8  of sale hearing, auction process, approval of various forms

9  of notice and the assignment of executory contracts and

10  unexpired leases.

11          The debtors are seeking to sell all of their

12  assets in this case either in an all-asset sale or through

13  separate sales.  You might have noticed in the revised form

14  of order originally the timelines for both Rubraca and FAP

15  were uniformed.  The timelines have been modified a bit, but

16  all the parties have signed off on those timelines.  They are

17  substantially similar.  They are about three weeks apart. The

18  parties are hoping to reach a sale hearing for both FAP and

19  Rubraca within approximately 100, 120 days after the petition

20  date.

21          We are also seeking authority today to enter into

22  the stalking horse purchase agreement with Novartis with

23  respect to the FAP assets and are seeking approval of the bid

24  protections, of course, which are subject to the U.S.

25  Trustees objection.

1       Before we turn to the objection, Your Honor, I was

2  hoping to turn to the revised form of order and just

3  highlight a few provisions for the Court.

4       THE COURT:  Certainly.

5       MR. MORDKOFF:  And I am looking -- what I have in

6  front of me is the revised form of order that was filed last

7  night Docket 227, and the redline was Exhibit 2.

8       THE COURT:  I have the redline.

9       MR. MORDKOFF:  Thank you.  Just two provisions I

10 would like to highlight, Your Honor.

11      Paragraph 7, this language dealt with the

12 additional -- the right to designate additional stalking

13 horse purchasers with respect to the other assets outside of

14 FAP.  This was actually one of the objections from the U.S.

15 Trustee.  We agreed to this form of language and this

16 resolves her objection on the third ground of her objection -

17 - of the U.S. Trustees objection.

18      I would note, Your Honor, that in preparing for

19 today I did notice that Your Honor in two of your cases, I

20 think it was Fast Radius and American Eagle has approved

21 similar constructs in those cases.  I do note that you

22 sometimes like to enter a mechanic to have an expeditious

23 hearing.

24      We have somewhat of a shortcut here.  We basically

25 say there is only a hearing if someone objects.  We are happy

1  to mold this to your precedent in the other two cases if you

2  prefer.

3          THE COURT:  Well, first of all, I appreciate this

4  because I will prospectively order bid protections.  I do

5  appreciate an expedited process.  I don't know, and you

6  probably don't as you stand here, how many possible

7  supplemental stalking horse agreements you might file, but I

8  think it provides an opportunity to have a hearing to meet

9  O'Brien standards if you need to and also it just expedites

10 matters.

11         I actually think that I have approved procedures

12 that are actually less then 10 days, but I want you to work

13 with Ms. Sierra-Fox on this because certainly I appreciate

14 the modification as you had made it. I was simply going to

15 suggest do you want to include a provision for a hearing.

16         MR. MORDKOFF:  Excellent. We will synch-up with

17 her after the hearing and include that in the revised form of

18 order.

19         The only other -- as you can see, Your Honor,

20 there were several changes; this was the biproduct of

21 extensive negotiations with all the stakeholders.  So, we did

22 reach consensus on the form of order.

23         The only other paragraph, Your Honor, is Paragraph

24 21 which sets -- we filled in the date of the sale hearings.

25 Of course, we would just need to make sure the Court is

1  available.  We are happy to circle back with Chambers after

2  this to make sure the Court is available. The dates we filled

3  in fit within the milestones set forth in our DIP credit

4  agreement and the stalking horse APA.  Again, they are pretty

5  far out.

6        THE COURT:  No.  I actually had a note, sale

7  hearing March 21st at 11 a.m., and the other sale hearings

8  April 10th at 1 p.m.  Does that work?

9        MR. MORDKOFF:  That works.  Thank you, Your Honor.

10 We will confirm with everyone, but I'm sure that works.

11       THE COURT:  If it doesn't just, please, reach out

12 to Mr. Lugano in my office and he will give you alternative

13 dates.

14       MR. MORDKOFF:  Will do, Your Honor.

15       Just to keep things moving, unless Your Honor had

16 any specific questions about the redline, the revised form of

17 order, I submit that we just turn to the one pending

18 objection.

19       THE COURT:  I would say, why don't we hear from

20 the objector.  I do have a few comments on the order, but I

21 would just as well move forward to hear the U.S. Trustees

22 objection.

23       MR. MORDKOFF:  Understood, Your Honor.  Thank you.

24       MS. SIERRA-FOX:  Good afternoon, Your Honor.  Rosa

25 Sierra-Fox on behalf of the United States Trustee.

1          THE COURT:  Good afternoon, Ms. Sierra-Fox.

2          MS. SIERRA-FOX:  Your Honor, I would like to star

3  by asking if you want me to walk through my objection and the

4  issues at hand or if you have any questions.  I mean we have

5  laid it out in the objection in written form, so if you have

6  any questions at the outset, I am happy to address them.

7          THE COURT:  Well, I have a question.  It goes to

8  your objection, but I am not sure you can answer it.  That

9  has to do with -- perhaps I missed this in reviewing things,

10 but when are milestone payments received and when are they

11 projected to be received, and who is the ultimate recipient

12 of the milestone agreements.  Is it the lender?  Is there an

13 assignment?  How does that work?

14         MR. MORDKOFF:  Andrew Mordkoff from Willkie Farr &

15 Gallagher, Your Honor.

16         The debtors -- so as set forth in the supplemental

17 declaration of Mr. Cesarz the company, when projecting the

18 bid protections, did use their best estimate of the timing

19 and the achievability of the milestones.  There is no set

20 date with respect to each of them.  The milestones will come

21 into the debtors' estate however.

22         THE COURT:  Okay.  So, they would, arguably,

23 trickle to the trust?

24         MR. MORDKOFF:  That is correct, Your Honor.  There

25 is a specific mechanic in the DIP credit agreement as well

1  where proceeds come in for the benefit of the DIP lender as

2  well.  Happy to elaborate on that, but in terms of your first

3  question there is no set date with respect to each of these.

4          THE COURT:  Okay.

5          MS. SIERRA-FOX:  Your Honor, your question, I

6  think, highlights what -- I guess the main issue with the bid

7  protections from the U.S. Trustees perspective.  Your Honor,

8  so bid protections, as you know and others know, are -- the

9  concept that they are approved as administrative expenses

10 under 503(b)(1) and the Seminole case on that point is

11 O'Brien from the Third Circuit.

12         So, a party seeking payment of costs of fees as an

13 administrative expense has the heavy burden of demonstrating

14 that the estate -- that the costs and fees for which it seeks

15 payments provided an actual benefit to the estate and that

16 such cost and expenses were necessary to preserve the value

17 of the assets; estate assets.

18         And in the context of bid protections and sales

19 what the case law says is we can evaluate that benefit to the

20 estate by looking at whether the assurance of a break-up fee

21 promotes competitive bidding and whether the availability of

22 a break-up fee induces a buyer to perform diligence and set a

23 floor price.

24         And I think in reading O'Brien its not, you know,

25 a very scientific sort of standard. I think you can also look

1  at the overall reasonableness of the fee at hand and what the

2  requesting party is asking to get paid.  And even if a

3  breakup fee would benefit the estate the Court is not

4  required to approve it and that comes from EFH I at 904 F.3d,

5  page 313.

6          So, Your Honor, the issue here is that the debtors

7  are proposing to pay the stalking horse bidder for the FAP

8  assets, a break-up at closing, assuming another transaction,

9  of $6 million plus the $2 million expense reimbursement.

10          THE COURT:  Up to.

11          MS. SIERRA-FOX:  Up to $2 million, that's right.

12  Your Honor, if we look at the way the sale is constructed and

13  the structure of the sale the only cash that the stalking

14  horse bidder is proposing to -- that is immediately

15  realizable to the estate under the stalking horse bidder's

16  bid is the $50 million up front cash payment.  So, if you

17  look at the breakup fee and the potential expense

18  reimbursement in the context of that breakup fee it's a very

19  high percentage.  I think in our papers we just -- we did

20  some very simple math and just aggregated the two fees and

21  that is about 16 percent of the $50 million. If you just look

22  at the breakup fee its about 12 percent of the $50 million.

23          We understand, now that the record has been

24  bolstered by the debtors on this issue, that there were

25  methodologies that they used to arrive at a different

1  percentage because they are also taking into consideration,

2  in one capacity or another, the sales milestones.  Your

3  Honor, but what is missing from the record, and maybe that

4  information just given the uncertainty of a drug that is in

5  development and the nature of this business, it can't be in

6  the record today is whether anything is -- the estate will

7  ever actually realize any value from those milestone

8  payments.

9          So, if you -- turning to Mr. Cesarz's declaration,

10  even excluding the sales milestones, under their methodology

11  they're still taking into consideration the regulatory

12  milestones and the development milestones; however, there are

13  not dates tied to that.  And more so than dates, Your Honor,

14  there are no -- other then, I think, the statement in the

15  Cesarz declaration is a reasonable probability that they will

16  be realized.  There is no assurances or any sort of

17  percentage range as to whether the likelihood of those

18  milestones being realized.

19          So the issue for the U.S. Trustee, Your Honor, is

20  why is the -- why would -- why are we -- why is the debtor

21  calculating bid protections on payments that may come in, in

22  cash -- payments that may come in, in two, three, four years

23  or maybe never, right.  And the point about how this can

24  chill competitive bidding is the following:

25          Your Honor, bidders have to, in order to top the

1  stalking horse bid, provide the $50 million, plus $8 million,

2  plus whatever the overbid increment is, and then I assume

3  they will also have to propose some milestone payments, Your

4  Honor.  Those bidders that want to enter into this process

5  have to pay cash or propose to pay cash today on the $8

6  million on an amount that has been calculated based on

7  percentage of milestone payments that are going to come in

8  tomorrow, best case scenario, or in two, five, 17 years, or

9  whatever the case might be, Your Honor.

10         So, the position that the U.S. Trustee is taking

11  today with respect to the bid protections is they should

12  really only be calculated on what the estate can immediately

13  realize.

14         THE COURT:  Let me just ask you, we have a

15  declaration in front of us that is uncontroverted, that says

16  transaction of biopharma sector involving early development

17  stage assets typically include an upfront payment coupled

18  with milestone payments.

19         Given that evidence, is it really chilling bidding

20  to parties who are in this space or is this what their used

21  to dealing with?  This is just the way the system works in

22  the biopharma industry.

23         MS. SIERRA-FOX:  Your Honor, that is a factual

24  question that we can't answer today.  Honestly, we might have

25  a better sense of that after the conclusion of the bidding or

1   the potential auction process on the FAP assets which also is

2   another opportunity for, depending on how that plays out, the

3   stalking horse bidder to ask for approval from this Court to

4   get those fees paid.

5           Your Honor, I actually don't think we can really

6   have the answer to that.  I -- we can accept -- you're right,

7   its uncontroverted that these transactions are common in this

8   space, but perhaps someone would be more willing to bid if

9   they only had to pay $2 million in breakup fees and then can

10  propose a billion dollars in sales milestones.  I mean, I

11  don't know.  I think that's the point, Your Honor, with

12  respect to the U.S. Trustees objection.

13          I think the second point of our objection, Your

14  Honor, is putting aside why these are reasonable and should

15  be granted under O'Brien what doesn't necessarily follow,

16  even if they are approved, Your Honor, is that there would be

17  grantor super-priority administrative expense status.  The

18  basis that we see in the code for granting such a status

19  would be Section 364(c)(1), but that makes clear that if the

20  estate is unable to obtain unsecured credit allowable under

21  503(b)(1) then certain things -- potential for granting that

22  super-priority administrative expense follows, Your Honor.

23          I don't think the bidding or submitting a bid for

24  the debtors' assets triggers that part of 364(c)(1), Your

25  Honor, because if it did then any trade creditor doing

1  business with the debtor that wanted to strongarm the debtor

2  in bankruptcy could say, sure, I will do this if you grant my

3  payment or whatever super-priority administrative expense

4  status, Your Honor.

5          I think it matters in this case especially

6  because, as I understand it, the debtors did not cease

7  operations at the petition date such that they're not

8  incurring further administrative expenses anymore.  They are

9  actually -- other then the professionals in the case there

10 are administrative expenses that are being incurred each and

11 every day in this case.

12         The grant of super-priority status to the bid

13 protections would top all of those administrative creditors

14 that are continuing to do business with the debtor, providing

15 services, working at the -- whatever the case may be, Your

16 Honor.

17         THE COURT:  Well, in an instance here where we

18 have a debtor whose represented that they need to proceed

19 with a sale process, right.  And we have a declaration that

20 says the breakup fee was necessary to induce the bidder's

21 commitment.  Isn't that sufficient to satisfy the second

22 prong in terms of 503(b)(1)?

23         MS. SIERRA-FOX:  That it brought value to the

24 estate?  Your Honor, I don't think that is -- it can't be

25 sufficient. It has to depend on the facts and I think in this

1 case it might have induced the buyer -- the stalking horse to

2 enter into the bid, but I don't believe that is the end of

3 the inquiry.  I don't think --

4          THE COURT:  Well, I would say to you what evidence

5 do you think I need above what is before the Court today?

6          MS. SIERRA-FOX:  Your Honor, I think our position

7 today is that -- and I have discussed this with the debtor,

8 just as a side note the debtor has really tried to resolve

9 our objections.  So I think this is an issue that we really

10 wanted Your Honor to decide based on the arguments that are

11 presented on both sides given, I think, the unique nature of

12 the sale transaction.

13          Your Honor, I think that the evidence that we

14 think would be proper for today for you to approve fees that

15 are over 10 percent of the upfront price today --

16          THE COURT:  But does O'Brien limit to the upfront

17 price of does O'Brien say the sales price?  And here the

18 sales price is over $600 million.  That is what I'm being

19 asked to approve, an asset purchase agreement that is $600

20 million, not $50.

21          MS. SIERRA-FOX:  Your Honor, that is true and

22 that's and that is the way the sale transaction has been

23 structured, but they can call it the sales prices and that is

24 what the defined term is, I assume, in the stalking horse

25 agreement, Your Honor.  But the truth of the matter is that

1  that $630 million in payments the estate might never realize

2  any value on that.

3          That is the U.S. Trustees point is why calculate

4  and approve bid protections today on milestone payments that,

5  quite frankly, there is no evidence before you that are

6  certain to produce value.  That is our point.

7          I think we spoke about the -- I don't know if you

8  have any questions about the other part of the objection, but

9  with that, Your Honor --

10          THE COURT:  No.  Thank you very much. I appreciate

11  it.

12          MR. MORDKOFF:  Thank you, Your Honor.  Andrew

13  Mordkoff, Willkie Farr & Gallagher, on behalf of the debtors.

14          We do -- we read O'Brien and its progeny as tying

15  the bid protections to the purchase price and the purchase

16  price here is the full $680 million.  And I would note that

17  in the methodologies that Perella ran they didn't -- they ran

18  it off of the $680, but they also ran other methodologies

19  that were significantly more conservative to show that it

20  wasn't completely aspirational.  You saw all the discounting

21  they did and even in one scenario left out all the sale

22  milestones, and in every single one of the methodologies it

23  fell within the range of -- the percentage range that are

24  routinely approved in this district with respect to bid

25  protections.

1        I'm happy to address the super-priority point,

2   Your Honor.  We addressed that in our reply as well.  I --

3   the debtors don't share the same view on 364(c)(1).  We

4   believe Courts in this district, including Exide, Lucky

5   Brand, Things Remembered, have approved super-priority status

6   with respect to bid protections.  Courts typically go through

7   a very technical analysis ticking through the definitions

8   which we laid out in our reply.

9        I think -- I also go back to the point that you

10  made, Your Honor, which is, I think, the primary driver here

11  is that this was required by our stalking horse bidder to

12  enter into the deal.  This is already in Mr. Cesarz's

13  supplemental declaration, but part of the backdrop here was

14  that this deal was originally supposed to be implemented out

15  of Court.

16       The parties were negotiating the sale transaction

17  out of Court and at the eleventh hour, when it became clear

18  that the debtors needed to implement the sale through a

19  bankruptcy case the parties quickly switched to a 363 model

20  and in order to get comfortable with that Novartis wanted

21  every single protection possible in order to get comfortable

22  on a quick timeline. One of that was bolting in bid

23  protections and one of them was bolting in the super-priority

24  status.

25       I would also note, and we do mention this in the

1   Cesarz declaration as well, they had originally asked to have

2   a carve-out from the DIP.  They wanted the bid protections,

3   essentially, to have a super-priority claim over the DIP

4   itself. The debtors rejected that because we knew that would

5   chill the marketing process with respect to the DIP and the

6   compromise where we landed.  We thought it was a fair

7   compromise under the circumstances was the agreeing to

8   Paragraph 7 in the bidding procedures order with respect to

9   the super-priority status.

10           Unless you have any other questions for me, Your

11   Honor, I rest on the papers.

12           THE COURT:  Are you aware of any other cases that

13   have approved a breakup fee in this scenario of initial

14   payment followed by milestones?

15           MR. MORDKOFF:  We are not, Your Honor.

16           THE COURT:  This is more of a question about the

17   agreement itself. I will say that Section, I think its 10,

18   that deals with termination and a breakup it's a dead section

19   and it requires a lot of referencing back and forth to other

20   sections of the document.

21           One of the questions I have is the payment to the

22   stalking horse, if this is approved, is that payment -- when

23   is that payable, when the alternative transaction closes?

24           MR. MORDKOFF:  I think that is not the only

25   trigger as you can see from 6.06.

1          THE COURT:  Okay.  That is what I am trying to

2   understand.

3          MR. MORDKOFF:  Correct.  So that is definitely one

4   of the triggers is consummation of alternative transaction.

5   There are other triggers as well where the breakup fee and

6   the expense reimbursement would be triggered as well.  And I

7   guess I would just add two points to that.

8          One is --

9          THE COURT:  I want to make sure I understand

10  those, what are those other triggers.

11         MR. MORDKOFF:  Of course.  Happy to tick through

12  them if it would be helpful, Your Honor.

13         THE COURT:  Pardon?

14         MR. MORDKOFF:  I'm happy to tick through each of

15  them.

16         THE COURT:  Yes. Do you mind?

17         MR. MORDKOFF:  So, the first one is -- we're

18  talking about just breakup fee, not expense reimbursement,

19  correct?

20         THE COURT:  Yes.

21         MR. MORDKOFF:  So the first one would be the

22  cross-reference 10.01(b)(1) this is where Applicable Law

23  would prohibit the transaction, but its limited, Your Honor,

24  only in instances where the termination event, the triggering

25  event is the result of the debtor's action, or inaction, or

1  failing to oppose an action by a third party.

2         The next one -- if it's all right I will just tick

3  through them, Your Honor. I think there is five or six of

4  them.

5         The other one is 10.01(b)(iii) which is where the

6  case is dismissed or converted to a Chapter 7, or a trustee

7  is appointed.  Once again, that would trigger a break-up fee,

8  but only if Clovis affirmatively sought to convert the case

9  to a Chapter 7 or sought to dismiss the case.

10         I am happy to continue to go through them, but if

11  I could just take a step back --

12         THE COURT:  Well, I guess -- go ahead, take your

13  step back.

14         MR. MORDKOFF:  If I take a step back, when we were

15  negotiating these, and you can tell from all the cross-

16  references that it is very dense, we probably spent three

17  weeks just on this one provision going back and forth.  This

18  was probably the most heavily negotiated provision in the

19  entire agreement.

20         Again, going back to my comment from a few minutes

21  ago the Novartis was really looking for as many protections

22  as they could get in order to become the stalking horse.

23  What we tried to do here is limit the breakup fee to

24  situations either (A) where an alternative transaction was

25  closed, or (B) other instances where things were in the

1    control of the debtor and the debtor, essentially -- a bad

2    act isn't the right word, but it was instances where it was -

3    -

4         THE COURT:  Act or inaction.

5         MR. MORDKOFF:  Correct, Your Honor.  It was within

6    the debtor's control.  So, for example, one of them is

7    milestones which I know you discussed -- you had colloquy

8    with debtor's counsel in, I think, the Alpha Latam case.  So,

9    we are familiar with the issue, Your Honor.

10         In that case, though, I think the concern that you

11   had expressed on the record was, you know, an inadvertent

12   footfall might trigger a breakup fee.  Here, this is

13   10.01(h).  Again, these are only milestones -- so if the

14   Court hear at the DIP hearing on time and we missed the DIP

15   milestone hearing -- the final DIP hearing milestone by one

16   today that wouldn't trigger a breakup fee.

17         Here, the language is clear that a breach of a

18   milestone would trigger a breakup fee, but only if the

19   termination is a result of Clovis's action, or inaction, or

20   failure to oppose a third-party motion.  So, again, the idea

21   was to try to cabinet as much as possible while getting

22   Novartis as comfortable as possible in order to secure the

23   stalking horse bid which, essentially, is the backbone of

24   this entire case as of right now.

25         I would note, Your Honor, and I know sometimes

1 Courts don't like to site to other cases without the full --

2 we didn't brief this issue because no one objected to it, but

3 this similar break-up -- we did see similar breakup fee

4 triggers in other cases; I believe -- I have it written down,

5 excuse me, Scottish Holdings and Dendreon, both of those

6 cases did provide for breakup fees in instances where a

7 debtor breached a covenant or a rep in warranty. So, I just

8 wanted to provide that color as well.

9          Happy to answer any other questions. I'm also

10 happy to cede the podium to see if Novartis's counsel would

11 like to add any additional color that might be helpful for

12 Your Honor.

13          THE COURT:  Does anyone else wish to be heard?

14          MR. MINTZ:  Good afternoon, Your Honor.  Benjamin

15 Mintz from Arnold & Porter on behalf of Novartis

16          THE COURT:  Good afternoon.

17          MR. MINTZ:  Your Honor, I am happy to answer any

18 questions you may have.

19          With respect to the discussion about the breakup

20 fee and the circumstances under which its payable that is

21 serving, in effect, as our damages for breach. If there is a

22 breach of the agreement, as a practical matter, that -- if

23 you look at the termination provision that is our sole remedy

24 that we have in the event that the debtor missteps or,

25 otherwise, violates the agreement.

1          That is why this provision is very heavily

2     negotiated and dense, but, I think, as you parse through it

3     its very clear that outside of an alternative transaction the

4     circumstances under which its payable are using loosely the

5     term "a bad act" by Clovis to the extent that they have done

6     something that they have agreed not to do and it is within

7     their control not to take those actions.  We think its

8     appropriate for us to have a remedy in that situation if they

9     do violate the agreement in that way.

10          THE COURT:  Okay.  Thank you.

11          MR. MINTZ:  Thank you, Your Honor.

12          THE COURT:  Does anyone else wish to be heard with

13     respect to the motion?

14      (No verbal response)

15          THE COURT:  Okay.

16          MR. MORDKOFF:  Andrew Mordkoff on behalf of the

17     debtors.  Sorry for the whispering, Your Honor.

18          Just unrelated to the questioning you were just

19     mentioning, but there have been a couple milestones -- if you

20     are actually going through the milestones we have actually

21     passed one of them already.  The debtors and Novartis have

22     already agreed to an amendment.  We have an email

23     confirmation.  We are papering that amendment as we speak.

24          There are also a couple other obligations buried

25     in the APA as well including finalizing a TSA, for example,

1  by today's date.  Those negotiations are still ongoing.  So,

2  the parties are finalizing an amendment. I just wanted to let

3  the Court know.

4            THE COURT:  Okay. Thank you.

5            MR. MORDKOFF:  Thank you.

6            THE COURT:  Does anyone else wish to be heard?

7       (No verbal response)

8            THE COURT:  I am prepared to enter the revised bid

9  procedures order with some modification.  Based on the

10 evidence presented I am satisfied the debtors have

11 demonstrated a compelling and sound business justification

12 for entering of the proposed order.  Significantly, I will

13 note that the committee does not oppose this relief.

14            Also, I believe that the timeline that has been

15 laid out in the motion and the proposed order, given the

16 lead-up to today and the process expected to go forward from

17 today to the sale hearing, is sufficient and appropriate to

18 implement a sale and marketing process that will be designed

19 to maximize value and hopefully lead to a robust, active, and

20 competitive auction.

21            Based on the supplemental declaration of John

22 Cesarz -- I apologize if I am not pronouncing your name

23 correctly.  Based on that declaration at Docket 228, which is

24 uncontroverted, the FAP bid protections were the product of

25 good faith arm's length negotiation among the parties, a

1  critical component of the FAP stalking horse bidder's

2  commitment and an integral part of the stalking APA, and

3  necessary to induce the stalking horse bidder to purchase the

4  FAP therapeutic assets.  Mr. Cesarz has stated that he

5  believes the FAP stalking horse bidder would not have entered

6  into the APA without receiving a benefit of the bid

7  protections.

8         With respect to the proposed breakup bidding,

9  admittedly, this is a very unique issue.  I have not seen

10  this issue and I have thought long and hard about what is

11  being proposed here and what implications it has.

12         Mr. Cesarz indicates that transactions in the

13  biopharma sector involving early development stage asset

14  sales typically include an upfront payment, coupled with

15  certain milestone payments, and that transaction values in

16  this space are typically calculated by combining the

17  aggregate amount of the payments received.

18         The structure of the milestone events here is

19  consistent with market terms given the developmental nature

20  of the FAP therapeutic assets and the size and complexity of

21  this transaction.  The FAP stalking horse bidder has expended

22  and will continue to expend time and resources negotiating,

23  drafting, and performing due diligence activities

24  necessitated by the sale.

25         Here, I am being asked to approve a breakup fee of

1   $6 million on a proposed $680 million transaction; not a $50

2   million transaction.  Everyone is aware of the potential

3   execution risk and based on, simply stated, the math that is

4   set forth in the Cesarz declaration I find that the FAP

5   breakup fee, based on present value of either the aggregate

6   purchase price or the adjusted purchase price, is within the

7   range of reasonable breakup fees in this jurisdiction.

8           Further, the breakup fee and the expense

9   reimbursement, I believe, satisfy the O'Brien standard.  So

10  based on the facts as presented -- and I will admit, these

11  are very unique facts, very specific to this case, and as

12  supported by the declaration that the stalking horse bidder

13  is entitled to super-priority administrative expense claim

14  for the bid procedures.  So, I will enter the order with a

15  couple of modifications.

16          With respect to Paragraph 4 of the proposed order

17  it addresses material modifications and indicates that the

18  debtors can file a notice with the Court.  There should be a

19  corresponding deadline to object to any notice filed with the

20  Court; five days objection if no objection -- does that -- is

21  that sufficient time?  I don't believe -- you have a pretty

22  long runway for your sale process here, which is a great

23  thing, so I would think five days is reasonable.

24          I would like to hear from the parties who are in

25  the room.

1           MR. MORDKOFF:  Your Honor, that is acceptable to

2  the debtors.

3           MS. STRICKLAND:  Your Honor, is that five calendar

4  days?

5           THE COURT:  Okay.  Five calendar days.  And I

6  confirm the hearing date March 21st at 11 a.m., and the other

7  sale is April 10th at 1 p.m.  I believe those are the only

8  comments I had.  So, if you could file a clean and blackline

9  order under certification of counsel, we will get that

10 entered.

11          Unfortunately, we have other commitments today so

12 I don't know if you need these orders today?

13          MS. STRICKLAND:  We have a milestone for the DIP

14 so we're going to endeavor to get the revised form of order

15 to you and, otherwise, on the record, I am going to press our

16 DIP lender to say yes to extend our milestone, and Novartis

17 if they have got one as well, to Monday.

18          UNIDENTIFIED SPEAKER:  Our milestone is the 25th

19 so you're good with us.

20          MS. STRICKLAND:  Excellent.  And our DIP lender.

21 Monday sounds great, right?

22          MR. SAFERSTEIN:  Monday is fine.  Thank you, Your

23 Honor.

24          THE COURT:  Thank you.  And I would encourage the

25 parties to keep working together as you proceed through the

 1 │ case.  Good things come when people work together, right?

 2 │           Is there anything further for today?

 3 │           MS. STRICKLAND:  Your Honor, one housekeeping

 4 │ thing just to apprise the Court of.  We have a hearing in

 5 │ February that we may not need.  Is it the -- I'm sorry,

 6 │ January 26th that we may not need.  We have one matter and

 7 │ we're optimistic that it will be uncontested.  So just wanted

 8 │ to flag that for you that you may have that time back.

 9 │           THE COURT:  Thank you.

10 │           MS. STRICKLAND:  Thank you.

11 │           THE COURT:  I am reminded that I had motion for

12 │ leave to file replies.  I will enter that order.

13 │           MS. STRICKLAND:  Thank you, Your Honor.

14 │           THE COURT:  I believe that is all.  So, thank you

15 │ all very much. I do appreciate the presentations today.  They

16 │ were very helpful and I appreciate you all appearing in

17 │ person.  Have a great weekend.

18 │           We stand adjourned.

19 │       (Proceedings concluded at 3:49 p.m.)

20 │

21 │

22 │

23 │

24 │

25 │

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.


/s/ William J. Garling                    January 21, 2023

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Tracey J. Williams                    January 21, 2023

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable


/s/ Mary Zajaczkowski                      January 21, 2023

Mary Zajaczkowski, CET-531

Certified Court Transcriptionist

For Reliable