# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CLOVIS ONCOLOGY, INC., et al.,[1] | Case No. 22-11292 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 715** |

## DECLARATION OF ROBERT WAGSTAFF IN SUPPORT OF OBJECTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF CLOVIS ONCOLOGY, INC. TO THE DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER DISBANDING THE OFFICIAL COMMITTEE OF EQUITY HOLDERS

### I.   INTRODUCTION AND SCOPE

I, Robert Wagstaff, under penalty of perjury, declare as follows:

1. I submit this declaration (this "Declaration") in support of the *Objection of the Official Committee of Equity Security Holders of Clovis Oncology, Inc. to the Debtors' Emergency Motion for Entry of an Order Disbanding the Official Committee of Equity Holders* [D.I. 715] (the "Objection") filed by the Official Committee of Equity Security Holders of Clovis Oncology, Inc. (the "Equity Committee"). Specifically, I have been asked to provide an opinion as to whether or not the Debtors appear to be hopelessly insolvent.

2. I am a Managing Director at Riveron in the Restructuring & Turnaround Services ("RTS") division. In this role I have led and executed engagements in every major country in the Americas, including sourcing and valuing transactions, managing restructuring and due diligence engagements, and managing post-acquisition integrations.

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of their U.S. federal tax identification number, to the extent applicable, are Clovis Oncology, Inc. (5355), Clovis Oncology UK Limited, and Clovis Oncology Ireland Limited. The Debtors' headquarters is located at 5500 Flatiron Parkway, Suite 100, Boulder, CO 80301.

3. Prior to joining Riveron, I held managing director positions in the corporate finance groups at FTI Consulting ("FTI"), Frontera Capital Advisors ("Frontera"), and Berkeley Research Group ("BRG").  In general, my responsibilities at these firms included managing a team of professionals that provided consulting services to both debtors and creditors in a wide array of industries and in a variety of situations.  For example, while at FTI, I led a team of professionals that was responsible for restructuring Chrysler Financial Mexico's balance sheet during the Great Recession from 2007 to 2009. I also worked on several other complex cross-border insolvency matters during that time. While at Frontera, I led a long term multi-jurisdictional advisory engagement responsible for managing the operating cash flow and ultimate liquidation of a group of assets located throughout the Americas.  My primary goal in this assignment was to maximize recoveries for a group of investors that fell victim to a multi-million-dollar Ponzi scheme.  In my role at BRG, I routinely managed engagements representing the interests of investors in acquisitions of companies in North and South America.

4. I also served as Chief Financial Officer for a biotechnology company developing a pipeline of preclinical stage therapeutic candidates. In this role I oversaw all financing accounting and reporting functions, led fund-raising activities, and collaborated with business development on licensing discussions with strategic partners.

5. At Riveron, one of my most notable recent assignments was in an advisory role to the Official Unsecured Creditors' Committee in the LATAM Airlines Group S.A., et al bankruptcy matter. My role in this matter included providing advice on DIP and exit financing structures, reviewing business plans and cash flow forecast, and challenging claims assertions and stipulations entered into by the Debtors. I also served as an expert witness for an objection filed by the Committee related to a settlement agreement between the Debtors and an unsecured class of bondholders.

6. Other recent engagements include advising the Official Unsecured Creditors' Committee in the 1 Global Chapter 11 case, acting as Chief Restructuring Officer and implementing a pre-packaged Chapter 11 plan in the GC Services matter, and advising the court-appointed

liquidator and serving as the foreign representative in the ancillary Chapter 15 petition in the Credito Real case.

7. In addition, I have also worked in an advisory capacity to the Central Government of Puerto Rico and certain public corporations whereby I have assisted it in the restructuring of $120 billion in funded debt and unfunded pension obligations.

8. Before taking on the foregoing consulting roles, I held various senior level positions in finance and operations at Sitel Group ("Sitel"), an international publicly traded company that specialized in call center and related services. I initially served as Sitel's Executive Director of Mergers and Acquisitions and completed multiple acquisitions as well as the formation of a joint venture during my tenure in this position. Subsequently, I became Sitel's Chief Financial Officer and was responsible for, among other things, all external and internal financial reporting for Latin America. Finally, I was appointed as the Chief Executive Officer of the Mexico and Central America divisions while the company was in a financially distressed situation and was successful in returning operations to profitability.

## II. DISCLOSURES

9. Attached at **Exhibit A** is my Curriculum Vitae, listing of testifying experience, and listing of speaking engagements and publications I authored during the last ten years.

10. Riveron is being compensated as a professional retained by the Equity Committee at its usual and customary billing rates for all work performed in connection with this matter, based on actual hours worked and any out-of-pocket expenses. These rates range from $500-$970 per hour for Riveron staff on this case, and $775 per hour for my time.

11. No one from Riveron that has worked on this engagement has any known financial interest in either the Debtors, other interested parties, or the outcome of this matter. Further, Riveron's compensation is neither based nor contingent on the results of the analysis or outcome of this matter.

12. The preparation of my report included the review and analysis of certain documents publicly available on the case docket and research of publicly available information as cited throughout my report.

13. The procedures performed in connection with this engagement were either performed by me or by employees of Riveron under my supervision, direction, and control.

14. The opinions set forth below are as of the date of this report and are for the exclusive use of my client and the Court for the sole and specific purposes as noted herein. They are not intended to be used for any other purpose.

15. My opinions in this matter are based on my experience and information reviewed as of the date of this report. However, our procedures are ongoing, and I understand there is additional discovery being conducted that could impact my opinions. Therefore, I reserve the right to revise my opinions based on my review of additional information.

### III.   SUMMARY OF OPINIONS

16. As will be more fully discussed below, in my opinion, the Debtors are not hopelessly insolvent as there are scenarios that may result in a recovery for equity holders.

### IV.   OVERVIEW OF THE DEBTORS' ASSETS

17. The Debtors have a number of assets that, when considered on an aggregate basis, total at least approximately $901.9 million. Below is a list of the primary assets.

   i. *Cash*: The Debtors reported a cash balance as of March 31, 2023, of approximately $69 million.[2]

---

[2] Doc 663, page for 14 - Monthly Operating Report docket, Actual cash available for recovery could change based on the Debtors' actual cash flows after March 31, 2023. Insufficient information is available to assess the magnitude of the potential change.

    ii. ***FAP-2286 ("FAP")***: On March 21, 2023, the Court entered an Order approving the sale of clinical candidate FAP-2286 to Novartis.[3] The sale transaction contemplates an upfront payment of $50 million and total milestone payments of $630.8 million.[4]

    iii. ***Rubraca***: On April 12, 2023, the Court entered an Order approving the sale of Clovis' marketed drug Rubraca to pharma& Schweiz GmbH. The sale transaction contemplates an upfront payment of $70 million (net of contract cure costs) and total milestone payments of $65 million.[5]

    iv. ***Other assets***: The Debtors' most recent Monthly Operating Report lists other assets that could represent recoveries for the estate:
        a. Prepayments and Deposits - $14.4 million
        b. Other current assets - $2.7 million

18. In addition to the foregoing, the Debtors have other assets that could provide avenues of recovery. Below is a list of these other potential avenues of recovery.

    i. ***Lucitanib:***
        a. According to the declaration of the Official Equity Committee's medical expert, Dr. David Savello (the "Savello Declaration"), Lucitanib is in Phase 2 of clinical trials for gynecological cancers.

        b. At the Annual Meeting on Women's Cancer in March 2022, a collection of international medical professionals presented the results of a Phase I/II trial of the Debtors' drug candidate Lucitanib in combination with the oncology drug OPDIVO.[6] The conclusions presented included that the clinical trial demonstrated "encouraging" therapeutic results and "manageable" adverse safety events.[7]

---

[3] Doc 502.
[4] Doc 493-1, pages 66-69.
[5] Doc 582-1, page 26-27.
[6] Presentation at the *Annual Meeting on Women's Cancer – Building Bridges//Breaking Barriers, March 19-22, 2022.*
[7] Ibid, page 10.

    c.   These results suggest a promising development path for Lucitanib, as confirmed in the Savello Declaration.[8]

    d.   The worldwide market for TKI inhibitor oncology drugs was valued at $18 billion[9] in 2017, indicating a viable addressable market for drug candidates such as Lucitanib.

    e.   Additionally, there have been numerous licensing deals for TKI inhibitors, most recently on January 23, 2023, when Takeda Pharmaceutical Company Limited announced the licensing of ex-China rights to Fruquintinib, a molecule with the same mechanism of action as Lucitanib.[10] The drug has been approved in China since 2018, and Takeda will seek approval to commercialize it in the U.S, Europe, and Japan. Takeda paid Fruquintinib's developer HUTCHMED $400 million up front plus up to $730 million in milestones and royalties on net sales.[11]

    f.   While I have not had enough time perform a full analysis that would ascribe a value to Lucitanib as of the date of this declaration, it is clear that there is an active market for similar drugs and therefore Lucitanib may represent a valuable asset to the estate.

ii.   *Intercompany loans receivable:* the Debtors' March 2023 balance sheet lists $34 million of intercompany loans receivable. Based on information available to me, at least of portion of these loans were made to non-debtor affiliates[12] and that these affiliates appear to be solvent[13], implying potential recovery for the Debtors' estate.

iii.   *D&O Insurance Policy:* $50 million.[14]

---

[8] Declaration of Dr. Savello, refer to paragraph 53 on page 19.
[9] Transparency Market Research report entitled *Tyrosine Kinase Inhibitor Market*.
[10] Declaration of Dr. Savello, refer to paragraph 52 on page 18-19.
[11] Takeda press release dated January 23, 2023.
[12] Doc 277, page 66.
[13] Doc 316-1, Exhibit A-1-BS
[14] Doc 674-2, page 4.

    iv. ***Value of Debtors' NOLs***: I understand that the Debtors have approximately $1.8 billion in net operating losses[15] that could be utilized to create additional value to the estate. Assessing the potential for recoveries from these tax losses requires further analysis.

19. In summary, there are known assets available to the estate totaling more than $900 million in the aggregate before considering any additional value that may be realized from other avenues of recovery.

## V. OVERVIEW OF THE DEBTORS' LIABILITIES

20. According to the declaration of the Debtors' financial advisor, Randall Eisenberg (the "Eisenberg Declaration"), the Debtors have approximately $720 million of total secured and unsecured claims.[16] This amount is based on Eisenberg's apparent assumption that the Creditors' Committee is not successful in its challenge to treat approximately $175 million of capital advanced by Sixth Street as equity rather than secured debt.

21. In addition, there is approximately $490 million in unsecured claims. While we have not performed any reconciliation of these claims, in my experience, the claims validation process typically results in a reduction to the initial claimed amount for claims that may be duplicative, stipulated, or objectionable (i.e., made by insiders).

## VI. CONCLUSION

22. As outlined above, there is currently in excess of $900 million worth of aggregate known assets that may be available to the estate. The bulk of this amount is dependent upon FAP reaching the milestones outlined in the asset purchase agreement, which I understand from the Savello Declaration, are achievable from a regulatory approval perspective.

---

[15] Doc 277, page 10.
[16] Refer to paragraph 9 of Doc 675, entitled Declaration of Randall S. Eisenberg in Support of Debtors' Emergency Motion for Entry of an Order Disbanding the Official Committee of Equity Holders.

23. With respect to achieving the FAP sales milestones, Novartis has demonstrated significant market success with a similar drug to FAP known as Pluvicto. According to the Savello Declaration, Pluvicto is focused on treating certain prostate cancers, whereas FAP is applicable to multiple types of cancer (e.g., pancreatic ductal carcinoma, breast, lung, sarcoma).[17] Indeed, according to a recent press release, "Novartis aims to have an at least 250,000-dose annual capacity for Pluvicto" which translates into approximately $8 billion of revenue.[18] Given the foregoing Pluvicto sales forecast, and the wider application of FAP as compared to Pluvicto, in my opinion, the sales milestones in the FAP asset purchase agreement could be achievable.

24. Moreover, there are a number of other avenues that may generate additional recoveries to the estate, which, when taken as a whole, could represent material improvements to the Debtors' financial position.

25. Finally, in the event that the Creditors' Committee is successful in its challenge to treat approximately $175 million of capital advanced by Sixth Street as equity rather than secured debt, the Debtors' assumed claims pool of $720 million would be reduced to approximately $545 million.

26. Based on the foregoing, in my opinion, the Debtors are not hopelessly insolvent and equity holders could receive meaningful distributions depending upon the ultimate outcome of the items discussed above.

---

[17] Declaration of Dr. Savello, refer to paragraph 24 on page 9.
[18] Pluvicto Halted as New Patients Start Amid Supply Struggle | Fierce Pharma – February 28, 2023.

\* \* \* \* \*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

                                                      Respectfully Submitted,

                                                     /s/ Robert Wagstaff
                                                   _____
                                                   Managing Director
                                                   Riveron

Date: May 23, 2023

Exhibit

# EXHIBIT A

# ROBERT WAGSTAFF *Managing Director*

Mr. Wagstaff's 33-year career includes 22+ years of experience in the restructuring, transaction, and assurance advisory space, during which time he has led and executed complex restructuring and transaction advisory engagements in every major country in the Americas. His technical expertise includes financial restructurings and divestitures, turnarounds, buy-side and sell-side financial due diligence, merger integration, and business viability evaluations.

Prior to joining Riveron, Mr. Wagstaff held Managing Director positions in the corporate finance groups at FTI Consulting, Frontera Capital Advisors and Berkeley Research Group. He also has held senior financial and operational positions at an international publicly-traded company, including Executive Director of M&A, Chief Financial Officer - Latin America, and CEO – Mexico and Central America.

## Education/Certifications

- Post Graduate Studies in Finance – *McGill University*
- Bachelor of Science – Major in Accounting  *Concordia University*

## Recent Speaking Engagements and Publications

- Cross-Border Insolvencies and Reorganizations – North American Chilean Chamber of Commerce
- Public Private Partnerships: Balancing the Burden – 4th Latin America Project & Infrastructure Finance Summit
- Effects of the Pandemic on the Retail Sector in Latin America - Debtwire Latin American Webinar Series Retail in Latin America
- How Did the Pandemic Impact How Deals get Done - Midmarket Deal Maker's Symposium
- American Bankruptcy Institute Journal – "Navigating Mexican Banking Realm Opens Up Avenues to Capital"

# ROBERT WAGSTAFF *Managing Director*

**Prior Experience**

- Advisor to the Official Unsecured Committee of Unsecured Creditors In re: LATAM Airlines Group S.A., et al.
- Advisor to the central government of Puerto Rico in the restructuring of $120 billion in funded and pension obligations
- CRO for a call center company that successfully restructured $200m in debt through a pre-packaged Chapter 11 filing
- Financial Advisor to the Official Unsecured Creditors Committee Chapter 11 case involving a merchant cash advance company
- Advisor to the University of Puerto Rico in the restructuring of $2.4 billion in funded and pension obligations
- Advisor to the derivative lenders in the restructuring of $3 billion in debt of a large retail chain in Mexico of
- Advisor to the financial sponsor in the financial restructuring of Chrysler Financial de Mexico
- Advisor to the Latin American entities involved in the Exxon-Mobile merger
- Advisor to a publicly traded company in their acquisition of a portfolio of Brazilian telecommunication assets
- Advisor to the Puerto Rico Highways and Transportation Authority in the restructuring of $4.2 billion in debt
- Advisor to the derivative lenders in the restructuring of $700 million of debt of a largest food producer and distributor in Mexico
- Advisors to a publicly-traded REIT in assessing monetization strategies for their Latin America portfolio
- Advisor to the developer of solar generating assets in Mexico
- Advisor to a global publicly-traded construction company on their entry into the Mexican market
- Advisor to a Fortune 50 company in their assessment of an investment in the Venezuelan aluminum sector
- Advisor to a Central American plastics manufacturer in a distressed sale
- Advisor to the financial sponsor of a distressed agricultural company in Peru

RIVERON | 3

# ROBERT WAGSTAFF *Managing Director*

**Testifying Experience**

- In re: LATAM Airlines Group S.A., et al., United States Bankruptcy Court, Southern Division of New York, Case No. 20-11254-JLG, as advisor to the Official Committee of Unsecured Creditors, deposition testimony, May 2022.